Matthew N. Newman (AK Bar No. 1305023)
Wesley James Furlong (AK Bar No. 1611108)
Megan R. Condon (AK Bar No. 1810096)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Phone:  907-276-0680
mnewman@narf.org
wfurlong@narf.org
mcondon@narf.org

*Lead Counsel for Plaintiffs Native Village of Venetie*
*Tribal Government, Arctic Village Council, and*
*Venetie Village Council*

Teresa B. Clemmer (AK Bar No. 0111059)
Peter H. Van Tuyn (AK Bar No. 8911086)
Karen E. Schmidt (AK Bar No. 1211113)
BESSENYEY & VAN TUYN, LLC
310 K Street, Suite 200
Anchorage, AK 99501
Phone:  907-278-2000
teresa@bvt-law.com
peter@bvt-law.com
karen@bvt-law.com

*Co-Counsel for Plaintiffs Native Village of Venetie*
*Tribal Government, Arctic Village Council, and*
*Venetie Village Council*

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-SLG

1

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 1 of 79

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT; ARCTIC VILLAGE COUNCIL; and VENETIE VILLAGE COUNCIL,<br><br>                Plaintiffs,<br><br>v.<br><br>DAVID L. BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES BUREAU OF LAND MANAGEMENT; and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>                Defendants. | Case No. 3:20-cv-00223-JMK<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**Alaska National Interest Lands Conservation Act §§ 303, 304, Pub. L. 96-487, and 16 U.S.C. §§ 3101-3233; National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd-668ee; Tax Cuts and Jobs Act § 20001, Pub. L. 115-97; National Historic Preservation Act, 54 U.S.C. §§ 306108-307108; National Environmental Protection Act, 42 U.S.C. §§ 4321-4370j; Administrative Procedure Act, 5 U.S.C. §§ 701-706** |

## I. NATURE OF THE CASE

1.      Gwich'in people comprise an Indigenous Nation living in villages across the northern United States and Canada.  Within Alaska, Gwich'in live in nine communities along or near the migratory route of the Porcupine Caribou Herd.

2.      Gwich'in have considered themselves "Caribou People" for millennia.  Caribou provide much more than physical sustenance to Gwich'in communities.  Caribou

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 2 of 79

2

are entwined in Gwich'in stories, songs, worldview, spirituality, and traditions. Caribou are fundamental to their very existence.

3. To Gwich'in, the Coastal Plain of the Arctic National Wildlife Refuge is Iizhik Gwats'an Gwandaii Goodlit, the "Sacred Place Where Life Begins," because it is the place where the Porcupine Caribou Herd migrates each year to calve and raise their young.

4. For decades, Gwich'in have served as leaders in the effort to protect the Coastal Plain from the harmful effects of potential oil and gas drilling.

5. The Coastal Plain is also world-renowned for its extraordinary biological richness. In addition to caribou, migratory birds flock to the Coastal Plain in huge numbers. Many species of mammals, fish, and other wildlife thrive in and around its wild rivers, streams, lakes, tundra, and lagoons.

6. For all these reasons, the Coastal Plain was off-limits to oil and gas development for many decades. That all changed in 2017. Through a rider tucked into tax legislation, Congress authorized an oil and gas leasing program within the most intact and majestic landscape remaining in the United States. Since then, Defendants have conducted hurried and deeply flawed reviews of the program's impacts on subsistence, historic properties, and the environment. These reviews and the decisions flowing from them violate multiple federal laws and regulations.

7. One of the most egregious errors is Defendants' determination that the impacts of allowing large-scale oil and gas development across the entire Coastal Plain would have no significant impact on Neets'ąįį Gwich'in communities of Venetie and

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS

3

Arctic Village.  As a result, Defendants failed to conduct a full analysis of subsistence impacts with respect to these communities, as required by law.

8.      Another major error is Defendants' refusal to recognize and take into account the program's adverse effects on the Sacred Place Where Life Begins, an historic property of traditional religious and cultural significance to Plaintiffs, as required by law. Defendants omitted the most important historic property from their review.

9.      Similar omissions, erroneous assumptions, and incomplete analyses pervade Defendants' reviews and render their decisions unlawful.

10.     Plaintiffs assert claims under the Alaska National Interest Lands Conservation Act ("ANILCA") §§ 303, 304, Pub. L. No. 96-487, 94 Stat. 2371 (1980), 16 U.S.C. §§ 3101-3233, and implementing regulations; National Wildlife Refuge System Administration Act ("Refuge Act"), 16 U.S.C. §§ 668dd–668ee, and implementing regulations; Tax Cuts and Jobs Act of 2017 ("Tax Act") § 20001, Pub. L. No. 115-97, 131 Stat. 2054 (2017); National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101-307108, and implementing regulations; National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370j, and implementing regulations; and the standards for agency decision-making in the Administrative Procedure Act ("APA").  5 U.S.C. §§ 701-706.

11.     Plaintiffs challenge the Record of Decision ("ROD") issued by Defendants on August 17, 2020, approving an oil and gas leasing program ("Leasing Program") on the Coastal Plain of the Arctic National Wildlife Refuge ("Arctic Refuge"), as well as the associated Final Environmental Impact Statement ("EIS") and ANILCA § 810 Final

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 4 of 79

4

Evaluation published on September 20, 2019. Plaintiffs also challenge Defendants'
implementation of the NHPA § 106 process and the Programmatic Agreement ("PA")
that became effective October 4, 2019.

12.　　Plaintiffs seek declaratory, injunctive, mandamus, vacatur, and other and
further relief.

## II.  JURISDICTION AND VENUE

13.　　This Court has subject matter jurisdiction over this matter pursuant to 28
U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (civil action against United States),
28 U.S.C. § 1361 (action to compel mandatory duty), and 28 U.S.C. § 1362 (federal
question raised by Tribes).

14.　　This Court has personal jurisdiction over Defendants and their sovereign
immunity is waived pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1346, 1361
because Defendants are federal agencies, officers, and employees of the United States
acting in their official capacities.

15.　　Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because
Plaintiffs reside within the District of Alaska, Defendants maintain offices within the
District of Alaska, a substantial part of the events or omissions giving rise to the claims
occurred within the District of Alaska, and the Arctic Refuge is situated within the
District of Alaska.

16.　　Judicial review is authorized pursuant to 5 U.S.C. §§ 701–706 because
Defendants' actions, findings, conclusions, decisions, and failures to act in connection
with their approval and issuance of the Final EIS, ROD, ANILCA § 810 Final

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-SLG

5

Case 3:20-cv-00223-SLG　Document 1　Filed 09/09/20　Page 5 of 79

Evaluation, and NHPA § 106 PA are final agency actions that have adversely affected and aggrieved Plaintiffs.

17.     Declaratory, injunctive, mandamus, vacatur, and other and further relief are authorized pursuant to 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 1361, 2201–2202.

## III.  PARTIES

### A.     Plaintiffs

18.     Plaintiff  NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT is a federally recognized Indian Tribe,[1] and it is the Tribal governmental entity responsible for managing the 1.8 million acres of land surrounding Arctic Village and Venetie, which they own in fee simple and as tenants in common.  Native Village of Venetie Tribal Government engaged in government-to-government consultation with Defendants and submitted extensive comments relating to the Leasing Program.   Native Village of Venetie Tribal Government also served as a cooperating agency in Defendants' environmental review and decision-making process, as well as a consulting party in Defendants' NHPA § 106 review for the Leasing Program.  Throughout these efforts, Native Village of Venetie Tribal Government consistently maintained that the proposed oil and gas leasing program would cause harm to migratory wildlife that rely on the Coastal Plain of the Arctic Refuge, and that such a program would cause harm to the Tribe and its members.

---

[1] *See* 85 Fed. Reg. 5,462, 5,467 (Jan. 30, 2020).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS                                                                    6

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 6 of 79

19.     Plaintiff ARCTIC VILLAGE COUNCIL is a federally recognized Indian Tribe and the Tribal government of the community of Arctic Village.[2] Arctic Village is situated on the southern side of the Arctic Refuge, along the east fork of the Chandalar River and about 100 miles north of Fort Yukon, Alaska. Arctic Village Council engaged in government-to-government consultation with Defendants and submitted extensive comments relating to the Leasing Program. Arctic Village Council also served as a cooperating agency in Defendants' environmental review and decision-making process, as well as a consulting party in Defendants' NHPA § 106 review for the Leasing Program. Throughout these efforts, Arctic Village Council consistently maintained that the proposed oil and gas leasing program would cause harm to the migratory wildlife that rely on the Coastal Plain of the Arctic Refuge, and that such a program would cause harm to the Tribe and its members.

20.     Plaintiff VENETIE VILLAGE COUNCIL is a federally recognized Indian Tribe and the Tribal government of the community of Venetie.[3] Venetie is located south of the Arctic Refuge, on the north side of the Chandalar River and about forty-five miles northwest of Fort Yukon, Alaska. Venetie Village Council engaged in government-to-government consultation with Defendants and submitted extensive comments relating to the Leasing Program. Venetie Village Council also served as a cooperating agency in Defendants' environmental review and decision-making process, as well as a consulting

[2] Arctic Village Council is federally recognized as "Arctic Village." *See* 85 Fed. Reg. at 5,466.
[3] Venetie Village Council is federally recognized as "Village of Venetie." *See id*. at 5,467.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-SLG     7

party in Defendants' NHPA § 106 review for the Leasing Program. Throughout these efforts, Venetie Village Council consistently maintained that the proposed oil and gas leasing program would cause harm to migratory wildlife that rely on the Coastal Plain of the Arctic Refuge, and that such a program would cause harm to the Tribe and its members.

21.     The members of the three Plaintiff Tribes described above are Neets'ąįį Gwich'in and, to a lesser extent, Gwich'yaa and Dihaii Gwich'in. These are subsets of the larger Gwich'in Nation, whose territory extends from the northeastern Interior of Alaska to the Yukon and Northwest Territories in Canada. Historically, Gwich'in people in northeastern Alaska lived a highly nomadic life. They used seasonal camps and semi-permanent settlements, such as Arctic Village and Venetie, for hunting, fishing, and other subsistence activities, and they traded with Inupiat Eskimos on the Arctic coast. Under the stewardship of Plaintiffs and other Tribes over many centuries, the Coastal Plain has remained an intact ecosystem which continues to support vibrant and productive subsistence ways of life beyond the borders of the Coastal Plain.

22.     Gwich'in communities have become more settled in recent decades. The Venetie Indian Reservation was established in 1943, and the first school was built in 1959. When Congress enacted the Alaska Native Claims Settlement Act ("ANCSA") in 1971, Arctic Village and Venetie opted for fee title to the 1.8 million acres of land in the former reservation, and they have rejected both municipal government and ANCSA corporation structures. Today, Arctic Village and Venetie each serve as a home base for their residents to maintain their robust traditional culture and subsistence lifeways. They

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 8 of 79

8

rely heavily on caribou, birds, and other subsistence resources throughout the surrounding region, including wildlife that breeds, forages, inhabits, and migrates to and from the Coastal Plain of the Arctic Refuge.

23.     Gwich'in people view their relationship to their aboriginal homelands and the wild resources found therein more broadly than federal agencies and other Western observers.  While the resources that rely on the Coastal Plain certainly serve as a primary source of food, the Tribal members' relationship to the land and wildlife is also critically important for maintaining their Native language and dialects, cultural heritage and identity, community and family cohesion, spiritual and religious beliefs and ceremonies, transmission of knowledge and customs to children, connections with ancestors, intergenerational equity, and a whole host of other aspects of Gwich'in society.

24.     The way of life of Plaintiffs' Tribal members and that of their communities depend on the Porcupine Caribou Herd, migratory waterfowl, and other wildlife that rely on the Coastal Plain of the Arctic Refuge.  These wild resources are essential for subsistence and for maintaining sharing networks, kinship ties, and other social, cultural, physical, spiritual, and religious aspects of their identity and well-being.  Many individual Tribal members testified at one or more of the public hearings relating to the Leasing Program, and they have been personally affected by the Defendants' decision to approve the Leasing Program.

25.     With respect to the agency actions, findings, and conclusions challenged in this Complaint, Plaintiffs and their members have standing and they have exhausted administrative remedies.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 9 of 79        9

26.     Defendants' inadequate consultation and reviews in violation of ANILCA, the Refuge Act, the Tax Act, NHPA, NEPA, and the standards for agency decision-making in the APA have adversely affected and aggrieved Plaintiffs and their members by interfering with their ability to meaningfully participate in and influence governmental decision-making processes relating to the Leasing Program and denying them a meaningful opportunity to exercise the statutory rights they possess under these statutes and regulatory schemes.

27.     Defendants' unlawful decisions approving and issuing the Final EIS, ANILCA § 810 Final Evaluation, and NHPA §106 PA and failing to carry out meaningful and legally sufficient subsistence, historic property, and environmental review processes have adversely affected and aggrieved Plaintiffs and their members by failing to adequately consider impacts and implement protections for subsistence, historic properties, and wildlife and their habitat.

28.     Defendants' violations of ANILCA, the Refuge Act, the Tax Act, NHPA, NEPA, and the standards for agency decision-making in the APA have resulted in an unlawful decision in the ROD approving the Leasing Program on the Coastal Plain without adequate protections for Tribal interests, and this unlawful decision has adversely affected and aggrieved Plaintiffs and their members.

**B.     Defendants**

29.     Defendant DAVID L. BERNHARDT is sued in his official capacity as Secretary of the United States Department of the Interior ("DOI").  Defendant Bernhardt has responsibility for overseeing the activities and decisions of DOI, the United States

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 10 of 79          10

Bureau of Land Management ("BLM"), United States Fish and Wildlife Service ("FWS"), and other DOI sub-agencies.

30. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the department of the executive branch of the federal government responsible for overseeing the activities and decisions of BLM, FWS, and other sub-agencies. The mission of DOI is to conserve and manage the Nation's natural resources and cultural heritage for the benefit of the American people, provide scientific and other information about natural resources and natural hazards to address societal challenges and create opportunities for the American people, and honor the Nation's trust responsibilities and special commitments to American Indians, Alaska Natives, and affiliated island communities to help them prosper.

31. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is a federal agency within DOI entrusted with the administration of the public lands. The mission of BLM is to sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

32. Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency entrusted with managing the National Wildlife Refuge System, a diverse network of lands and waters dedicated to conserving America's rich fish and wildlife heritage, including the Arctic Refuge. The mission of FWS is to assist in the development and application of an environmental stewardship ethic for our society, based on ecological principles, scientific knowledge of fish and wildlife, and a sense of moral responsibility; guide the conservation, development, and management of the Nation's fish

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 11 of 79

11

and wildlife resources; and administer a national program to provide the public opportunities to understand, appreciate, and wisely use fish and wildlife resources.

## IV. FACTS

**A.    Gwich'in People and the Coastal Plain of the Arctic National Wildlife Refuge**

33.    The Arctic Refuge is a breathtaking, resplendent landscape—one of very few remaining in the world—and it lies at the heart of the traditional way of life for the Gwich'in people.

34.    The Coastal Plain region of the Arctic Refuge stretches southward from barrier islands in the Beaufort Sea to the foothills of the Brooks Range.  It is an area of rolling hills, small lakes, and braided rivers dominated by tundra vegetation.

35.    The Coastal Plain serves as the calving grounds for the Porcupine Caribou Herd, which migrates there in the summer to give birth, raise their young, seek relief from insects, avoid predators, and forage on high quality food.

36.    Gwich'in people enjoy a close and lasting relationship with these caribou, which pass through and near Gwich'in lands and communities on their annual migration. Caribou are the main source of subsistence harvests as well as a spiritual and cultural treasure for the nine Gwich'in communities along or near the migration route in Alaska: Arctic Village, Beaver, Birch Creek, Canyon Village, Chalkyitsik, Circle, Eagle Village, Fort Yukon, and Venetie.

37.    Gwich'in have maintained their culture, identity, and integrity as traditional Indigenous inhabitants of the area, with sacred relationships to the land and caribou, for thousands of years.  Their culture relies upon and honors the caribou and the ancestral

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 12 of 79          12

homelands that have provided for them. For them, the Coastal Plain is Iizhik Gwats'an Gwandaii Goodlit, the Sacred Place Where Life Begins.

38. The Sacred Place Where Life Begins is an historic property to which Plaintiffs ascribe traditional religious and cultural significance. Plaintiffs repeatedly provided information to BLM that the Sacred Place Where Life Begins is an historic property of traditional religious and cultural significance, a traditional cultural property ("TCP"), and a cultural landscape that must be taken into account in the NHPA § 106 process.

39. In addition to caribou, the Coastal Plain is also home to many migratory bird species that are important for sustaining Gwich'in people's traditional subsistence culture and way of life. A profusion of vegetation and insect life on the Coastal Plain in the spring, summer, and fall attracts tens of thousands of geese and other birds each year as part of their annual migrations across six continents. Tribal members hunt these migratory geese and gather their eggs, and both activities are important for social cohesion and for the transmission of language and cultural values from one generation to the next.

**B. Procedural History**

40. From 2018 to 2019, Defendants conducted an environmental review pursuant to NEPA for the Leasing Program. Defendants also conducted ANILCA § 810 and NHPA § 106 reviews concurrently with the NEPA review.

41. Defendant BLM served as the lead agency in preparing the EIS and conducting the ANILCA § 810 and NHPA § 106 reviews, under the supervision of

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Defendant DOI. Cooperating agencies in BLM's NEPA review included FWS, the United States Environmental Protection Agency, State of Alaska, North Slope Borough, Native Village of Kaktovik, and Plaintiffs.

42. Defendants published a Notice of Intent to prepare an EIS for the Leasing Program on April 20, 2018, and they carried out a formal scoping period from May through July 2018. 83 Fed. Reg. 17,562 (Apr. 20, 2018). The Notice of Availability of the Draft EIS was published on December 28, 2018, and public comments were accepted until March 13, 2019. 83 Fed. Reg. 67,337 (Dec. 28, 2018). In February 2019, Defendants held public meetings at various locations in Alaska and Washington, DC.

43. Plaintiffs participated extensively in the agency review processes, including without limitation scoping, Draft EIS review, ANILCA § 810 evaluation, and the NHPA § 106 process. Plaintiffs' leaders and members gave testimony at public meetings, submitted written comments, participated in government-to-government consultations, and served as cooperating agencies and consulting parties.

44. Defendants published the Final EIS and ANILCA § 810 Final Evaluation on September 20, 2019, 84 Fed. Reg. 50,472 (Sept. 25, 2019), executed the NHPA § 106 PA, which became effective on October 4, 2019, and issued the ROD approving the Leasing Program on August 17, 2020. 85 Fed. Reg. 51,754 (Aug. 21, 2020).

45. On a separate track, in the spring of 2018, SAExploration, Inc., submitted a detailed application to Defendants seeking authorization to conduct large-scale and intensive pre-leasing seismic survey activities throughout the Coastal Plain. In the summer of 2018, Defendants initiated a separate NEPA review for these activities.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 14 of 79          14

Although the results of pre-leasing seismic surveying are intended to inform the Leasing Program, Defendants excluded these proposed activities and analysis of their impacts from the environmental review for the Leasing Program. When the Final EIS for the Leasing Program was published in September 2019, the pre-leasing seismic NEPA review process remained in the early stages of scoping and had been "paused," according to Defendants' website. As such, the final information and analyses from the pre-leasing seismic NEPA review were not available and could not be incorporated into or relied on in the Final EIS.

C.     **ANILCA § 810 Process**

46.     Defendants acknowledged the "importance of the program area to caribou—particularly the [Porcupine Caribou Herd] and [Central Arctic Herd]"—and that twenty-two Alaskan communities engage in subsistence use of these caribou. ANILCA § 810 Final Evaluation, FEIS appx. E, at E-3.

47.     Defendants conducted a Tier 1 evaluation under ANILCA § 810 with respect to only four communities: the two Neets'ąįį Gwich'in communities of Arctic Village and Venetie and the two Inupiat communities of Kaktovik and Nuiqsut.

48.     Defendants thus included only two of the nine Gwich'in communities in Alaska in its ANILCA § 810 evaluation.

49.     Defendants' rationale for limiting the Tier 1 evaluation to only four communities was that these were the "closest to the program area and have subsistence uses in or near the program area or rely heavily on resources that use the program area." *Id.*

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 15 of 79      15

50. Defendants thus applied an erroneously high threshold at the outset of the Tier 1 evaluation based on close proximity and "heav[y]" subsistence use.

51. On the basis of that threshold, Defendants excluded seven Gwich'in communities despite their acknowledgment that those communities also engaged in subsistence use of the caribou that would be affected by the Leasing Program.

52. Defendants' Tier 1 evaluation is flawed and inadequate in many ways.

53. Defendants failed to properly evaluate the effect of the proposed Leasing Program on subsistence uses and needs for many reasons, including without limitation Defendants': (a) utilization of an overly narrow definition of subsistence; (b) imposition of unduly restrictive thresholds, such as whether a resource comprised the "majority" of wild foods consumed by residents; (c) exclusion of culturally important resources, such as migratory birds, and culturally important practices, such as bartering and sharing; (d) flawed and inadequate analysis of caribou impacts, including without limitation major data gaps, erroneous facts and reasoning concerning displacement distance and calving habitat, and overreliance on mitigation measures not shown to be effective; (e) failure to adequately identify which lands are needed for subsistence purposes; (f) flawed and inadequate analysis of cumulative impacts, including without limitation (i) lack of a meaningful analysis of climate change; (ii) overreliance on unproven mitigation; (iii) failure to meaningfully evaluate the impacts of oil and gas activities on caribou and migratory bird abundance; (iv) failure to meaningfully evaluate the impacts of oil and gas activities on caribou and migratory bird availability and access for subsistence communities; (iv) failure to meaningfully evaluate the impacts of transportation on

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK
Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 16 of 79          16

caribou and migratory bird abundance; and (v) failure to meaningfully evaluate the impacts of transportation on caribou availability and access for subsistence communities; and (g) failure to meaningfully consider and take into account the comments and traditional knowledge provided by Plaintiffs, other Tribes, and their members.

54.     Defendants failed to adequately consider the availability of other lands for the Leasing Program that would have lesser impacts on subsistence.

55.     Defendants failed to adequately consider other alternatives to the Leasing Program that would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes, including without limitation: (a) phased-leasing of only 400,000 acres of the highest hydrocarbon areas; (b) allowing less than 2,000 acres of surface development; (c) prohibiting seismic exploration on areas of the Coastal Plain not offered for lease; (d) not offering certain lands for leasing, such as caribou calving and post-calving areas; and (e) more protective lease stipulations and required operating procedures to protect caribou, migratory birds, subsistence, and other Coastal Plain resources, uses, and values.

56.     Defendants failed to conduct a meaningful analysis of abundance, availability, and access for all subsistence communities and all subsistence resources.

57.     Defendants applied an overly high threshold to determine whether to proceed with a Tier 2 analysis.

58.     With respect to Arctic Village and Venetie, as well as Nuiqsut, Defendants found that the Leasing Program would not significantly restrict subsistence uses and, as

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK                                                                                    17

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 17 of 79

such, did not conduct Tier 2 analyses, hold any formal subsistence hearings, or make any formal findings pursuant to ANILCA § 810(a)(3) in connection with these communities.

59.     With respect to Kaktovik, Defendants found that the Leasing Program may significantly restrict subsistence uses and thus conducted a Tier 2 analysis relating to Kaktovik.  Defendants held a formal subsistence hearing in Kaktovik on February 5, 2019, and included formal findings relating to Kaktovik pursuant to ANILCA § 810(a)(3) in their Final Evaluation.

60.     Defendants' Tier 2 evaluation and determinations are flawed and inadequate in many ways.

61.     Defendants' determination that the Leasing Program's significant restriction of subsistence use is necessary, consistent with sound management principles for the utilization of public lands, is erroneous for many reasons, including without limitation:  (a) Defendants' improper exclusion of numerous subsistence communities, including without limitation Arctic Village, Venetie, and the seven other Gwich'in subsistence communities that Defendants have acknowledged are reliant on the caribou that will be affected by the Leasing Program; (b) the many flaws and inadequacies of the Tier 1 evaluation described above; (c) Defendants' overreliance on unproven mitigation; (d) Defendants' failure to adequately consider the availability of other lands with lesser impacts on subsistence; (e) Defendants' failure to consider alternatives that would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes, such as the examples described above; and (f) Defendants' erroneous interpretations and applications of the Tax Act described below.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 18 of 79          18

62. Defendants' determination that the Leasing Program will involve the minimal amount of public lands necessary to accomplish its purposes is erroneous for many reasons, including without limitation: (a) Defendants' improper exclusion of numerous subsistence communities, including without limitation Arctic Village, Venetie, and the seven other Gwich'in subsistence communities that Defendants have acknowledged are reliant on the caribou that will be affected by the Leasing Program; (b) the many flaws and inadequacies of the Tier 1 evaluation described above; (c) Defendants' overreliance on unproven mitigation; (d) Defendants' failure to adequately consider the availability of other lands with lesser impacts on subsistence; (e) Defendants' failure to consider alternatives that would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes, such as the examples described above; and (f) Defendants' erroneous interpretations and applications of the Tax Act described below.

63. Defendants' determination that reasonable steps will be taken to minimize adverse effects upon subsistence uses and resources resulting from the Leasing Program is erroneous for many reasons, including without limitation: (a) Defendants' improper exclusion of numerous subsistence communities, including without limitation Arctic Village, Venetie, and the seven other Gwich'in subsistence communities that Defendants have acknowledged are reliant on the caribou that will be affected by the Leasing Program; (b) the many flaws and inadequacies of the Tier 1 evaluation described above; (c) Defendants' overreliance on unproven mitigation; (d) Defendants' failure to adequately consider the availability of other lands with lesser impacts on subsistence; (e)

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 19 of 79

19

Defendants' failure to consider alternatives that would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes, such as the examples described above; and (f) Defendants' erroneous interpretations and applications of the Tax Act described below.

64. The problems with Defendants' ANILCA § 810 evaluation are compounded by their reliance on the information in the Final EIS. Defendants' faulty NEPA review (described below) undermined the ANILCA § 810 evaluation in numerous ways, including without limitation Defendants': (a) erroneous interpretations and applications of the Tax Act; (b) a development scenario based on erroneous assumptions later rejected by Defendants; (c) exclusion of pre-leasing seismic surveying activities; (d) utilization of low oil production estimates and associated development levels; (e) consideration of only development-maximizing action alternatives; (f) failure to conduct or take into account NHPA § 106 consultation concerning broad historic properties; (g) failure to take into account comments and traditional knowledge provided by Tribes and their members; and (h) deeply flawed and inadequate analyses of direct and indirect effects, cumulative impacts, and mitigation measures.

## D. NHPA § 106 Process

65. During meetings and through comments, Plaintiffs repeatedly urged Defendants to initiate the NHPA § 106 process early enough in the development of the Leasing Program that it would inform the development, evaluation, and selection of Leasing Program, or development scenario, alternatives. Defendants failed to do so.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 20 of 79

20

66.     Defendants published their Notice of Intent to prepare an EIS in April 2018.  During scoping thereafter, Defendants held a three-day workshop to develop and evaluate Leasing Program alternatives in July 2018.  A preliminary Draft EIS containing the alternatives that had already been selected for evaluation was shared with cooperating agencies in early August 2018.

67.     By this time, Defendants had not held a single NHPA § 106 consultation or meeting with Plaintiffs and all consulting parties.  The first NHPA § 106 meeting took place in late October 2018.  The purpose of the October 2018 meeting was simply to inform consulting parties of Defendants' timeline for developing a PA; nothing substantive was discussed.

68.     When the Draft EIS was released to the public in late December 2018, Defendants had not held a single NHPA § 106 consultation with Plaintiffs.  On Plaintiffs' information and belief, Defendants had not engaged in substantive discussions with any consulting parties concerning the NHPA § 106 process, historic properties within the Leasing Program's area of potential effects ("APE"), potential adverse effects of the Leasing Program on historic properties, possible alterations or modifications to avoid, minimize, or mitigate those effects, the PA, or other aspects of the NHPA § 106 process.

69.     Defendants' failure to initiate the NHPA § 106 process early enough meant that neither the process nor the historic properties it is meant to protect informed Defendants' development, evaluation, and selection of the alternatives that were evaluated in the NEPA process or the final alternative that was selected by Defendants in the ROD.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 21 of 79        21

70.     None of the action alternatives evaluated by Defendants, including the alternative selected in the ROD, considered alternatives or modifications to the Leasing Program what would avoid, minimize, or mitigate adverse effects to historic properties, including cultural landscapes and TCPs, specifically, the Sacred Place Where Life Begins.  Instead, all of the action alternatives evaluated by Defendants, including the alternative selected in the ROD, maximize industrial oil and gas development without taking into account the Leasing Program's effects on historic properties, including without limitation the following.  Each action alternative:  (a) allows seismic surveying to occur throughout the entire program area, including areas closed to leasing; (b) allows leasing in the majority or entirety of the program area; (c) allows for surface development on at least 2,000 acres; (d) fails to exclude key lands from leasing, such as caribou calving and post-calving areas; and (e) is subject to mitigation measures which have not been developed in consultation with Plaintiffs and other consulting parties in the NHPA § 106 process, analyzed or shown to be effective, and are broadly subject to waivers, exemptions, and modifications.

71.     The belated NHPA § 106 "process" undertaken by Defendants was woefully and legally deficient in numerous ways.  The following are a few examples.

72.     Defendants failed to engage in adequate and meaningful NHPA § 106 consultations.  The interactions Defendants had with Plaintiffs were *pro forma* and failed to take their concerns, comments, and traditional knowledge about historic properties and potential adverse effects into account in any meaningful way.  On information and belief, Defendants' interactions with other consulting parties were similarly inadequate.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 22 of 79                 22

73.     For example, Defendants planned to conduct interviews in Arctic Village and Venetie in December 2018 and January 2019 as part of their effort to identify historic properties and evaluate their eligibility for inclusion in the National Register of Historic Places ("National Register").  These consultations were cancelled.  Defendants eventually conducted interviews in Venetie and Fairbanks in April 2019, but Defendants never conducted interviews in Arctic Village.  Defendants never engaged in consultation with Plaintiffs to identify and evaluate the National Register-eligibility of historic properties potentially affected by the Leasing Program.  Instead, Plaintiffs were forced to conduct interviews on their own and provide the transcripts to Defendants along with information about the National Register-eligibility of such properties.  Defendants thus failed to make a reasonable and good faith effort to identify historic properties potentially affected by the Leasing Program, to fulfill their statutory obligation to comply with NHPA § 106 requirements, and to bear full legal and financial responsibility for such compliance.  *See* 36 C.F.R. §§ 800.2(a), 800.4(b)(1).

74.     Defendants never engaged in NHPA § 106 consultations with Plaintiffs to apply the adverse effects criteria, *see id*. § 800.5(a), and develop alternatives and modifications to the Leasing Program to avoid, minimize, or mitigate adverse effects.  *Id*. § 800.6(a).  On information and belief, Defendants failed to meaningfully and adequately consult with other consulting parties as well.

75.     In March 2019, Defendants provided Plaintiffs and other consulting parties with a draft PA and held a meeting the next day to discuss it, despite none of the consulting parties, including Plaintiffs, having had sufficient time to review it.  In June

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 23 of 79

23

2019, Defendants provided Plaintiffs and other consulting parties with a second draft of the PA. In July 2019, Defendants held a meeting with Plaintiffs and other consulting parties, but instead of discussing the second draft PA, Defendants merely indicated they would review the consulting parties' written comments on the second draft and declined to engage in substantive discussions. In sum, Defendants accepted written comments from Plaintiffs and, on information and belief, other consulting parties concerning the PA but never engaged in meaningful consultations with them about it.

76. As a result of Defendants' superficial approach to consultation, they failed to give Plaintiffs special consideration, recognizing their special expertise in identifying and evaluating historic properties and adverse effects, and the government-to-government relationship, as required in the NHPA § 106 process. On information and belief, Defendants likewise failed to give special consideration to other Tribal consulting parties as well.

77. Defendants failed to adequately consult with Plaintiffs at specific steps in the NHPA § 106 process, including but not limited to: (a) information-gathering; (b) identification and evaluation of the National Register-eligibility of historic properties potentially affected by the Leasing Program; (c) assessment of the Leasing Program's effects on historic properties; (d) resolution of adverse effects by developing and evaluating alternatives and modifications to the Leasing program that avoid, minimize, and mitigate adverse effects; (e) and development and implementation of the PA. On information and belief, Defendants' failures extend to other consulting parties as well.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 24 of 79

24

78.     Defendants also improperly limited the scope of the NHPA § 106 process to small, localized historic properties and refused to consider larger historic properties, such as TCPs and cultural landscapes, including the Sacred Place Where Life Begins. Plaintiffs emphasized the deep traditional religious and cultural significance to them of the Sacred Place Where Life Begins, submitted extensive documentation of its significance, integrity, and contributing resources, and repeatedly urged Defendants to take into account this historic property in their NHPA § 106 evaluation. Defendants declined to do so, deferring identification and evaluation, assessment of effects, and resolution of adverse effects through the development of avoidance, minimization, and mitigation plans until later stages of oil and gas development, *i.e.*, post-leasing, when applications for permits to drill ("APD") are submitted.

79.     Defendants took the position that they were not required to carry out these steps prior to the APD stage because approval of the Leasing Program would not authorize ground-disturbing activities. This position is based on unlawfully narrow interpretations of Defendants' NHPA § 106 obligations and the adverse effects federal agencies must consider. Adverse effects that must be considered include without limitation direct, indirect, reasonably foreseeable, and cumulative effects, as well as effects not involving physical alterations. *See* 36 C.F.R. § 800.5(a)(1).

80.     Defendants' position is also erroneous because the scope of subsequent reviews will be limited to the specific sub-areas being permitted. Only at the leasing stage is it possible to consider the adverse effects of the entire Leasing Program on landscape-level historic properties, such as the Sacred Place Where Life Begins, as well

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS                                                                                    25

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 25 of 79

as avoidance, minimization, and mitigation measures for the entire Leasing Program that reduce such effects.

81. As a result of their unlawfully narrow scope, Defendants failed to properly identify and evaluate the National Register-eligibility of landscape-level historic properties, including the Sacred Place Where Life Begins, failed to assess the effects of the Leasing Program on such properties, and failed to develop and consider alternatives or modifications to the Leasing Program that would avoid, minimize, or mitigate such adverse effects.

82. Defendants also failed to engage the public in the NHPA § 106 process. Defendants never provided the public with information about the undertaking and its effects on historic properties. Further, Defendants never provided the public with notice or an opportunity to comment on the NHPA § 106 process, including without limitation key steps such as the identification and evaluation of historic properties, assessment of effects, resolution of adverse effects through the development and evaluation of alternatives and modifications to the Leasing Program that avoid, minimize, and mitigate adverse effects, and development and implementation of the PA.

83. Additionally, the NHPA § 106 process was not completed before the issuance of the Draft EIS or by the end of the public comment period for the NEPA review. As a result, during the NEPA review process, the public was not informed about and did not have a meaningful opportunity to comment on numerous issues relating to the NHPA § 106 process, including but not limited to key steps such as the identification and evaluation of historic properties, assessment of effects, resolution of adverse effects

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 26 of 79

26

through the development and evaluation of alternatives and modifications to the Leasing Program that avoid, minimize, and mitigate adverse effects, and development and implementation of the PA.

84.     The Final PA was signed by BLM and the Alaska State Historic Preservation Officer ("SHPO") on September 20 and 23, 2019, respectively. The Notice of Availability for the Final EIS was published a few days later on September 25, 2019. The Final PA was then signed by FWS on September 30, 2019. The Final PA when into effect when it was signed by the Advisory Council on Historic Preservation ("ACHP") on October 4, 2019.

85.     Despite the close timing of the finalization of these NEPA and NHPA § 106 documents, the PA was not included as an appendix to the Final EIS or otherwise made available to the public. Defendants did not inform Plaintiffs that the Final PA was executed until March 11, 2020.

**E.     NEPA REVIEW PROCESS**

86.     The reasonably foreseeable development ("RFD") scenario serves as the basis for the entire Leasing Program EIS, including without limitation its action alternatives and its evaluation of direct and indirect impacts, cumulative impacts, and mitigation measures. The RFD and the Leasing Program EIS are fundamentally flawed in numerous ways, including without limitation the following.

87.     Defendants relied on unduly low oil production estimates ranging from about 2.4 billion barrels of oil ("BBO") for Alternatives D1 and D2 to roughly 2.7 BBO for Alternative C and 3.0 BBO for Alternative B. Defendants have erroneously

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS-SLG                                                                27

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 27 of 79

characterized these oil production estimates as "optimistic high-production" levels used to "minimize the chance that the resultant impact analysis will understate potential impacts." Final EIS, at B-3. Truly high-end estimates, however, would be approximately 10.0 BBO or greater, and the corresponding extent of oil and gas facilities and operations evaluated in the action alternatives would be approximately triple what is described in the Final EIS. Defendants' use of unduly low oil production estimates resulted in an understatement of impacts in the Final EIS.

88.    Defendants improperly excluded pre-leasing seismic surveying activities from the NEPA review for the Leasing Program, rather than considering these closely interrelated activities as part of the same NEPA review process. As a result, Defendants failed to acknowledge and properly evaluate the combined impacts of these activities, and this led to an understatement of impacts in the Final EIS.

89.    None of the action alternatives in the Final EIS maximize protection for subsistence, wildlife, habitat, ecosystems, historic properties, cultural landscapes, TCPs, and/or public health. Instead, all of the action alternatives in the Final EIS maximize industrial oil and gas development in multiple ways, including but not limited to the following. Each action alternative: (a) allows seismic surveying to occur throughout the entire program area, including areas closed to leasing; (b) allows leasing in the majority or entirety of the program area; (c) allows for surface development on at least 2,000 acres; (d) fails to exclude key lands from leasing, such as caribou calving and post-calving areas; and (e) is subject to mitigation measures which have not been analyzed or shown to be effective and are broadly subject to waivers, exemptions, and modifications.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK    28

Case 3:20-cv-00223-SLG    Document 1    Filed 09/09/20    Page 28 of 79

90.     Due to the flawed ANILCA § 810 process described above, the action alternatives in the Final EIS reflect inadequate Tier 1 analyses for too few subsistence communities and do not reflect any Tier 2 formal subsistence hearings or findings relating to Arctic Village, Venetie, or any other Gwich'in subsistence community.  As a consequence, Defendants failed to adequately consider which areas not to offer for leasing to reduce impacts on subsistence, and the alternatives do not include sufficient features designed to reduce impacts on subsistence.  Similarly, due to the delayed, deferred, and inadequate NHPA § 106 process described above, the action alternatives in the Final EIS do not reflect the required consultations and evaluations with respect to historic properties, including cultural landscapes and TCPs, and do not include features designed to reduce adverse effects on them.

91.     The analyses of direct and indirect effects, cumulative impacts, and mitigation measures in the Final EIS are flawed and inadequate in numerous ways, including without limitation the following:

        a.      <u>Subsistence, Sociocultural Systems, and Environmental Justice</u>. With respect to subsistence, sociocultural systems, and environmental justice, the flaws and inadequacies in the Final EIS include without limitation: (i) inadequate baseline data and other data gaps; (ii) erroneous assumptions; (iii) reliance on unduly low oil production estimates and associated development levels; (iv) reliance on erroneous interpretations of the Tax Act; (v) failure to analyze the impacts of pre-leasing seismic activities; (vi) reliance on a flawed and inadequate ANILCA § 810 process; (vii) reliance on a deferred, delayed, and inadequate NHPA § 106 process; (viii) inadequate

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 29 of 79          29

demographic information, harvest data, and subsistence use maps for Arctic Village, Venetie, and other communities; (ix) excessive focus on overall quantity of food consumption and harvest with inadequate attention to culturally important subsistence practices, such as egg-gathering, and inadequate attention to lower quantity but essential subsistence activities in time periods and locations with limited resources; (x) inadequate attention to the timing of harvesting; (xi) erroneous assumption that Kaktovik and Nuiqsut are the only communities that could be precluded from subsistence use in the program area; (xii) inadequate analysis of seismic activities and water withdrawals on subsistence resources; (xiii) reliance on other flawed and inadequate analyses in the Final EIS, such as those relating to caribou, waterfowl, soils, and vegetation (described below); (xiv) overly generalized and non-quantified analysis; (xv) failure to take into account traditional knowledge; (xvi) failure to meaningfully address climate change; (xvii) cursory and inadequate cumulative impact analysis; (xviii) failure to analyze the efficacy of reclamation and other mitigation measures; (xix) and overall understatement of impacts.

   b. <u>Public Health</u>.  With respect to public health, the flaws and inadequacies in the Final EIS include without limitation: (i) inadequate baseline data and other data gaps; (ii) erroneous assumptions; (iii) reliance on unduly low oil production estimates and associated development levels; (iv) reliance on erroneous interpretations of the Tax Act; (v) failure to analyze the impacts of pre-leasing seismic activities; (vi) inadequate analyses of public health impacts on Arctic Village, Venetie, and other communities; (vii) deferral of a Health Impact Analysis and other evaluations until later

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG Document 1 Filed 09/09/20 Page 30 of 79

30

stages of oil and gas development; (viii) reliance on an inadequate ANILCA § 810 process; (ix) inadequate and inaccurate data regarding subsistence resources, subsistence activities, and wild food consumption; (x) reliance on other flawed and inadequate analyses in the Final EIS, such as those relating to subsistence, sociocultural systems, environmental justice, caribou, and waterfowl (described above and below); (xi) failure to take into account traditional knowledge; (xii) failure to meaningfully address climate change; (xiii) cursory and inadequate cumulative impact analysis that excludes Arctic Village and Venetie and other communities; (xiv) failure to analyze the efficacy of mitigation measures; and (xv) overall understatement of impacts.

    c. <u>Cultural Resources</u>. With respect to cultural resources, the flaws and inadequacies in the Final EIS include without limitation: (i) inadequate baseline data and other data gaps; (ii) erroneous assumptions; (iii) reliance on unduly low oil production estimates and associated development levels; (iv) reliance on erroneous interpretations of the Tax Act; (v) failure to analyze the impacts of pre-leasing seismic activities; (vi) failure to follow guidelines concerning ethnographic studies; (vii) reliance on a delayed, deferred, and inadequate NHPA § 106 process; (viii) reliance on an inadequate ANILCA § 810 process; (ix) failure to consider psychosocial and other impacts of the Leasing Program approval decision itself; (x) failure to take into account traditional knowledge; (xi) failure to meaningfully address climate change; (xii) cursory and inadequate cumulative impact analysis that fails to address colonialism, trauma, and other historical impacts; (xiii) failure to analyze the efficacy of mitigation measures; and (xiv) overall understatement of impacts.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-SLG           31

Case 3:20-cv-00223-SLG  Document 1  Filed 09/09/20  Page 31 of 79

d.    Caribou.  With respect to caribou, the flaws and inadequacies in the

Final EIS include without limitation: (i) inadequate baseline data and other data gaps; (ii)

erroneous assumptions; (iii) reliance on unduly low oil production estimates and

associated development levels; (iv) reliance on erroneous interpretations of the Tax Act;

(v) failure to analyze the impacts of pre-leasing seismic activities; (vi) unreasonable 40%

threshold for important calving habitat; (vii) inadequate analysis of forage habitat and

vegetation types; (viii) failure to explain how acreages affected by development are

significant for caribou; (ix) failure to adequately analyze impacts on post-calving

grounds; (x) improper assumption that the Porcupine Caribou Herd will react in a manner

similar to other herds and excessive reliance on data from other herds; (xi) failure to

discuss general decline in caribou herds across the Arctic; (xii) inadequate analysis of

seismic activities and water withdrawals; (xiii) overly generalized and non-quantified

analysis; (xiv) failure to take into account traditional knowledge; (xv) failure to

meaningfully address climate change; (xvi) cursory and inadequate cumulative impact

analysis; (xvii) failure to analyze the efficacy of reclamation and other mitigation

measures; and (xviii) overall understatement of impacts.

e.    Migratory Waterfowl.  With respect to migratory waterfowl, the

flaws and inadequacies in the Final EIS include without limitation: (i) inadequate

baseline data and other data gaps; (ii) erroneous assumptions; (iii) reliance on unduly low

oil production estimates and associated development levels; (iv) reliance on erroneous

interpretations of the Tax Act; (v) failure to analyze the impacts of pre-leasing seismic

activities; (vi) inadequate analysis of seismic activities and water withdrawals; (vii)

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK                                                                              32

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 32 of 79

overly generalized and non-quantified analysis; (viii) failure to take into account traditional knowledge; (ix) failure to meaningfully address climate change; (x) cursory and inadequate cumulative impact analysis; (xi) failure to analyze the efficacy of reclamation and other mitigation measures; and (xii) overall understatement of impacts.

f. <u>Vegetation, Tundra, and Wetlands</u>. With respect to vegetation, tundra, and wetlands, the flaws and inadequacies in the Final EIS include without limitation: (i) inadequate baseline data and other data gaps; (ii) erroneous assumptions; (iii) reliance on unduly low oil production estimates and associated development levels; (iv) reliance on erroneous interpretations of the Tax Act; (v) failure to analyze the impacts of pre-leasing seismic activities; (vi) lack of meaningful analysis of habitat value of vegetation, tundra, and wetlands and the impacts of their degradation on caribou, waterfowl, and other wildlife; (vii) deferral of meaningful analysis until later stages of oil and gas development; (viii) overreliance on non-comparable data from the Prudhoe Bay region and other areas; (ix) inadequate analysis of seismic activities and water withdrawals; (x) overly generalized and non-quantified analysis; (xi) limitation of scope of impacts to the program area; (xii) failure to take into account traditional knowledge; (xiii) failure to meaningfully address climate change; (xiv) cursory and inadequate cumulative impact analysis; (xv) failure to analyze the efficacy of reclamation and other mitigation measures; and (xvi) overall understatement of impacts.

g. <u>Soils, Permafrost, Sand, and Gravel</u>. With respect to soils, permafrost, sand, and gravel, the flaws and inadequacies in the Final EIS include without limitation: (i) inadequate baseline data and other data gaps; (ii) erroneous assumptions;

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 33 of 79      33

(iii) reliance on unduly low oil production estimates and associated development levels; (iv) reliance on erroneous interpretations of the Tax Act; (v) failure to analyze the impacts of pre-leasing seismic activities; (vi) deferred consideration of gravel supply plans, reclamation plans, and site-specific analysis based on them until later stages of oil and gas development; (vii) inadequate analysis of seismic activities and water withdrawals; (viii) inadequate evaluation of climate change; (ix) failure to account for unique characteristics of the Coastal Plain; (x) overly generalized and non-quantified analysis; (xi) limitation of scope of impacts to the program area; (xii) failure to take into account traditional knowledge; (xiii) failure to meaningfully address climate change; (xiv) cursory and inadequate cumulative impact analysis; (xv) failure to analyze the efficacy of reclamation and other mitigation measures; and (xvi) overall understatement of impacts.

92.     In an effort to address the many flaws, inadequacies, and gaps in the Final EIS, Defendants improperly relied on, purported to tier to, and/or attempted to incorporate by reference, with little or no accompanying summary or explanation, numerous other documents, including but not limited to non-NEPA documents, non-federal documents, future or incomplete NEPA reviews, and NEPA reviews concerning unrelated projects and activities.

## F.   FINAL DECISION APPROVING THE LEASING PROGRAM

93.     In the ROD, Defendants have selected and approved Alternative B, which allows oil and gas development across virtually the entire Coastal Plain and is the most

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 34 of 79       34

damaging and destructive of the action alternatives presented in the Final EIS for the Leasing Program.

94.     Defendants' rationale for this decision is that including the entire Coastal Plain in the Leasing Program will ensure that it is making available the highest hydrocarbon potential areas for lease and maximizing flexibility to ensure that these areas will be developed.  Defendants also contend there is too much uncertainty for them to reasonably foresee which areas have the highest potential until after exploration drilling occurs.

95.     Defendants' assertions appear inconsistent with the maps in the Final EIS identifying specific areas of "high," "medium," and "low" hydrocarbon potential.  *See* FEIS, appx. A, maps 3-6 to 3-9 and 3-59.  The Final EIS also discusses areas with hydrocarbon potential, including their acreage, oil and gas recovery potential, and other characteristics in Appendix B in connection with the RFD scenario and in various other places in the Final EIS text and associated tables and figures.  *See, e.g.,* FEIS, at ES-4; 3-50 to 3-51, tbls. 3-11, 3-12, 3-13, and 3-14; and appx. B, at B-3 to B-9, tbls. B-1, B-2, and map B-1.  Defendants presumably have access to additional information concerning the oil and gas resources of the Coastal Plain in the Administrative Record, through the studies required under ANILCA, and through ongoing interactions with the oil and gas industry.

96.     All of the lease stipulations and required operating procedures that Defendants rely on to support their claims that they are adequately protecting subsistence,

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 35 of 79          35

wildlife, habitat, ecosystems, historic properties, cultural resources, and public health are unproven and subject to waivers, exceptions, and modifications.

97. Defendants have failed to include meaningful protections for subsistence, wildlife, habitat, ecosystems, historic properties, cultural resources, and public health.

98. Defendants have failed to make a determination that the Leasing Program is a compatible use of the Arctic Refuge or that the Leasing Program fulfills the purposes of the Refuge. Instead, Defendants merely indicate that they took the other Refuge purposes into account and that there will be some adverse impacts on those purposes.

99. The RFD and EIS were developed based on erroneous and unlawful interpretations of the Tax Act's 2,000-acre provision, including without limitation the understanding that this provision imposes a minimum acreage requirement (*i.e.*, prohibits any action alternative that provides for surface development covering less than 2,000 acres) and that it applies on a rolling rather than cumulative basis (*i.e.*, allows for multiple successive 2,000-acre areas of surface development).

100. In the ROD, Defendants abandoned these interpretations and set forth several new legal interpretations of the Tax Act, which are likewise erroneous and unlawful, including without limitation the following: (a) the "up to 2,000 surface acres" language is not an upper limit on a range of surface acres that Defendants may allow but part of a mandate that they must authorize production and support facilities covering the entire 2,000 surface acres; (b) facilities counting toward the 2,000 acres must be both "production" *and* "support facilities"; (c) other facilities assumed to count toward the 2,000 acres in the RFD and EIS, such as airstrips, roads, pads, gravel pits and stockpiles,

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 36 of 79

36

and barge landing and storage facilities, may or may not be counted toward the 2,000 acres by future decision-makers; and (d) rights-of-way and easements are not subject to the 2,000-acre limitation.

101.    The ROD asserts that Defendants' last-minute changes in interpretation do not affect the validity of the EIS because the assumptions underlying its analysis of environmental impacts were conservative and designed to overstate the impacts.

102.    The ROD does not acknowledge the potential that, because there are now many facilities ineligible to be counted toward the 2,000 acres and many others that potentially will not be counted toward the 2,000 acres by future decision-makers, the acreage associated with surface development could far exceed 2,000 acres and, as a result, the EIS may actually understate environmental impacts or otherwise inaccurately characterize impacts.

103.    The potential for expansive surface impacts beyond the 2,000 acres assumed in the EIS is compounded by Defendants' erroneous interpretations that they are subject to stringent mandates and have little or no discretion with respect to the 2,000 acres of surface development and the authorization of rights-of-way and easements for exploration, development, production, and transportation facilities related to the Leasing Program.

## V.  STATUTORY FRAMEWORK

### A.    Alaska National Interest Lands Conservation Act

104.    The Coastal Plain and surrounding areas were federally protected in 1960 through an order issued by the Secretary of the Interior.  Pub. Land Order 2214 (Dec. 6,

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK        37

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 37 of 79

1960), 25 Fed. Reg. 12,598 (Dec. 8, 1960). This Order established the Arctic National Wildlife Range "for the purpose of preserving unique wildlife, wilderness and recreational values."

105.    Congress formally renamed the Arctic National Wildlife Range the Arctic National Wildlife Refuge through the enactment of ANILCA in 1980. Pub. L. No. 96-487, 94 Stat. 2371 (1980). Through ANILCA, Congress added four purposes for the land now included within the Arctic Refuge, emphasizing the conservation and subsistence objectives of ANILCA. These purposes are: "(i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd . . . , polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling; (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats; (iii) to provide . . . the opportunity for continued subsistence uses by local residents; and (iv) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge." *Id.* § 303(2)(B).

106.    More generally, Congress's intent in establishing conservation system units under ANILCA was to "provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 38 of 79     38

ecosystems; to protect the resources related to subsistence needs; [and] to protect and preserve historic and archeological sites, rivers, and lands." 16 U.S.C. § 3101(b).

107.    Congress further intended for fish and wildlife within ANILCA conservation system units to be managed "in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded." *Id.* § 3101(c); *see id.* § 3112(1).

108.    Congress also intended for conservation system units established under ANILCA to "provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." *Id.* § 3101(c); *see id.* § 3112(1). Congress found that the "continuation of the opportunity for subsistence uses . . . is essential to Native physical, economic, traditional, and cultural existence." *Id.* § 3111(1).

109.    Congress further found that the "situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses." *Id.* § 3111(2). Congress therefore declared it to be federal policy that the "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands." *Id.* § 3112(1).

110.    Under ANILCA, the term "subsistence" is defined broadly to mean "the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 39 of 79      39

byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade." *Id.* § 3113.

111.    Subsistence extends beyond a "sufficient food supply" and includes "customary and traditional practices which ANILCA was designed to protect." *Alaska Wilderness Rec'n & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995).

112.    To achieve these conservation and subsistence objectives, ANILCA establishes both procedural and substantive requirements. Congress explained that the "national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life . . . require that an administrative structure be established for the purpose of enabling rural residents who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska." 16 U.S.C. § 3111(5).

113.    The ANILCA § 810 process takes place in two phases. Under the first step, commonly known as "Tier 1," the agency must consider: (a) the "effect" of the proposed "use, occupancy, or disposition" on "subsistence uses and needs"; (b) the "availability of other lands for the purposes sought to be achieved"; and (c) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a). In conducting the Tier 1 evaluation, the agency must consider cumulative impacts, along with direct and indirect impacts. *See City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK      40

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 40 of 79

114.     If, after completing the Tier 1 evaluation, the agency determines that the proposed activity "may significantly restrict subsistence uses," the agency must proceed to Tier 2.  *Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984).  The Tier 2 threshold is "quite low."  *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987), *aff'd* 857 F.2d 1307 (9th Cir. 1988).  Only a "threat of significant restriction" is required, and such a restriction "need not be likely."  *Hanlon v. Barton*, 740 F. Supp. 1446, 1448 (D. Alaska 1988).

115.     In Tier 2, the agency must provide notice, hold hearings, and make a series of detailed findings and determinations demonstrating compliance with ANILCA's substantive standards.  The agency is prohibited from authorizing the proposed activity unless and until it: (a) "gives notice to the appropriate State agency and the appropriate local committees and regional councils"; (b) "gives notice of, and holds, a hearing in the vicinity of the area involved; and" (c) "determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions."  16 U.S.C. § 3120(a).

116.     Section 810 thus "provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 554 (1987).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 41 of 79      41

117.    When the Secretary of the Interior is required to prepare an EIS under NEPA, they or their designee "shall provide the notice and hearing and include the findings required by subsection (a) of this section as part of such environmental impact statement."  16 U.S.C. § 3120(b).

118.    Only after a federal agency has complied with ANILCA's requirements regarding subsistence is it authorized to "manage or dispose of public lands" under its jurisdiction for other lawful uses or purposes.  *Id.*

119.    Furthermore, the Arctic Refuge and other refuges "shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act."  Pub. L. No. 96-487, § 304(a).

**B.    National Wildlife Refuge System Administration Act**

120.    The Refuge Act governs the administration of the National Wildlife Refuge System, including the Arctic Refuge.  *See* 16 U.S.C. § 668dd.

121.    The mission of the National Wildlife Refuge System is to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans."  *Id.* § 668(d)(a)(2).

122.    In administering the National Wildlife Refuge System, the Secretary of the Interior must comply with statutory management standards, including but not limited to obligations to "provide for the conservation of fish, wildlife, and plants, and their habitats within the System;" "ensure that the biological integrity, diversity, and environmental

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 42 of 79          42

health of the System are maintained;" and manage the System in a manner that "contribute[s] to the conservation of the ecosystems of the United States." *Id.* § 668dd(a)(4).

123.   Each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." *Id.* § 668dd(a)(3)(A).

124.   The Secretary of the Interior also "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use." *Id.* § 668dd(d)(3(A)(i).

125.   A use is "compatible" if it will not "materially interfere with or detract from the fulfillment of the mission of the [National Wildlife Refuge] System or the purposes of the refuge." *Id.* § 668ee(1).

126.   Compatibility determinations must be in writing and based on the Secretary's "sound professional judgment." 50 C.F.R. § 25.12.

127.   "Sound professional judgment" means a decision "that is consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of [the Refuge] Act and other applicable laws." 16 U.S.C. § 668ee(3).

## C.   Tax Act

128.   For more than forty years, the State of Alaska and others sought authorization for exploration and development activities in the Coastal Plain of the Arctic Refuge, but they faced strong opposition from the local Alaska Native communities, as

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 43 of 79

43

well as the general public.  Through ANILCA, Congress expressly prohibited such development.  16 U.S.C. § 3143.

129.    In 2017, a provision inserted into the Tax Act added an "oil and gas leasing program on the Coastal Plain" as a new purpose of the Arctic Refuge and opened the Coastal Plain to oil and gas leasing and development.  Tax Act § 20001(b)(2)(B)(v).  This provision, however, did not modify the other purposes of the Arctic Refuge, and it did not waive, eliminate, or alter any of the procedural requirements and substantive standards applicable to the Arctic Refuge or its Coastal Plain under ANILCA, the Refuge Act, NHPA, NEPA, and other statutes.  *See id*. § 20001.

130.    The Tax Act requires DOI, acting through BLM, to hold two lease sales within four and seven years of the law's enactment.  Each lease sale must offer at least 400,000 acres of land on the Coastal Plain and must include the areas within the Coastal Plain that have the "highest potential for the discovery of hydrocarbons."  *Id.* § 20001(c)(1).  The Tax Act limited surface development associated with such leasing to a maximum of 2,000 acres for oil and gas production and support facilities.  *See id.* § 20001(c)(3).

**D.    National Historic Preservation Act**

131.    When Congress enacted the NHPA in 1966, it found and declared that the "historical and cultural foundation of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American People."  Pub. L. No. 89-665, (b), 80 Stat. 915, 915 (1966).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 44 of 79

44

132.    The NHPA seeks to "foster the conditions under which our modern society and our historic property can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations." 54 U.S.C. § 300101(1). The NHPA includes a "series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006) (internal citation omitted).

133.    To achieve this "productive harmony" between "our modern society and our historic property," Congress enacted § 106 of the NHPA.

134.    Section 106 provides:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department of independent federal agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the [ACHP] a reasonable opportunity to comment with regard to the undertaking.

54 U.S.C. § 306108.

135.    Additionally, the NHPA provides: "In carrying out its responsibilities under section 306108 of this title, a Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to property described in subsection (a)." *Id*. § 302706(b).

136.    Subsection (a) provides: "Property of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization may be determined to be eligible for inclusion on the National Register." *Id*. § 302706(a).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 45 of 79

45

137.    Congress has delegated to the ACHP the exclusive authority to "promulgate regulations as it considered necessary to govern the implementation of section 306108 of this title in its entirety." *Id*. § 304108(a).

138.    The ACHP has promulgated these regulations at 36 C.F.R. Part 800.  These regulations are binding on all federal agencies.  *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't Interior*, 608 F.3d 592, 607 (9th Cir. 2010) (citations omitted).

139.    The ACHP's "regulations establish a four-step process" by which federal agencies must fulfill their NHPA § 106 obligations.  *Presidio Historical Ass'n v. Presidio Trust*, No. C12-00522, 2013 WL 2435089, at *4 (N.D. Cal. June 3, 2013); *see* 36 C.F.R. §§ 800.3-800.6.

140.    The goal of the NHPA § 106 process is to "identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties."  36 C.F.R. § 800.1(a).

141.    "The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings."  *Id.*  The NHPA § 106 process is a "'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs" on historic properties.  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (citation omitted).

142.    <u>Initiation</u>.  The first step of the NHPA § 106 process requires federal agencies to "determine whether the proposed Federal action is an undertaking . . . and, if so, whether it is the type of activity that has the potential to cause adverse effects on historic properties."  36 C.F.R. § 800.3(a).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

46

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 46 of 79

143.     An undertaking is any "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of the Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval." *Id*. § 800.16(y); 54 U.S.C. § 300320.

144.     An historic property is "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in the National Register." 36 C.F.R. § 800.16(l)(1); 54 U.S.C. § 300308.

145.     Eligible for inclusion means "both properties formally determined as such in accordance with [36 C.F.R. Part 63] and all other properties that meet the National Register criteria." 36 C.F.R. § 800.16(l)(2); *see id.* § 60.4 (National Register criteria).

146.     Historic properties "include[] properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization that meet the National Register criteria." *Id*. § 800.16(l)(1); 54 U.S.C. § 302706(a).

147.      Properties of traditional religious and cultural importance are often referred to as TCPs or cultural landscapes.

148.     A TCP is a property "eligible for inclusion in the National Register because of its association with cultural practices and beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continued cultural identity of the community." Patricia L. Parker & Thomas F. King, *National Register Bulletin: Guidelines for Evaluating and Documenting Traditional Cultural Properties* 1 (rev. ed. 1998).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK                                                                    47

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 47 of 79

149. A cultural landscape is a property encompassing a "geographic area including both cultural and natural resources and wildlife or domestic animals therein, associated with an historic event, activity, or person exhibiting other cultural or aesthetic values." Charles A. Birnbaum, *Preservation Briefs: Protecting Cultural Landscapes: Planning, Treatment and Management of Historic Landscapes* 1 (1994).

150. Both TCPs and cultural landscapes are among the historic properties that must be considered by federal agencies during the NHPA § 106 process. *See Muckleshoot Indian Tribe*, 177 F.3d at 807; ACHP, *Information Paper on Cultural Landscapes: Understanding and Interpreting Indigenous Places and Landscapes* 1 (Oct. 11, 2016).

151. The NHPA § 106 process must be initiated early enough in the undertaking's planning process that it can inform the development, evaluation, and selection of alternatives that avoid, minimize, or mitigate adverse effects on historic properties. *See* 36 C.F.R. §§ 800.1(c); 800.6(a); 800.8(a)(2).

152. During the first step, federal agencies must identify "consulting parties," including "any Indian tribes . . . that may attach religious and cultural significance to historic properties in the [undertaking's] area of potential effects" and initiate the consultation process. *Id*. § 800.3(f)(2).

153. <u>Identification and Evaluation</u>. Step two requires federal agencies to determine the undertaking's APE, *id.* § 800.4(a)(1), and "take the steps necessary to identify historic properties" within the APE. *Id.* § 800.4(b).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK
Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 48 of 79          48

154.    APE means the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties," and it is "influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.* § 800.16(d).

155.    Agencies must "make a reasonable and good faith effort to carry out appropriate identification efforts." *Id.* § 800.4(b)(1).  Such efforts "may include background research, consultation, oral history interviews, sample field investigation, and field survey." *Id.*

156.    In addition to identifying historic properties previously listed on, or determined eligible for inclusion on, the National Register, agencies must "apply the National Register criteria . . .  to properties identified within the [APE] that have not been previously evaluated for National Register eligibility." *Id*. § 800.4(c)(1).

157.    In applying the National Register criteria, agencies must "acknowledge that Indian tribes . . . possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." *Id.*

158.    <u>Assessment</u>.  Step three requires federal agencies to "apply the criteria of adverse effect to historic properties within the [APE]." *Id*. § 800.5(a).  This means agencies must "assess the effects of the undertaking" on historic properties within the APE and "determine whether the effect will be adverse." *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005 (9th Cir. 2013) (internal quotation omitted).

159.    An undertaking causes adverse effects if it "may alter, directly or indirectly, any of the characteristics of the historic property that qualify the property for inclusion in

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK                                                                                            49

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 49 of 79

the National Register in any manner that would diminish the integrity of the property's location, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1).

160. Adverse effects do not need to physically alter an historic property to be direct. Direct "refers to the causality, and not the physicality, of the effect." Memo. from ACHP Office of Gen. Counsel to ACHP Staff, *Recent Court Decision Regarding the Meaning of "Direct" in Sections 106 and 110(f) of the National Historic Preservation Act* 2 (June 7, 2019). Accordingly, "if the effect comes from the undertaking at the same time and place with no intervening cause, it is 'direct' regardless of its specific type (e.g., whether it is visual, physical, auditory, etc.)." *Id.*; *see Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019).

161. "Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5(a)(1).

162. Examples of adverse effects include without limitation:

a. "Physical destruction of or damage to all or part of the property," *id.* § 800.5(a)(2)(i);

b. "Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance," *id.* § 800.5(a)(2)(iv);

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK                                                                 50

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 50 of 79

c. "Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features," *id.* § 800.5(a)(v); and

d. "Transfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance," *id*. § 800.5(a)(2)(vii).

163. <u>Resolution</u>. Step four requires federal agencies to "develop and evaluate modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id.* § 800.6(a).

164. Agency commitments to avoidance, minimization, and mitigation may be documented through a memorandum of agreement ("MOA"). *See id*. § 800.6(b). The execution and implementation of the MOA "evidences the agency official's compliance with section 106" and governs NHPA § 106 compliance for the undertaking moving forward. *Id.* § 800.6(c).

165. A PA, instead of an MOA, may be developed "for dealing with the potential adverse effects of complex projects or multiple undertakings," such as long-term or phased undertakings. *Id*. § 800.14(b)(3). A PA controls NHPA § 106 compliance for the undertaking as it is implemented and supersedes the procedures established at 36 C.F.R. Part 800.

166. <u>Consultation</u>. Consultation is the most important aspect of the NHPA § 106 process. The accommodation of historic preservation concerns with the needs of federal undertakings occurs "*through consultation*." *Id*. § 800.1(a) (emphasis added)).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 51 of 79        51

167.    In carrying out their NHPA § 106 obligations, federal agencies are required to "consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by the undertaking." *Id*. § 800.2(c)(2)(ii); 54 U.S.C. § 302706(b).

168.    Consultation is the "process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f).

169.    The statutory obligation to consult with Tribes requires federal agencies to grant Tribes "*special consideration* in the course of the agency's fulfillment of its consultation obligations." *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dept. Interior*, 755 F. Supp. 2d 1104, 1109 (S.D. Cal. 2010) (emphasis in original).

170.    Consultation with Tribes is "not an empty formality," *id*. at 1108, and cannot be satisfied by "mere *pro forma* recitals," "professions of good intent," and "solicitations to consult." *Id*. at 1118. Instead, consultation "should be conducted in a sensitive manner respectful of tribal sovereignty," 36 C.F.R. § 800.2(c)(2)(ii)(B); it "must recognize the government-to-government relationship," *id*. § 800.2(c)(2)(ii)(C); and it should be "conducted in a manner sensitive to the concerns and needs of the Indian tribe." *Id*.

171.    Consultation "should commence early in the planning process" and must ensure that Tribes are provided a "reasonable opportunity to identify [their] concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 52 of 79      52

[their] views on such properties, and participate in the resolution of adverse effects." *Id.*
§ 800.2(c)(2)(ii)(A).

172. Federal agencies must consult with Tribes at specific points in the NHPA §
106 process about specific determinations, including without limitation the following.

a. <u>Identification</u>. In determining and documenting the APE, federal
agencies must "gather information from any Indian tribe . . . to assist in identifying
properties . . . which may be of religious and cultural significance to them and may be
eligible for the National Register," *id*. § 800.4(a)(4). Federal agencies must "take the
steps necessary to identify historic properties within the [APE]" "in consultation with . . .
any Indian tribe . . . that might attach religious and cultural significance to properties
within the [APE]." *Id*. § 800.4(b).

b. <u>Evaluation</u>. Federal agencies must apply the National Register
criteria to previously unidentified or unevaluated historic properties "[i]n consultation
with . . . any Indian tribe . . . that attaches religious and cultural significance to identified
properties." *Id.* § 800.4(c)(1). In applying the National Register criteria, federal agencies
must "acknowledge that Indian tribes . . . possess special expertise in assessing the
eligibility of historic properties that may possess religious and cultural significance to
them." *Id.*

c. <u>Assessment</u>. Federal agencies must apply the criteria of adverse
effect to historic properties within the APE "[i]n consultation with . . . any Indian tribe . .
. that attaches religious and cultural significance to identified historic properties." *Id.* §
800.5(a).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK                                                                      53

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 53 of 79

d. <u>Resolution</u>. Federal agencies "shall consult with . . . Indian tribes . . . to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id.* § 800.6(a).

173. <u>Public Participation</u>. ACHP regulations recognize that the "views of the public are essential to informed Federal decisionmaking" concerning historic properties. *Id.* § 800.2(d)(1). Accordingly, federal agencies "shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties . . . and the relationship of the Federal involvement to the undertaking." *Id.*

174. Federal agencies must "provide the public with information about an undertaking and its effects on historic properties and seek public comment and input." *Id.* § 800.2(d)(2); *see Winnemem Wintu Tribe v. U.S. Dep't Interior*, No. CIV. 2:09-cv-01072-FCD EFB, 2009 WL 10693214, at *7 (E.D. Cal. Sept. 15, 2009); *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1151 (D. Mont. 2004).

175. The obligation to involve the public applies at every step of the NHPA § 106 process, including without limitation the following.

a. <u>Initiation</u>. During the first step, federal agencies "shall plan for involving the public in the section 106 process[ and] . . . identify the appropriate points for seeking public input and for notifying the public of proposed actions." *Id.* § 800.3(e).

b. <u>Identification and Evaluation</u>. During the second step, federal agencies must make "available for public inspection prior to approving the undertaking"

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 54 of 79

54

documentation that no historic properties are present within the APE or that the undertaking will not affect historic properties present within the APE." *Id.* § 800.4(d)(1).

        c.     <u>Assessment</u>.  During the third step, federal agencies "shall consider any views concerning [adverse] effects that have been provided by . . . the public." *Id.* § 800.5(a).

        d.     <u>Resolution</u>.  During the fourth step, federal agencies "shall make information available to the public," "provide an opportunity for members of the public to express their views on resolving adverse effects of the undertaking," and "use appropriate mechanisms . . . to ensure that the public's views are considered." *Id.* § 800.6(a)(4).

**E.**    **National Environmental Policy Act**

    176.    NEPA requires federal agencies to prepare an EIS before approving any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Regulations promulgated by the Council of Environmental Quality ("CEQ") to implement NEPA are set forth at 40 C.F.R. §§ 1500–1508, and they are binding on all federal agencies.[4]  *See* 40 C.F.R. § 1500.3.  Federal agencies "shall integrate the NEPA process with other planning at the earliest possible time." *Id.* § 1501.2; *accord* 36 C.F.R. § 800.8(a).

---

[4] CEQ has recently revised its regulations implementing NEPA, and the changes take effect September 14, 2020.  *See* 85 Fed. Reg. 43,304 (July 16, 2020).  CEQ's prior regulations govern Defendants' decision-making in this matter.  All references in this complaint are to the 1978 CEQ regulations as they existed prior to September 14, 2020.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

177.     An agency preparing an EIS "may not 'segment' its analysis so as to conceal the environmental significance of the project or projects." *Hammond v. Norton*, 370 F. Supp. 2d 226, 244 (D.D.C. 2005) (internal quotation omitted). "Connected" actions should be considered together in the same EIS. 40 C.F.R. § 1508.25(a). Actions are connected if they: (a) "[a]utomatically trigger other actions which may require environmental impact statements;" (b) "[c]annot or will not proceed unless other actions are taken previously or simultaneously;" or (c) "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id*. § 1508.25(a)(1).

178.     Courts apply an "independent utility" test to determine "whether multiple actions are so connected as to mandate consideration in a single EIS." *Sierra Club v. U.S. Bureau Land Mgmt.*, 786 F.3d 1219, 1226 (9th Cir. 2015). Relevant factors include without limitation: (a) whether each project would have taken place without the other; (b) whether projects have been separated from each other to circumvent full NEPA review or downplay impacts; (c) whether each project was intended to stand alone; (d) whether one project would be irrational or unwise without another; and (e) whether a project will render a subsequent project a *fait accompli* or otherwise tie the agency's hands.

179.     NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions in an EIS. *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000). The effects that must be analyzed in the EIS include without limitation impacts on natural resources, ecosystems, cultural resources, social systems, and health. 40 C.F.R. § 1508.8(b); *see id.* § 1508.14. An EIS must:

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 56 of 79

56

a. "Rigorously explore and objectively evaluate all reasonable alternatives," *id*. § 1502.14(a);

b. Analyze the "environmental effects of alternatives including the proposed action," *id*. § 1502.16(d);

c. Analyze "[d]irect effects and their significance" and "[i]ndirect effects and their significance," *id*. § 1502.16(a)–(b); *see id*. § 1508.8;

d. Analyze the "cumulative impact" on the environment resulting from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions," *id*. § 1508.7; *see id*. §§ 1502.16, 1508.8; and

e. Analyze the "[m]eans to mitigate adverse environmental impacts," *id*. § 1502.16(h); *see id*. §§ 1502.14(f), 1508.20.

180. An agency "[s]hall prepare supplements to either draft or final environmental impact statements if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id*. § 1502.9(c)(1).

181. NEPA seeks to ensure the use of high-quality scientific information and mandates scientific integrity. *See id*. §§ 1500.1(b), 1502.24. In the absence of adequate baseline data, "there is simply no way to determine what effect the proposed [action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988). Where

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 57 of 79

57

"incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 C.F.R. § 1502.22(a).

182.  Overall, the analysis in the EIS must provide a "clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14.

F.    **Administrative Procedure Act**

183.  Under the APA, the "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed . . . [and] hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(1), (2)(A), (D).

184.  An agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (internal quotation omitted).

185.  An agency action, finding, or conclusion is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for*

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 58 of 79          58

*Biological Diversity v. Zinke*, 900 F.3d 1053,1067 (9th Cir. 2018) (internal quotation omitted).

186.    A federal agency's failure to consult with a Tribe during the NHPA § 106 process may be challenged under Section 706(1) of the APA as a failure to act.  *See Grand Canyon Trust v. Williams*, 38 F. Supp. 3d 1073, 1083 (D. Ariz. 2014).

## VI.  FIRST CLAIM

**Violations of the Refuge Act and ANILCA:  Failure to Make a Compatibility Determination and Failure to Approve a Leasing Program Compatible with the Purposes of and Consistent with the Management Standards Applicable to the Arctic Refuge**

187.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 186 above.

188.    Under the Refuge Act, the Arctic Refuge and other refuges "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established."  16 U.S.C. § 668dd(a)(3)(A).

189.    The Secretary of the Interior must "provide for the conservation of fish, wildlife, and plants, and their habitats within the System;" "ensure that the biological integrity, diversity, and environmental health of the System are maintained;" and manage the System in a manner that "contribute[s] to the conservation of the ecosystems of the United States."  *Id.* § 668dd(a)(4).

190.    The mission of the National Wildlife Refuge System is to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of fish, wildlife, and plant resources and their habitats within the

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 59 of 79

59

United States for the benefit of present and future generations of Americans." *Id.* § 668(d)(a)(2).

191.    Under ANILCA, the Arctic Refuge and other refuges "shall be administered" by the Secretary of the Interior "in accordance with the laws governing the administration of units of the National Wildlife Refuge System and [ANILCA]." ANILCA § 304(a), Pub. L. No. 96-487, 94 Stat. 2371.

192.    Conservation system units established under ANILCA, including the Arctic Refuge, are expected to be managed "in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded." 16 U.S.C. § 3101(c); *see id.* § 3112(1).

193.    The original and ANILCA purposes of the Arctic Refuge emphasize the conservation of wildlife, habitat, and ecosystems, the continuation of traditional subsistence-based ways of life, and the protection of historic properties. *See* PLO 2214 (Dec. 6, 1960); ANILCA § 303(2)(B), Pub. L. No. 96-487, 94 Stat. 2371; 16 U.S.C. §§ 3101, 3111, 3112.

194.    Congress has also declared it to be federal policy that the "utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands." 16 U.S.C. § 3112(1).

195.    The Leasing Program is a new use of the Arctic Refuge that required a compatibility determination.

196.    Defendants have failed to make a determination that the Leasing Program is compatible with the other purposes of the Arctic Refuge.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK
Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 60 of 79        60

197.    Defendants have approved an oil and gas leasing program for the Coastal Plain of the Arctic Refuge that maximizes industrial development opportunities and will cause grave harm to subsistence, wildlife, habitat, ecosystems, historic properties, cultural resources, and public health.

198.    In doing so, Defendants failed to meaningfully consider and take into account relevant factors, including but not limited to the original Refuge purposes set forth in PLO 2214.

199.    Defendants have failed to demonstrate that their proposed mitigation measures are sufficient to reduce adverse impacts to levels compatible with the purposes of and consistent with the management standards governing the Arctic Refuge.

200.    To the extent Defendants have addressed compatibility with Refuge purposes or consistency with management standards, Defendants have failed to provide a rational explanation to support a compatibility determination, consistency with applicable management standards, or their decision to approve the Leasing Program.

201.    Defendants' approval of the Leasing Program is an exercise of their authority to manage the Arctic Refuge, and it is subject to the requirements of the Refuge Act and ANILCA.

202.    Defendants' approval of the Leasing Program is also a final agency action subject to the standards for federal agency decision-making in the APA.  5 U.S.C. § 706(2).

203.    For the foregoing reasons and others, Defendants' decision to approve the Leasing Program despite its incompatibility with the purposes of the Arctic Refuge and

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK
Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 61 of 79          61

its inconsistency with applicable management standards violates ANILCA § 304(a), Pub. L. No. 96-487, 94 Stat. 2371, 16 U.S.C. § 3114, the Refuge Act, 16 U.S.C. § 668dd, and their implementing regulations, and it is arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA. 5 U.S.C. § 706(2).

## VII.  SECOND CLAIM

### Violations of ANILCA § 810:  Failure to Comply with Procedural and Substantive Requirements for Subsistence Evaluation and Protection

204.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 203 above.

205.    ANILCA is meant to "enabl[e] rural residents who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska." 16 U.S.C. § 3111(5).

206.    Federal agencies are prohibited from authorizing any "withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses" unless and until the relevant agency first completes the evaluations and makes the findings specified in ANILCA § 810.  *Id.*

207.    Under ANILCA § 810, federal agencies "shall evaluate the effect" of any proposed "use, occupancy, or disposition" of public lands on "subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 62 of 79     62

lands needed for subsistence purposes." *Id.* § 3120(a). If, after completing the Tier 1 evaluation, the agency determines that the proposed activity "may significantly restrict" subsistence uses, the agency must proceed to Tier 2. *Kunaknana*, 742 F.2d at 1151.

208.    In Tier 2, the agency must provide notice, conduct hearings, and make a series of detailed findings and determinations demonstrating compliance with ANILCA's substantive standards, including without limitation determinations that (a) the restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands; (b) the proposed activity will involve the minimal amount of public lands necessary; and (c) reasonable steps will be taken to minimize adverse impacts on subsistence uses. *See* 16 U.S.C. § 3120(a).

209.    Only after a federal agency has complied with ANILCA's requirements regarding subsistence is it authorized to "manage or dispose of public lands" under its jurisdiction for other lawful uses or purposes. *Id.* § 3120(d).

210.    Defendants applied an erroneous and unlawful threshold at the outset of the Tier 1 evaluation based on close proximity and heavy subsistence use.

211.    Defendants failed to conduct a Tier 1 evaluation for all nine Gwich'in subsistence communities they identified as relying on the caribou that will be affected by the Leasing Program.

212.    Defendants prepared a deeply flawed and inadequate Tier 1 evaluation for only four subsistence communities: Arctic Village, Venetie, Kaktovik, and Nuiqsut.

213.    Defendants only considered alternatives maximizing oil and gas development and failed to consider an adequate range of alternatives that would "reduce

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 63 of 79    63

or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a).

214. Defendants failed to adequately evaluate the direct, indirect, and cumulative impacts of the Leasing Program on subsistence.

215. Defendants applied a standard higher than the applicable "may significantly restrict" subsistence uses standard in determining whether to proceed to Tier 2.

216. Defendants made an erroneous, unfounded, and unlawful determination that the Leasing Program would not significantly restrict subsistence uses with respect to Arctic Village, Venetie, and seven other Gwich'in subsistence communities.

217. Defendants failed to conduct any Tier 2 analysis, hold any formal subsistence hearings, or make any formal findings pursuant to ANILCA § 810(a)(3) in connection with Arctic Village, Venetie, and seven other Gwich'in subsistence communities.

218. Defendants' approval of the Leasing Program is a federal authorization subject to ANILCA § 810 requirements. Defendants' approval of the Leasing Program is also a final agency action subject to the standards for federal agency decision-making in the APA. 5 U.S.C. § 706(2).

219. For the foregoing reasons and others, Defendants' approval of the Leasing Program without having conducted a valid ANILCA § 810 process violates ANILCA and its implementing regulations, and it is arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA. 5 U.S.C. § 706(2).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 64 of 79

64

# VIII.  THIRD CLAIM

## Violations of NHPA § 106:  Failure to Comply with Procedural and Substantive Requirements for Historic Property Evaluation and Protection

220.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 219 above.

221.     Before expending any federal funds on or issuing any license for a proposed "undertaking," NHPA § 106 provides that federal agencies "shall take into account the effect of the undertaking on any historic property" and "shall afford" the ACHP a "reasonable opportunity to comment with regard to the undertaking."  54 U.S.C. § 306108.

222.     ACHP regulations establish a four-step process for complying with NHPA § 106:  (1) initiation; (2) identification and evaluation; (3) assessment; and (4) resolution. *See* 36 C.F.R. §§ 800.3–800.6.

223.     In carrying out their NHPA § 106 obligations, federal agencies "shall consult with any Indian tribe . . . that attaches religious and cultural significance to historic property that may be affected by an undertaking." *Id.* § 800.2(c)(2)(ii); 54 U.S.C. § 302706(b).

224.     In the NHPA § 106 process, federal agencies must give Tribes special consideration, recognizing the government-to-government relationship and taking into account Tribes' special expertise.  *See* 36 C.F.R. § 800.2(c)(2)(ii)(A)-(C).

225.     Federal agency consultation with Tribes "should commence early in the planning process," and each Tribe must have a reasonable opportunity to "identify its

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK                                                                                      65
Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 65 of 79

concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on such properties, and participate in the resolution of adverse effects." *Id.* § 800.2(c)(2)(ii)(A).

226. Federal agencies must consult with Tribes at many points about specific determinations, including but not limited to information-gathering, identification and evaluation of historic properties, alternatives development, assessment of effects, development and consideration of alternatives and modifications to the undertaking that avoid, minimize, or mitigate adverse effects, and development and implementation of the MOA or PA. *See id*. §§ 800.3–800.6.

227. Federal agencies must also provide the public with information and documentation regarding the undertaking and adverse effects, and they must seek and consider the views of the public at many points throughout the NHPA § 106 process. *See id*. §§ 800.2–800.6, 800.11.

228. Defendants failed to initiate the NHPA § 106 process early enough in the development of the Leasing Program for it to inform the development, evaluation, and selection of Leasing Program alternatives evaluated in the NEPA process and the selection of the final Leasing Program alternative in the ROD. Defendants only considered alternatives maximizing oil and gas development and failed to develop and consider an adequate range of alternatives that would avoid, minimize, or mitigate adverse effects on historic properties. *See* 36 C.F.R. §§ 800.1(c); 800.6(a); 800.8(a)(2).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS
66

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 66 of 79

229.    Defendants failed to engage in adequate and meaningful consultation with Plaintiffs and, on information and belief, other consulting parties in the NHPA § 106 process, including without limitation in identifying and evaluating historic properties for National Register-eligibility, assessing the Leasing Program's effects on historic properties, developing and evaluating alternatives and modifications to the Leasing Program that would avoid, minimize, or mitigate adverse effects on historic properties, and in developing the PA.

230.    Defendants improperly limited the scope of the NHPA § 106 process by failing to take into account the Leasing Program's adverse effects on landscape-level historic properties of traditional religious and cultural significance to Plaintiffs and, on information and belief, other consulting parties, such as the Sacred Place Where Life Begins.

231.    Defendants failed to engage the public in the NHPA § 106 process by failing to provide the public with adequate opportunities for participating, including without limitation opportunities to comment on the NHPA § 106 process, the identification and evaluation of historic properties, and the assessment and resolution of adverse effects.

232.    The Leasing Program is an undertaking subject to NHPA § 106 requirements.  Defendants' approval of the Leasing Program is a final agency action subject to the standards for federal agency decision-making in the APA.  5 U.S.C. § 706.

233.    For the foregoing reasons and others, Defendants' approval of the Leasing Program without having conducted a valid NHPA § 106 process violates the NHPA and

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 67 of 79        67

its implementing regulations, and it is arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA. *Id.* § 706(2)(A), (C).

234.     The Court must compel Defendants to engage in the adequate and meaningful consultation that they unlawfully withheld.  *Id.* § 706(1).

## IX.  FOURTH CLAIM

### Violations of the Tax Act:  Failure to Properly Interpret and Implement Surface Development Limitation

235.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 234 above.

236.     The Tax Act provides that the Secretary of the Interior "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any areas covered by gravel berms or piers for support of pipelines) during the term of the leases under the oil and gas program under this section."  Pub. L. No. 115-97, § 20001(c)(3).

237.     Defendants erroneously and unlawfully interpret this provision to mean that they cannot authorize surface development in an amount less than 2,000 acres in connection with the Leasing Program.

238.     Defendants erroneously and unlawfully interpret this provision as mandating that facilities counting toward the 2,000 acres must be both "production" *and* "support facilities."

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 68 of 79          68

239. Defendants erroneously and unlawfully interpret this provision as allowing them to exclude airstrips, roads, pads, gravel pits and stockpiles, barge landing and storage facilities, and other facilities from the 2,000 acres.

240. Defendants erroneously and unlawfully interpret this provision as excluding rights-of-way and easements from the 2,000-acre limitation.

241. These interpretations and others violate the plain meaning and intent of the 2,000-acre limitation in the Tax Act.

242. Defendants developed and approved the Leasing Program in reliance on these erroneous and unlawful statutory interpretations.

243. Defendants have rejected proposed alternatives on the basis of these erroneous and unlawful interpretations.

244. Defendants' erroneous and unlawful interpretations would allow surface infrastructure associated with the Leasing Program to cover more than 2,000 acres, in violation of the Tax Act.

245. Defendants' approval of the Leasing Program is a final agency action subject to the standards for federal agency decision-making in the APA. 5 U.S.C. § 706(2).

246. For the foregoing reasons and others, Defendants' approval of the Leasing Program in reliance on erroneous and unlawful legal interpretations violates the Tax Act § 20001(c)(3), and it is arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA. 5 U.S.C. § 706(2).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 69 of 79          69

# X.  FIFTH CLAIM

## Violations of NEPA

### 1.  Improper Segmentation of the NEPA Review for the Leasing Program from the NEPA Review for Pre-Leasing Seismic Activities

247.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 246 above.

248.    NEPA requires federal agencies to prepare an EIS before approving any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

249.    "Connected" actions should be considered together in the same EIS.  40 C.F.R. § 1508.25(a).  It is mandatory for multiple actions to be considered together where one or more of them lack independent utility or if their separation reflects an intent to circumvent a full and meaningful NEPA review.

250.    In spring 2018, SAExploration, Inc., submitted an application to Defendants seeking authorization for large-scale and intensive pre-leasing seismic survey activities throughout the Coastal Plain of the Arctic Refuge.

251.    The results of such pre-leasing seismic surveying activities are intended to help inform the Leasing Program.

252.    Defendants excluded pre-leasing seismic surveying activities from the NEPA review for the Leasing Program.  Instead, Defendants initiated a separate NEPA review for these activities, and this process remained in the early stages of scoping at the time the Final EIS for the Leasing Program was issued.  As such, the final information

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 70 of 79

70

and analyses from the pre-leasing seismic NEPA review were not available and could not be incorporated into or relied on in the Final EIS.

253.    In the absence of the Leasing Program, the pre-leasing seismic surveying activities would have no independent utility.

254.    Plaintiffs are informed and believe that the NEPA review for the pre-leasing seismic surveying activities and the NEPA review for the Leasing Program have been improperly separated from each other as a means to circumvent full environmental review and/or to downplay the combined impacts of the two actions.

255.    The Leasing Program is a major federal action significantly affecting the quality of the human environment, and it is therefore subject to the requirements of NEPA and its implementing regulations.

256.    Defendants' issuance of the Final EIS and their approval of the Leasing Program are each final agency actions subject to the standards for federal agency decision-making in the APA.  5 U.S.C. § 706(2).

257.    For the foregoing reasons and others, Defendants' issuance of a Final EIS that excludes pre-leasing seismic surveying activities and their approval of the Leasing Program without having analyzed the impacts of pre-leasing seismic surveying activities constitute unlawful segmentation in violation of NEPA and its implementing regulations. These decisions are also arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA, 5 U.S.C. § 706(2).

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 71 of 79        71

## 2. Failure to Consider a Reasonable Range of Alternatives.

258. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 257 above.

259. An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

260. The action alternatives in the Final EIS are very similar to each other and heavily weighted toward maximizing oil and gas development.

261. Each of the action alternatives: (a) allows seismic surveying to occur throughout the entire program area, including areas closed to leasing; (b) allows leasing in the majority or entirety of the program area; (c) allows for surface development on at least 2,000 acres; (d) fails to exclude key lands from leasing, such as caribou calving and post-calving areas; and (e) is subject to mitigation measures which have not been analyzed or shown to be effective and are broadly subject to waivers, exemptions, and modifications.

262. None of the action alternatives in the Final EIS maximize protection for subsistence, wildlife, habitat, ecosystems, historic properties, cultural landscapes, TCPs, and/or public health.

263. Due to the flawed ANILCA § 810 process, the action alternatives in the Final EIS reflect inadequate Tier 1 analyses and do not reflect any Tier 2 formal subsistence hearings or findings relating to Arctic Village, Venetie, or any other Gwich'in subsistence community. As a consequence, Defendants failed to adequately

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 72 of 79        72

consider which areas not to offer for leasing to reduce impacts on subsistence, and the alternatives do not include sufficient features designed to reduce impacts on subsistence.

264.    Due to the delayed, deferred, and inadequate NHPA § 106 process, the action alternatives in the Final EIS do not reflect the required consultations and evaluations with respect to historic properties, including cultural landscapes such as the Sacred Place Where Life Begins, and do not include features designed to reduce adverse impacts on them.

265.    Defendants' erroneous and unlawful interpretations of the Tax Act have skewed the alternatives toward maximizing industrial development by:   (a) requiring all the action alternatives to provide for at least 2,000 acres of surface development; (b) mandating that facilities counting toward the 2,000 acres must be both "production" *and* "support facilities"; (c) allowing the exclusion of airstrips, roads, pads, gravel pits and stockpiles, barge landing and storage facilities, and other facilities from the 2,000 acres; and (d) excluding rights-of-way and easements from the 2,000-acre limitation.

266.    The Leasing Program is a major federal action significantly affecting the quality of the human environment, and it is therefore subject to the requirements of NEPA and its implementing regulations.

267.    Defendants' issuance of the Final EIS and their approval of the Leasing Program are each final agency actions subject to the standards for federal agency decision-making in the APA.  5 U.S.C. § 706(2).

268.    For the foregoing reasons and others, Defendants' issuance of a Final EIS that fails to evaluate a reasonable range of alternatives and their approval of the Leasing

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 73 of 79          73

Program without having analyzed a reasonable range of alternatives violate NEPA and its implementing regulations. These decisions are also arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA. 5 U.S.C. § 706(2).

### 3. Failure to Properly Analyze Direct and Indirect Effects, Cumulative Impacts, and Mitigation Measures

269. Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 268 above.

270. NEPA requires federal agencies to take a hard look at the environmental consequences of their actions.

271. An EIS must analyze the environmental effects of the alternatives, including without limitation direct and indirect effects, cumulative impact, and mitigation measures. *See* 40 C.F.R. §§ 1502.14, 1502.16, 1508.7, 1508.8, 1508.20.

272. The effects that must be analyzed in the EIS include without limitation impacts on natural resources, ecosystems, subsistence, cultural resources, social systems, and health. *See id*. §§ 1508.8, 1508.14.

273. NEPA seeks to ensure the use of high-quality scientific information and mandates scientific integrity. *See id.* §§ 1500.1(b), 1502.24.

274. Overall, the analysis in the EIS must provide a "clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14.

275. Throughout the Final EIS, Defendants' evaluation of impacts was based on development scenarios utilizing unduly low oil production estimates ranging from about

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JWS-SLG
74

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 74 of 79

2.4 BBO for Alternatives D1 and D2 to roughly 2.7 BBO for Alternative C and 3.0 BBO for Alternative B.  Defendants have erroneously characterized these oil production estimates as "optimistic high-production" levels used to "minimize the chance that the resultant impact analysis will understate potential impacts."  Final EIS, at B-3.  Truly high-end estimates, however, would be in the range of approximately 10.0 BBO or greater as supported by DOI analyses.  The corresponding extent of oil and gas facilities and operations evaluated in the action alternatives would be approximately triple what is described in the Final EIS.  Defendants' use of unduly low oil production estimates thus resulted in an understatement of impacts in the Final EIS.  Defendants also failed to properly develop and evaluate mitigation measures addressing the impacts associated with the full scope of potential oil and gas development.

276.   Defendants' belated, erroneous, and unlawful interpretations of the Tax Act are different from the assumptions underlying the RFD that the analysis of environmental consequences was based on, and this renders the Final EIS's evaluation of direct, indirect, and cumulative impacts and mitigation measures inaccurate and inadequate as a basis for informed decision-making.

277.   Defendants improperly excluded pre-leasing seismic surveying activities from the NEPA review for the Leasing Program, rather than considering these closely interrelated activities as part of the same NEPA review process.  As a result, Defendants failed to acknowledge and properly evaluate the combined impacts of these activities, and this led to an understatement of impacts in the Final EIS.  Defendants also failed to

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 75 of 79          75

properly develop and evaluate mitigation measures addressing the impacts associated with the full scope of leasing-related activities.

278.     The analyses of direct and indirect effects, cumulative impacts, and mitigation measures relating to subsistence, sociocultural systems, environmental justice, public health, cultural resources, caribou, migratory waterfowl, vegetation, tundra, wetlands, soils, permafrost, sand, and gravel are flawed, inadequate, and unlawful in numerous ways, as described above.

279.     In an effort to address the many flaws, inadequacies, and gaps in the Final EIS, Defendants improperly relied on, purported to tier to, and/or attempted to incorporate by reference, with little or no accompanying summary or explanation, numerous other documents, including but not limited to non-NEPA documents, non-federal documents, future or incomplete NEPA reviews, and NEPA reviews concerning unrelated projects and activities.

280.     The Leasing Program is a major federal action significantly affecting the quality of the human environment, and it is therefore subject to the requirements of NEPA and its implementing regulations.

281.     Defendants' issuance of the Final EIS and their approval of the Leasing Program are each final agency actions subject to the standards for federal agency decision-making in the APA.  5 U.S.C. § 706(2).

282.     For the foregoing reasons and others, Defendants' issuance of the Final EIS and their approval of the Leasing Program without having properly analyzed direct and indirect effects, cumulative impacts, and mitigation measures violate NEPA and its

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 76 of 79

76

implementing regulations.  These decisions are also arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.  5 U.S.C. § 706(2).

### 4.  Failure to Prepare a Supplemental EIS

283.    Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 282 above.

284.    CEQ regulations implementing NEPA require federal agencies to prepare a supplemental EIS whenever the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).

285.    Defendants' abandonment of the rationale and key assumptions underlying the RFD and the entire analysis of environmental consequences in the EIS, together with their belated assertion of differing legal interpretations of the Tax Act, constitute "substantial changes in the proposed action that are relevant to environmental concerns" as well as "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

286.    Defendants were required to prepare a supplemental EIS, and their failure to do so violates 40 C.F.R. § 1502.9(c)(1).

287.    The Leasing Program is a major federal action significantly affecting the quality of the human environment, and it is therefore subject to the requirements of NEPA and its implementing regulations.

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 77 of 79

77

288.    Defendants' issuance of the Final EIS and their approval of the Leasing Program are each final agency actions subject to the standards for federal agency decision-making in the APA.  5 U.S.C. § 706(2).

289.    For the foregoing reasons and others, Defendants' failure to prepare a supplemental EIS and their approval of the Leasing Program based on a faulty EIS that depends on legal assumptions no longer in effect without the benefit of a revised analysis of impacts in a supplemental EIS violate NEPA and its implementing regulations, and these decisions are also arbitrary, capricious, an abuse of discretion, contrary to law, and without observance of the procedure required by law under the APA.  5 U.S.C. § 706(2).

## XI.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.    Enter a declaratory judgment that Defendants' actions, findings, conclusions, decisions, and failures to act pertaining to the Final EIS, ANILCA § 810 Final Evaluation, NHPA § 106 process, NHPA § 106 PA, and ROD approving the Leasing Program violate ANILCA, the Refuge Act, the Tax Act, NHPA, and NEPA, and that these actions, findings, conclusions, decisions, and failures to act are arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure as required by law;

B.    Vacate and set aside the Final EIS, ANILCA § 810 Final Evaluation, NHPA § 106 PA, and ROD approving the Leasing Program, and any decisions to lease or actual leases;

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 78 of 79

78

C.     Enter appropriate injunctive and mandamus relief;

D.     Award Plaintiffs all reasonable attorney fees and costs as authorized by law, including without limitation the NHPA, 54 U.S.C. § 307105, and the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E.     Grant such other relief as this Court deems just and proper.


DATED:  September 9, 2020

Respectfully submitted,

NATIVE AMERICAN RIGHTS FUND

By:   *s/ Matthew N. Newman*
       *s/ Wesley James Furlong*
       *s/ Megan R. Condon*
       Matthew N. Newman (AK Bar No. 1305023)
       Wesley James Furlong (AK Bar No. 1611108)
       Megan R. Condon (AK Bar No. 1810096)

       *Lead Counsel for Plaintiffs Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council*


BESSENYEY & VAN TUYN, LLC

By:   *s/ Teresa B. Clemmer*
       Teresa B. Clemmer (AK Bar No. 0111059)
       Peter H. Van Tuyn (AK Bar No. 8911086)
       Karen E. Schmidt (AK Bar No. 1211113)

       *Co-Counsel for Plaintiffs Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council*

*Native Village of Venetie Tribal Government v. Bernhardt*
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. 3:20-cv-00223-JMK

Case 3:20-cv-00223-SLG   Document 1   Filed 09/09/20   Page 79 of 79

79