Matthew N. Newman (AK Bar No. 1305023)
Wesley James Furlong (AK Bar No. 1611108)
Megan R. Condon (AK Bar No. 1810096)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Phone: 907-276-0680
mnewman@narf.org
wfurlong@narf.org
mcondon@narf.org

Teresa B. Clemmer (AK Bar No. 0111059)
Peter H. Van Tuyn (AK Bar No. 8911086)
Karen E. Schmidt (AK Bar No. 1211113)
BESSENYEY & VAN TUYN, LLC
310 K Street, Suite 200
Anchorage, AK 99501
Phone: 907-278-2000
teresa@bvt-law.com
peter@bvt-law.com
karen@bvt-law.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, *et al*., <br> Plaintiffs, <br> v. <br><br> DAVID L. BERNHARDT, *et al*., <br> Defendants, <br><br> ALASKA OIL & GAS ASSOCIATION, *et al.*, Intervenor-Defendants, <br><br> NORTH SLOPE BOROUGH, *et al*., <br> Intervenor-Defendants. | Case No. 3:20-cv-00223-SLG |

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
(Fed. R. Civ. P. 65)**

<u>EXPEDITED RULING REQUESTED BY:
<u>JANUARY 6, 2021 - LEASING</u>
<u>JANUARY 26, 2021 - SEISMIC</u></u>

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2
I.   THE COASTAL PLAIN OF THE ARCTIC REFUGE AND THE GWICH'IN TRIBES
     AND WILDLIFE THAT DEPEND ON IT........................................................................ 2
II.  ARCTIC REFUGE PURPOSES AND PROCEDURAL HISTORY OF THE COASTAL
     PLAIN OIL AND GAS LEASING PROGRAM ............................................................... 3
III. AREA-WIDE SEISMIC EXPLORATION ACTIVITIES COMMENCING IN
     JANUARY 2021 ....................................................................................................... 5
IV.  LEASE SALE PROCESS CULMINATING IN JANUARY 2021........................................ 8

LEGAL STANDARDS ................................................................................................. 11
I.   PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER ..................... 11
II.  JUDICIAL REVIEW OF AGENCY DECISION-MAKING.............................................. 14

ARGUMENT................................................................................................................. 15
I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OR HAVE RAISED
     SERIOUS QUESTIONS AS TO THE MERITS OF THEIR CLAIMS. ................................. 15
     A.   Defendants Unlawfully Excluded Gwich'in Communities from
          the ANILCA § 810 Evaluation Process. .................................................. 15
     B.   Defendants Failed to Take a "Hard Look" at Cultural Resource Impacts.  19
     C.   Defendants Failed to Make a Compatibility Determination. .................... 22
II.  IRREPARABLE HARM IS LIKELY TO OCCUR IN THE ABSENCE OF PRELIMINARY
     INJUNCTIVE RELIEF. ............................................................................................ 25
     A.   Irreparable Harm from Seismic Exploration ............................................ 25
     B.   Irreparable Harm from Oil and Gas Leasing ............................................ 34
III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES TIP SHARPLY IN FAVOR OF
     PRELIMINARY INJUNCTIVE RELIEF. ...................................................................... 37
IV.  NO BOND SHOULD BE REQUIRED. ....................................................................... 39

CONCLUSION ............................................................................................................. 39

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG

# INTRODUCTION

Plaintiffs Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council (collectively "Plaintiffs" or "the Tribes") seek a temporary restraining order and a preliminary injunction prohibiting the U.S. Department of the Interior and the other federal defendants ("Defendants") from approving seismic activity, issuing oil and gas leases, or taking any other action in reliance on the Coastal Plain Oil and Gas Leasing Program Final Environmental Impact Statement ("Final EIS"), Alaska National Interest Lands Conservation Act § 810 Final Subsistence Evaluation ("ANILCA § 810 Evaluation"), or Record of Decision ("ROD"), which are the subject matter of the above-captioned litigation.[1]

Plaintiffs are likely to prevail on the merits, or have raised serious questions as to the merits, of their claims that Defendants:  (1) unlawfully excluded Gwich'in communities from the subsistence evaluation process required under ANILCA § 810, using thresholds which contradict the plain language of the statute and, as a result, irretrievably skewed the § 810 balancing test;[2] (2) failed to take a "hard look" at cultural resource impacts, as required under the National Environmental Policy Act ("NEPA");[3] and (3) failed to make a compatibility determination, as required under the National

---

[1] *See* Final EIS, AR 661 at 90163-93729; ANILCA § 810 Eval., AR 661 at 90848; ROD, AR 671 at 205951-206038.

[2] 16 U.S.C. § 3120.

[3] 42 U.S.C. § 4321 *et seq*.; 40 C.F.R. § 1500.1 *et seq*.  Although the NEPA regulations have recently been revised, *see* 85 Fed. Reg. 43,304 (July 16, 2020, eff. Sept. 14, 2020), the prior regulations govern this matter, and all references herein are to the prior regulations.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG        1

Wildlife Refuge System Administration Act ("Refuge Act")[4] and ANILCA.[5]

Defendants' approval of seismic operations and issuance of oil and gas leases are likely to result in irreparable harm to: (1) the Gwich'in tribal governments and their members who depend on the cultural and natural resources of the Coastal Plain Arctic National Wildlife Refuge ("Arctic Refuge") as fundamental to their traditional culture and identity; (2) the Coastal Plain and its vegetation, hydrology, ecosystems, and cultural and natural landscape; (3) the caribou, migratory birds, and other wildlife supported by the Coastal Plain; and (4) the archaeological and cultural resources known or anticipated to be present on the Coastal Plain. The public interest and balance of equities tip sharply in favor of protecting against such irreparable harm while the merits of this lawsuit are considered.

Plaintiffs respectfully request the Court to waive any bond requirement, and Plaintiffs are concurrently submitting a Joint Motion and Stipulation for Expedited Consideration and a Motion to Accept Overlength Brief.

## FACTUAL BACKGROUND

### I.   THE COASTAL PLAIN OF THE ARCTIC REFUGE AND THE GWICH'IN TRIBES AND WILDLIFE THAT DEPEND ON IT

The Coastal Plain of the Arctic Refuge is a biological wonder and is the cultural

---

[4] 16 U.S.C. § 668dd *et seq*. Without waiving any claims or allegations set forth in their Complaint, Plaintiffs are focusing on a limited subset of their claims and allegations for purposes of this motion for preliminary injunctive relief.
[5] ANILCA § 304(a), Pub. L. No. 96-487, 94 Stat. 2371 (1980) (requiring compliance with the Refuge Act).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          2

cornerstone for the Gwich'in Tribes. The Porcupine Caribou Herd migrates about 2,700 miles annually through Alaska and Canada to reach the Coastal Plain because it offers uniquely high-quality habitat for calving, rearing young, seeking relief from insects, foraging, and avoiding predators.[6] The Coastal Plain has been sacred to the Tribes and other Gwich'in communities for millennia because of their deep cultural and spiritual connection to the Porcupine Caribou Herd.[7] Gwich'in call themselves "Caribou People," and they refer to the Coastal Plain as "Iizhik Gwats'an Gwandaii Goodlit:" the "Sacred Place Where Life Begins."[8] The Coastal Plain and the Caribou permeate throughout Gwich'in songs, dance, and oral histories.[9] The abundance of the Coastal Plain also attracts hundreds of thousands of migratory birds from six continents, and it supports a multitude of other wildlife.[10] The Tribes rely on these migratory birds and other wildlife as part of their traditional subsistence way of life.[11] Archaeological and cultural resources tied to the Gwich'in's shared history in the Coastal Plain can still be found today.[12]

## II. ARCTIC REFUGE PURPOSES AND PROCEDURAL HISTORY OF THE COASTAL PLAIN OIL AND GAS LEASING PROGRAM

The Arctic Refuge was first granted federal protection through a public land order

---

[6] *See* AR 661 at 90376-90379.
[7] *See* Exs. 1, 2, 3.
[8] *See* Exs. 1, 2.
[9] *See* Ex. 1.
[10] *See* AR 661 at 90344-90354.
[11] *See* Ex. 1, 2, 3.
[12] *See* Ex. 4.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG        3

in 1960.[13]  It was then known as the Arctic National Wildlife Range ("the Range"), and it was established for the purposes of "preserving unique wildlife, wilderness and recreational values."[14]  Through ANILCA in 1980, Congress renamed the Range the Arctic National Wildlife Refuge, expanded its acreage, and recognized four Refuge-specific purposes[15] in addition to those established through the 1960 public land order and those established under ANILCA for National Wildlife Refuges generally.[16]  The four Refuge-specific purposes for the Arctic Refuge are:  "(i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd . . . , polar bears, grizzly bears muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling; (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats; (iii) to provide . . . the opportunity for continued subsistence uses by local residents; and (iv) to ensure . . . water quality and necessary water quantity within the refuge."[17]

Until recently, ANILCA prohibited oil and gas leasing and development anywhere in the Arctic Refuge.[18]  Through tax legislation in 2017, however, Congress added a fifth Refuge-specific purpose—"to provide for an oil and gas program on the Coastal

---

[13] *See* F. Seaton, Sec'y Interior, Pub. Land Order 2214, Establishing the Arctic National Wildlife Range (Dec. 6, 1960).
[14] *Id.*
[15] *See* ANILCA § 303(2)(B), Pub. L. No. 96-487, 94 Stat. 2371 (1980).
[16] 16 U.S.C. §§ 3101, 3111, 3112.
[17] ANILCA § 303(2)(B).
[18] 16 U.S.C. § 3143.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                    4

Plain"[19]—and directed the Secretary of the Interior to establish and administer an oil and gas leasing and development program there.[20]  Importantly, Congress did not otherwise modify the purposes of the Arctic Refuge or waive any applicable laws.

Defendants subsequently conducted rushed and inadequate environmental, subsistence, and historic property reviews in violation of multiple federal laws.[21]  They issued their Final EIS and ANILCA § 810 Evaluation in September 2019 and their ROD in August 2020.[22]  Four lawsuits were filed in August and September 2020 challenging these federal agency actions, including the present lawsuit by the Tribes.[23]

## III.  AREA-WIDE SEISMIC EXPLORATION ACTIVITIES COMMENCING IN JANUARY 2021

Concurrent with the Leasing Program process, in the spring of 2018, SAExploration, Inc. ("SAE"), submitted a detailed application to Defendants seeking authorization to conduct pre-leasing seismic survey activities throughout the Coastal Plain.[24]  This proposal was later withdrawn.

A new proposal for seismic exploration was submitted to Defendants on October 23, 2020, by Kaktovik Iñupiat Corporation ("KIC") ("the KIC Seismic Proposal"),[25] and

---

[19] Tax Cuts and Jobs Act of 2017 ("Tax Act") § 20001(b)(2)(B)(iii), Pub. L. No. 115-97, 131 Stat. 2054 (2017).
[20] *See id.* § 20001(b)(2)(A).
[21] *See generally* Complaint, ECF 1.
[22] *See supra* note 1.
[23] *See* ECF 3, 16.
[24] *See* Complaint, ECF 1 ¶ 45; Answer, ECF 15 ¶ 45.
[25] *See* Exs. 5, 6, 7.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                5

Defendants accepted public comments during a two-week scoping period.[26] On December 8, 2020, the U.S. Fish & Wildlife Service ("FWS") issued a Proposed Incidental Harassment Authorization ("IHA") and Draft Environmental Assessment ("EA") relating to the polar bear impacts of the KIC Seismic Proposal.[27]

Under the current version of the KIC Seismic Proposal, intensive 3D seismic exploration and related activities would be carried out by SAE, as KIC's contractor, from January 21, 2021 through September 30, 2021.[28] "Mobilization of the seismic survey equipment and crew will begin once the tundra opens to winter travel," which could be as early as January 26, 2021.[29] KIC and SAE plan to use heavy tracked and wheeled tundra vehicles to drag forty to fifty trailers on sleds–in eight to ten strings of five trailers each—approximately 136 miles across the tundra from Deadhorse to Kaktovik.[30] This massive mobilization would provide camp facilities for a workforce of up to 180 workers, along with fuel tanks, incinerators, tracked vehicles, trucks, and other industrial equipment.[31] The camp would be moved one to two miles every five to seven days throughout the winter season.[32] Thousands of gallons of water would be obtained through snow melting

---

[26] *See* Ex. 4 ¶ 5, Ex. 4-1.
[27] *See* Exs. 8, 9. FWS is not among the Defendants in this action. The FWS Proposed IHA and Draft EA are only relevant for this motion insofar as they provide updated details about the timing and scope of the upcoming seismic exploration activity.
[28] *See* Exs. 5, 7, 8, 9.
[29] Ex. 8 at 2, 3.
[30] *See* Ex. 5 at 7-8 10; Ex. 7 at 1, 3, 5-6; Ex. 8 at 4-5; Ex. 9 at 11-12, 13-14.
[31] *See* Ex. 5 at 10; Ex. 7 at 5-6; Ex. 8 at 4-5; Ex. 9 at 13-14.
[32] *See* Ex. 5 at 10; Ex. 7 at 6; Ex. 8 at 4; Ex. 9 at 14.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                    6

or from nearby lakes.[33]

Seismic activities would take place over a vast area, covering approximately 567 square miles of the Coastal Plain.[34] KIC and SAE propose to use thousands of miles of source lines spaced 1,320 feet (400 meters) apart with sampling taking place every 27.5 feet (8 meters) along each line.[35] The seismic data would be gathered along roughly twice as many miles of receiver lines spaced 660 feet (200 meters) apart and placed perpendicular to the source lines.[36] Twelve 97,000-pound tracked vibrator vehicles could operate at the same time, along with other smaller vehicles.[37] Each of the lines would be traveled multiple times by crews for placement and retrieval of the lines and nodes, and the work would be conducted 24 hours per day with two 12-hour personnel shifts each day.[38]

Temporary airstrips would be constructed on lakes and/or tundra for resupplies and personnel transport.[39] Numerous airplane takeoffs and landings would occur throughout the winter season. In addition, about 450 to 600 helicopter takeoffs and landings would occur during a fifteen-day summer debris cleanup operation in July and August 2021.[40]

---

[33] *See* Ex. 5 at 6; Ex. 7 at 8-9; Ex. 8 at 5; Ex. 9 at 15.
[34] *See* Ex. 8 at 2; Ex. 9 at 11.
[35] *See* Ex. 5 at 9; Ex. 7 at 7; Ex. 8 at 4; Ex. 9 at 13.
[36] *See* Ex. 5 at 9; Ex. 7 at 7; Ex. 8 at 4; Ex. 9 at 13.
[37] *See* Ex. 5 at 9; Ex. 7 at 7; Ex. 8 at 4; Ex. 9 at 13.
[38] *See* Ex. 5 at 9-10; Ex. 7 at 7-8; Ex. 8 at 4; Ex. 9 at 12-13.
[39] *See* Ex. 5 at 11, 14; Ex. 7 at 3-4, 6; Ex. 8 at 5; Ex. 9 at 14-15, 16.
[40] *See* Ex. 5 at 15-16; Ex. 7 at 10; Ex. 8 at 6; Ex. 9 at 11, 16-17.

Defendants have acknowledged that they are relying heavily on the Final EIS, including the attached ANILCA § 810 Evaluation, and the ROD to support their decision-making concerning the proposed KIC Seismic Program.[41]  In their Draft Finding of No New Significant Impact for the Program, Defendants stated that "[a]n EA was determined to be the appropriate NEPA tool for analyzing the proposed action *because BLM has previously analyzed and disclosed impacts resulting from such seismic exploration in the Coastal Plain Leasing EIS ... which this EA tiers to and incorporates by reference*."[42]  Defendants underscored the point by emphasizing that the EA "*tiers to and incorporates by reference in its entirety* the Coastal Plain Leasing EIS."[43]  This means the Defendants are also relying on and tiering to the ANILCA § 810 Evaluation, which is set forth as Appendix E to the Final EIS.[44]  Defendants also discuss at length the Required Operating Procedures (ROPs) set forth in the Leasing Program ROD that they are relying on for the KIC Seismic Program.[45]

## IV.  LEASE SALE PROCESS CULMINATING IN JANUARY 2021

On November 17, 2020, Defendants published a Call for Nominations for oil and

---

[41] *See* Ex. 21.  Defendants made available their Environmental Assessment and Draft Finding of No New Significant Impact for the KIC Seismic Program today, December 15, 2020.  See Exs. 20, 21. Plaintiffs have incorporated a few items from these materials, but they have not yet had a chance to carefully review these documents.  Plaintiffs will address any discrepancies in their Reply.

[42] Ex. 21 at 3 (emphasis added).

[43] *Id*. at 6 (emphasis added).

[44] *See* AR 661 at 90844 *et seq*.

[45] *See generally* Ex. 21.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          8

gas leasing on the Coastal Plain and opened a thirty-day public comment period.[46]

Halfway through the comment period, however, Defendants issued a Notice of Lease

Sale and Detailed Statement of Lease Sale, which indicated bids would be accepted from

December 21 to 31, 2020 and the lease sale itself would take place on January 6, 2021,

with the actual issuance of leases taking place thereafter.[47]  This action contradicted

Defendants' representation to this Court that its Notice of Lease Sale would be published

"[s]ubsequent[]" to the end of the Call for Nominations comment period.[48]  Defendants'

apparent goal is to issue final leases before the transition to the Biden Administration.[49]

The proposed leases include "extraordinary" language that would grant expansive rights

to lessees,[50] as a result of BLM's erroneous interpretation of the Tax Act.[51]  For instance,

Interior Secretary David Bernhardt has emphasized to Congress that the leases would

"guarantee . . . rights-of-way" across the sensitive Coastal Plain.[52]  The Detailed

Statement confirms this characterization:

> Section 20001(c)(2) of Public Law 115-97 states that the Secretary acting
> through the BLM "shall issue any rights-of-way or easements across the

---

[46] *See* Ex. 15; ECF 14.
[47] *See* Exs. 16, 17; ECF 29.
[48] ECF 14 at 2.
[49] *See* Ex. 19.
[50] House Approps. Comm., *Dept. Interior Budget Request for FY2021*, at 1:53:35 to
1:54:03, YouTube.com, https://appropriations.house.gov/events/hearings/department-of-
the-interior-budget-request-for-fy2021 (Mar. 11, 2020, testimony of Interior Secretary
Interior David Bernhardt) (explaining the "rights conferred under these [Coastal Plain]
leases are extraordinary" and "guarantee . . . rights-of-way" to the lessees).
[51] Plaintiffs dispute the validity of BLM's interpretation of the Tax Act in several
respects, *see* Complaint, ECF 1 at 36-37, 68-69, but these claims are not the focus of the
present motion.
[52] Bernhardt Testimony, *supra* note 50.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          9

Coastal Plain for the exploration, development, production, or transportation necessary to carry out this section." *BLM interprets the plain language of this provision as requiring that it authorize any such rights-of-way necessary to carry out the Coastal Plain oil and gas program established by Section 20001 of PL 115-97. . . . Off-lease rights-of- way and easements necessary for development under a particular lease will be granted, as well as any right-of-way or easement necessary to carry out the oil and gas program across the Coastal Plain.*[53]

The text in the Sample Lease for the Coastal Plain likewise includes unusual language

guaranteeing rights-of-way and easements across the Coastal Plain to lessees:

This lease is issued granting the exclusive right to drill for, extract, remove and dispose of all the oil and gas ... in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon, *and including access to those lands through the availability of off-lease right-of-way and easements necessary for the exploration, development, production, or transportation of oil and gas from such lands* for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority.[54]

Moreover, Defendants have made clear their view that they are mandated to allow

future oil and gas development activities under the leases and will not have the ability

reject or impose substantial restrictions on such activities:

Section 20001(c)(3) of Public Law 115-97 provides that BLM shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities . . . during the term of the leases under the oil and gas program. *This mandate . . . will be carried out through leases that allow for regulation of facilities but may not preclude such infrastructure. . . .* This statutory requirement *functions as a directive to BLM that it must not deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 surface acres are covered by production and support facilities.*[55]

---

[53] Ex. 17 at 5-6 (emphasis added).
[54] Ex. 17 at 81. *Compare with* Ex. 18 at 139.
[55] Ex. 17 at 6 (emphasis added).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                    10

There is no comparable language regarding guaranteed rights-of-way and easements, or limitations on future agency authority, in a recent Detailed Statement concerning leasing in the National Petroleum Refuge-Alaska ("NPR-A").[56]

The geographic scope of the Lease Sale is breathtakingly expansive as well; Defendants are proposing to make essentially the entire 1.5 million acres of the Coastal Plain available for leasing on January 6, 2021.[57]

## LEGAL STANDARDS

### I. PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Plaintiffs seeking a preliminary injunction must establish that: (1) they are "likely to succeed on the merits"' (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"' (3) the "balance of equities tips in [their] favor"' and (4) an injunction is "in the public interest."[58] Under the Ninth Circuit's "sliding scale" approach, it is sufficient for a plaintiff to show "serious questions going to the merits" where the "hardship balance . . . tips sharply toward the plaintiff" and the other factors are satisfied.[59] Serious questions are "substantial, difficult, and doubtful," requiring "more deliberative investigation."[60] The standards for a temporary restraining order are

---

[56] *Compare* Ex. 17, at 5-6 *with* Ex. 18 at 6.
[57] *See* Ex. 17 at 13 (map of lease sale tracts).
[58] *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).
[59] *Alliance Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).
[60] *Se. Alaska Conserv. Council v. U.S. Forest Serv.*, 413 F. Supp. 3d 973, 979 (D. Alaska 2019) (quoting *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991)).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          11

"substantially identical" to those for a preliminary injunction.[61]

Courts recognize that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable."[62] Injury to tribal cultural resources also constitutes irreparable harm.[63] As such, where environmental or cultural resource injury is "sufficiently likely," the "balance of harms will usually favor the issuance of an injunction to protect the environment."[64]

Courts also acknowledge the "well-established 'public interest in preserving nature and avoiding irreparable environmental injury," as well as the "public interest in careful consideration of environmental impacts before major federal projects go forward," and they have "held that suspending such projects until that consideration occurs 'comports with the public interest.'"[65] The public also has a strong interest in the "enforcement of its statutes."[66] Further, the Ninth Circuit has frequently held that the

---

[61] *Stuhlbarg Int'l Sales v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). *See E. Bay Sanct. Cov. v. Trump*, 909 F.3d 1219, 1238 (9th Cir. 2018) (citation omitted).
[62] *Alliance*, 632 F.3d at 1135 (quotation omitted).
[63] *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010) ("Damage to or destruction of any of the[] [historic and cultural sites] would constitute irreparable harm in some degree."); *Battle Mountain Band of Te-Moak Tribe of W. Shoshone Indians v. U.S. Bureau of Land Mgmt.*, No. 3:16-cv-0268-LRH-WGC, 2016 WL 4497756, at *10 (D. Nev. Aug. 26, 2016) ("Such injuries have previously been held to be irreparable." (citations omitted)).
[64] *Se. Alaska*, 413 F. Supp. 3d at 984 (quoting *Amoco Prod. Co. v. Village Gambell*, 480 U.S. 531, 545 (1987), *abrog. other grounds by Winter*, 555 U.S. at 20).
[65] *Alliance*, 632 F.3d at 1138 (quotations omitted).
[66] *Enyart v. Nat'l Conf. Bar Exam's, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) (quoting district court approvingly). *See Alliance*, 632 F.3d at 1138 ("It comports with the public

---

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          12

"public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns."[67]  Where there is likely to be irreparable environmental harm, "more than pecuniary harm must be demonstrated" to avoid an injunction.[68]

Courts should consider whether a bond is necessary in connection with preliminary injunctive relief,[69] but a district court retains substantial discretion "as to the amount of security required, *if any.*"[70]  Courts may waive the bond requirement or impose only a nominal bond to avoid frustrating public interest litigation and to avoid denying judicial review to plaintiffs with limited financial means.[71]

---

interest for the Forest Service to comply faithfully with [its] procedures" and "regulations."); *Seattle Aud. Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991) (describing the interest in "having government officials act in accordance with the law" as a "public interest of the highest order").

[67] *Nat'l Parks Conserv. Assoc. v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (explaining the "loss of anticipated revenues" by a cruise ship company "does not outweigh the potential irreparable damage to the environment").  *See Alliance*, 632 F.3d at 1138-39 (concluding temporary logging jobs did not outweigh the public interest in avoiding environmental injury); *Idaho Sport. Cong. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (concluding irreparable harm from logging outweighed financial hardship to the Forest Service, logging companies, and surrounding communities).  *See also Or. Nat. Res. Council v. Goodman*, 505 F.3d 885, 889–90 (9th Cir. 2007) (reversing and remanding because the "risk of permanent ecological harm" outweighed "temporary economic harm" that a ski resort operator "may suffer pending further study").

[68] *Indig. Envtl. Network v. U.S. Dept. State*, 369 F. Supp. 3d 1045, 1052 (D. Mont. 2018) (citing *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986)).

[69] Fed. R. Civ. P. 65(c).

[70] *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir.2003)) (emphasis in original).  *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

[71] *See Barahona-Gomez*, 167 F.3d at 1237 (9th Cir. 1999) (affirming nominal bond of $1,000 because the plaintiff class of immigrants was furthering the public interest and because, even without evidence of indigency, it was clear the members of the class were very poor); *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho

## II.    JUDICIAL REVIEW OF AGENCY DECISION-MAKING

Courts review challenges arising under ANILCA, NEPA, and the Refuge Act under the Administrative Procedure Act ("APA").[72]  Under the APA, courts "hold unlawful and set aside agency action, findings, and conclusions" when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or adopted "without observance of procedure required by law."[73]  "Agency action is 'not in accordance with the law' when it is in conflict with the language of the statute relied upon by the agency,"[74] and this is a question of "statutory interpretation" in the ANILCA claims below, rather than "reasonableness."[75]

With respect to factual determinations, Courts must ensure the agency made a "rational connection between the facts found and the conclusions made."[76]  This standard is violated when an agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence . . . or is so implausible that it could not be ascribed to a

---

2019) (waiving the bond requirement because the plaintiffs were seeking to advance the public interest); *Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) (setting bond at $100 in offshore leasing case and citing several similar cases in which only nominal bonds were required).

[72] Courts also have independent subject matter jurisdiction to review federal agency action under 28 U.S.C. § 1331.  *See Se. Alaska Conserv. Council*, 413 F. Supp. 3d at 979 (quoting *Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

[73] 5 U.S.C. § 706(2)(A), (D).

[74] *Se. Alaska Conserv. Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995 (D. Alaska 2020) (quoting *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007)).

[75] *Id*. (quoting *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2020)).

[76] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quotation omitted); *Alliance Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1117 (9th Cir. 2018).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          14

difference in view or the product of agency expertise."[77]

## ARGUMENT

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OR HAVE RAISED
      SERIOUS QUESTIONS AS TO THE MERITS OF THEIR CLAIMS.**

    A.    **Defendants Unlawfully Excluded Gwich'in Communities from the
       ANILCA § 810 Evaluation Process.**

In enacting ANILCA, Congress recognized that the "continuation of the

opportunity for subsistence uses . . . is essential to Native physical, economic, traditional,

and cultural existence,"[78] and a key purpose of Alaska public lands is to "provide the

opportunity for rural residents engaged in a subsistence way of life to continue to do

so."[79]  Congress also declared it to be federal policy that the "utilization of the public

lands in Alaska is to cause the least adverse impact possible on rural residents who

depend upon subsistence uses of the resources of such lands."[80]  Toward that end,

ANILCA § 810 establishes both procedural and substantive protections for subsistence.

The ANILCA § 810 process takes place in two steps.  In Tier 1, the agency must

evaluate: (a) the "effect" of the proposed action on "subsistence uses and needs"; (b) the

"availability of other lands" for the action; and (c) "other alternatives which would

reduce or eliminate the use, occupancy, or disposition of public lands needed for

subsistence purposes."[81]  If, after completing Tier 1, the agency determines that the

---

[77] *Gr. Yellowst. Coal'n v. Lewis*, 628 F.3d 1143, 1148 (9th Cir. 2010) (quotation omitted).
[78] 16 U.S.C. § 3111(1).
[79] *Id.* § 3101(c).  *See id.* § 3112(1).
[80] *Id.* § 3112(1).
[81] *Id*. § 3120(a).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          15

proposed activity "may significantly restrict subsistence uses," the agency must proceed to Tier 2.[82]

The Tier 2 threshold is "quite low."[83] Only a "threat of significant restriction" is required, and such a restriction "need not be likely."[84] In Tier 2, the agency cannot authorize the proposed activity unless and until it: "gives notice of, and holds, a hearing in the vicinity of the area involved" and determines that (1) the "restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands," (2) the proposed activity will involve the "minimal amount of public lands necessary," and (3) "reasonable steps will be taken to minimize adverse impacts upon subsistence."[85] The ultimate determination of whether a proposed action is "necessary" calls for a balancing of the harm to subsistence against the benefits of the action, and this weighing of competing interests is affected by how many and which types of subsistence communities are included in the evaluation.

Defendants unlawfully excluded Gwich'in Tribes from both phases of their ANILCA § 810 process for the Coastal Plain Leasing Program.[86] Initially, Defendants acknowledged the "importance of the program area to caribou" and identified twenty-two communities that rely on these caribou for subsistence, including nine Gwich'in

---

[82] *Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984).
[83] *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987), *aff'd* 857 F.2d 1307 (9th Cir. 1988).
[84] *Hanlon v. Barton*, 740 F. Supp. 1446, 1448 (D. Alaska 1988).
[85] 16 U.S.C. § 3120(a).
[86] *See* Complaint, ECF 1, at 13-20, 37-42, 59-62.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          16

communities.[87]  Defendants' Tier 1 evaluation was limited to only four communities,

however, and only two of these were Gwich'in, even though Gwich'in are the most

heavily reliant on caribou for their culture, spirituality, sustenance, and way of life.

Defendants' rationale was that the four communities included were "closest to the

program area and have subsistence uses in or near the program area or rely heavily on

resources that use the program area."[88]  This exclusionary threshold based on "close[]"

proximity and "heav[y]" subsistence use is much more stringent than the minimal "may

significantly restrict" standard, and it was unlawfully applied at the *outset* of the Tier 1

evaluation, rather than at the end of it.  The threshold is also nonsensical because the

Porcupine Caribou Herd migrates thousands of miles, and Gwich'in communities—from

Alaska to Canada—rely on these caribou regardless of their proximity to the Coastal

Plain.

        As a result of Defendants' unlawful threshold, seven Gwich'in communities were

excluded from the entire ANILCA § 810 review process.  This, in turn, meant that the

full extent of subsistence uses of the Porcupine Caribou Herd was not considered, and the

full range of potential alternatives and mitigation to minimize adverse impacts on

Gwich'in subsistence communities, including Plaintiff Tribes, likewise were not

considered.

        Defendants also unlawfully excluded from Tier 2 both of the Gwich'in tribal

---

[87] AR 661 at 90850.
[88] *Id.*

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG            17

communities—Arctic Village and Venetie—that had been included in Tier 1. Defendants' exclusion of these communities was based primarily on their finding that "large-scale displacement and consequent large decreases in the abundance of [Porcupine Caribou Herd] caribou available for subsistence use is unlikely."[89] A standard focusing on "large" adverse impacts that are "likely" is far more stringent than the low "may significantly restrict" threshold for Tier 2. Indeed, this Court has specifically held that subsistence impacts "need not be likely" to surpass the Tier 2 threshold.[90] As a consequence, Arctic Village and Venetie were unlawfully deprived of the opportunity to participate in formal subsistence hearings in Tier 2. Moreover, the exclusion of these communities precluded Defendants from making informed decisions concerning the minimization of adverse impacts on subsistence uses and the balancing of harms to subsistence against the benefits of oil and gas development.

In sum, Defendants applied thresholds at the outset of their ANILCA § 810 evaluation and prior to Tier 2 that contradict the plain language of the statute and were therefore not in accordance with the law. As a result, Defendants unlawfully excluded seven Gwich'in communities at the outset of their ANILCA § 810 review, and the remaining two (Plaintiffs Arctic Village and Venetie) prior to Tier 2.

This, in turn, resulted in the crucial balancing of the harms to subsistence against the benefits of oil and gas development being done without taking into account the

---

[89] AR 661 at 90858 (making finding for Alternative B, which was selected in the ROD).
[90] *Hanlon*, 740 F. Supp. at 1448.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          18

adverse impacts of such development on the two Plaintiff Gwich'in subsistence communities, any other Gwich'in communities in Alaska, or the reliance of Gwich'in on the Porcupine Caribou Herd. This unlawfully tipped the scales against Gwich'in subsistence uses and in favor of oil and gas development.

## B. Defendants Failed to Take a "Hard Look" at Cultural Resource Impacts.

NEPA requires federal agencies to take a "hard look" at the environmental effects of their actions,[91] including effects on cultural resources.[92] NEPA seeks to ensure the use of "high quality" scientific information,[93] and it mandates "scientific integrity."[94] In the absence of adequate baseline data, "there is simply no way to determine what effect the proposed [action] will have on the environment and, consequently, no way to comply with NEPA."[95] Where "incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant," the agency "shall include" the information in the EIS."[96] An agency's reliance on incomplete or outdated information

---

[91] *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000).
[92] *See* 40 C.F.R. §§ 1502.16, 1508.8(b), 1508.14; *Indig. Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 580 (D. Mont. 2018) (quoting *Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005) (agency must "provide a 'full and fair discussion of the potential effects of the project to cultural resources[.]'")
[93] 40 C.F.R. § 1500.1(b).
[94] *Id*. § 1502.24.
[95] *Half Moon Bay Fish. Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).
[96] 40 C.F.R. § 1502.22(a).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG        19

regarding potential cultural resources is unlawful.[97]

The archaeological data relied on by Defendants for the cultural resource analysis in the Final EIS is grossly inadequate to support informed decision-making or comply with NEPA requirements.[98]  Indeed, Defendants have admitted that "[o]verall, *vast inland areas of the program area have received little to no systematic investigation for cultural resources*; while the coastal region has been the subject of a greater number of survey efforts."[99]

The only broad archaeological survey of inland areas of the Coastal Plain was conducted in 1982,[100] before the advent of GPS and other modern surveying technologies.  Defendants have acknowledged that "[*m*]*any of the sites in the program area were documented before the use of global positioning systems, so the reported sites may not be accurate*."[101]  Even at the time, FWS pointed out major limitations in the 1982 survey:

> *Archeological investigations on ANWR during the last 30 years have not provided comprehensive coverage.  Former surveys focused on very limited geographic areas and, generally, selectively sampled only some of the locales where archeologists expected to find sites, thereby skipping areas assumed to have low site frequencies.  This has left large gaps in the data base regarding settlement system and changing land use patterns and the basic chronology of the cultural occupation sequences.*  Many questions remain unanswered regarding the cultural processes that produced the

---

[97] *Indig. Envtl. Network*, 347 F. Supp. 3d at 581 ("The Department appears to have jumped the gun when it issued the ROD in 2017 and acted on incomplete information regarding potential cultural resources along the 1,038 acres of unsurveyed route.")
[98] *See generally* Ex. 4.
[99] AR 661 at 90448 (emphasis added).
[100] *See id*.
[101] AR 661 at 90451 (emphasis added).

sequences of human occupations (now represented only in archeological sites), environmental influences on these processes, and the social behavior that resulted from and produced these processes. Even though the *previous investigations have been limited in scope and intensity*, they have identified over 50 prehistoric and historic sites representing at least 6,000 years of human occupation within ANWR. Research in adjacent areas in north Alaska and Canada clearly indicate that the ANWR study area is within one of the two most probable northern entry routes for the first human inhabitants of the Western Hemisphere from the mainland of Asia. Thus, it can be expected that sites representing at least 12,000 years of human occupation, from Paleoindian times to the present, may be found within the coastal plain study area of ANWR. These sites, both early and recent, could yield data of great scientific and cultural value because so little is known of the sequence of human occupations and culturally defined land use patterns for this region.[102]

The last broad archaeological survey of coastal areas was conducted by the U.S. Army Corps of Engineers ("Corps") in 2011.[103] The Corps survey did not encompass the entire coastal region. Instead, it was "primarily concentrated in and around the village of Kaktovik, along the coast and barrier islands of the Beaufort Sea, and along several of the major rivers in the area."[104] The Corps' research was also limited to sites already documented in the Alaska Heritage Resources Survey, and the Corps did not conduct any archaeological surveys of areas in between known sites.[105]

The cultural resources analysis in the Final EIS thus relies primarily on an archaeological survey conducted almost forty years ago for inland areas of the Coastal Plain and on a coastal survey conducted nine years ago that was limited to known sites in

---

[102] Ex. 14 at 13 (emphasis added).
[103] *See* AR 661 at 90448, 90453 (citing "Grover and Ryder 2011") and AR 661 at 90613 (full citation).
[104] AR 661 at 90448.
[105] *See* Ex. 13 at 34, 38.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG      21

only some of the coastal areas.[106]  This data is utterly insufficient to inform Defendants'

decision-making for the Leasing Program.[107]  Cultural resource surveys are routinely

prepared and not exorbitantly expensive, and adverse impacts on archaeological

resources from large-scale, intensive seismic exploration activity are reasonably

foreseeable.[108]  Reasonably up-to-date and comprehensive information was therefore

essential to reasoned decision-making.  Moreover, Defendants have had plenty of time to

acquire useful archaeological data as the Tax Act opened the Coastal Plain to such

development three years ago, and an initial area-wide seismic proposal was submitted to

them a few months later, in early 2018.[109]  Defendants' failure to do so violates NEPA

requirements.[110]

### C.    Defendants Failed to Make a Compatibility Determination.

The Refuge Act governs the administration of the National Wildlife Refuge

System.[111]  The Arctic Refuge and other refuges "shall be managed to fulfill the mission

of the System, as well as the specific purposes for which that refuge was established."[112]

The "mission of the System" is to "administer a national network of lands and waters for

the conservation, management, and . . . restoration of fish, wildlife, and plant resources

---

[106] *See* AR 661 at 90447-90459, 91034-91039.

[107] *See generally* Ex. 4.

[108] *See infra* at 31-34; Ex. 4.

[109] *See* Complaint, ECF 1 ¶ 45; Answer, ECF 15 ¶ 45.

[110] *See Indig. Envtl. Network*, 347 F. Supp. 3d at 581 ("The Department must supplement
the information on the unsurveyed acres to the 2014 EIS's cultural resource analysis, in
order to comply with its obligations under NEPA.") (citation omitted).

[111] *See* 16 U.S.C. §§ 668dd-668ee.

[112] *Id.* § 668dd(a)(3)(A).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          22

and their habitats . . . for the benefit of present and future generations of Americans."[113]

The "purposes" of a refuge include those "specified in or derived from the law, proclamation, executive order, agreement, public land order . . . establishing, authorizing, or expanding a refuge[.]"[114]  The Arctic Refuge must therefore be managed in a manner that fulfills all of the purposes outlined above, including those set forth in PLO 2214, ANILCA § 303(2)(B), and 16 U.S.C. §§ 3101, 3111, 3112.  As discussed above, these purposes emphasize the conservation of wildlife, habitat, and ecosystems and the continuation of traditional subsistence-based ways of life.

To achieve these purposes, the Secretary of the Interior must "provide for the conservation of fish, wildlife, and plants, and their habitats within the System;" "ensure that the biological integrity, diversity, and environmental health of the System are maintained;" and manage the System in a manner that "contribute[s] to the conservation of the ecosystems of the United States."[115]  A "new use of a refuge" cannot be initiated or permitted "unless the Secretary has determined that the use is a compatible use."[116]  A use is "compatible" if it will not "materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge."[117]  Compatibility determinations must be in writing[118] and based on "sound professional judgment."[119]

---

[113] *Id.* § 668dd(a)(2).
[114] *Id.* § 668ee(10).  *See* 50 C.F.R. § 25.12(a).
[115] 16 U.S.C. § 668dd(a)(4)(A)-(C).
[116] *Id.* § 668dd(d)(3)(A)(i).
[117] *Id.* § 668ee(1).  *See* 50 C.F.R. § 25.12(a).
[118] *See* 50 C.F.R. § 25.12(a).
[119] 16 U.S.C. § 668ee(1).  *See* 50 C.F.R. § 25.12(a).

*Native Village of Venetie Tribal Govt. v. Bernhardt*, 3:20-cv-00223-SLG          23

"Sound professional judgment" means "consistent with principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of [the Refuge] Act and other applicable laws."[120]

Additionally, ANILCA requires the Arctic Refuge and other refuges to be administered "in accordance with the laws governing the administration of units of the National Wildlife Refuge System and [ANILCA]."[121]  Under ANILCA, Refuges are expected to be managed "in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded."[122]

The Leasing Program is a new use of the Arctic Refuge that requires a compatibility determination, and nothing in the Tax Act eliminates or waives this requirement.  Defendants acknowledge that they retain authority to determine "where and under what terms and conditions" leasing and oil and gas development will occur.[123] And, they have pointed to mitigation measures that may reduce adverse impacts on other refuge purposes to some extent.[124]  At the same time, however, Defendants admit there

---

[120] 16 U.S.C. § 668ee(3).  *See* 50 C.F.R. § 25.12(a).
[121] ANILCA § 304(a), Pub. L. No. 96-487, 94 Stat. 2371.
[122] 16 U.S.C. § 3101(c).  *See id.* § 3112(1).
[123] AR 671 at 205958, 205960, 205961, 205969.
[124] AR 671 at 205964.  Plaintiffs dispute the effectiveness of the mitigation measures and the adequacy of Defendants' evaluation of them, but those issues are beyond the scope of this motion.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          24

will be "some potential impact on the other four refuge purposes."[125]  Defendants have

failed to make any definitive determination that the net result is that the Leasing Program

will be "compatible" with the other purposes of the Arctic Refuge.  Defendants' approval

of the Leasing Program in the absence of a compatibility determination is a clear

violation of the Refuge Act, ANILCA, and implementing regulations.

## II.    IRREPARABLE HARM IS LIKELY TO OCCUR IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF.

### A.    Irreparable Harm from Seismic Exploration

The large-scale and intensive seismic exploration activities proposed to begin on

January 21, 2021, with ground operations commencing on January 26, 2021, are likely to

cause irreparable harm to the Tribes, the Coastal Plain, caribou and other wildlife, and

tribal archaeological and cultural resources.[126]

***Gwich'in Communities.***  The Coastal Plain is one of the most important natural,

cultural, and subsistence resources to the Tribes and their members.[127]  It has historical

significance as a place where Gwich'in have traveled, camped, hunted, and traded since

time immemorial.[128]  Today, the Tribes continue to regard the Coastal Plain as sacred and

important.[129]  The Tribes and their members view the Coastal Plain as a place of peace

---

[125] AR 671 at 205963.  By focusing on the other "four" refuge purposes in ANILCA § 303(2)(B), Defendants have unlawfully excluded the additional purposes in PLO 2214 and in ANILCA §§ 3101, 3111, 3112.  That issue, however, is beyond the scope of this motion.

[126] *See* Exs. 1, 2, 3, 4, 10, 11, 12, 14.

[127] Ex. 1 ¶ 4; Ex. 2 ¶ 4; Ex. 3 ¶ 4.

[128] Ex. 2 ¶ 8.

[129] Ex. 1 ¶ 8; Ex. 2 ¶ 8.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                25

and a sanctuary where animals return to renew their lifecycles.[130] On-the-ground activities in the KIC Seismic Proposal will harm the Tribes' view of the Coastal Plain as a birth place and place of peace.[131] Increased noise, pollution, and outsider presence will diminish the Tribes' connection to the Coastal Plain.[132] Scars on the land resulting from seismic activities will forever change how the Tribes view the Coastal Plain as a sacred place.[133]

The Tribes' identity as caribou people is intertwined with the Porcupine Caribou Herd's calving areas in the Coastal Plain.[134] Therefore, any impacts to the Porcupine Caribou Herd from changes in migration patterns, lower fertility rates, and changes in habitat will have significant adverse social, cultural, spiritual, and subsistence impacts on the Tribes and their members.[135] The caribou that calve within the Coastal Plain are the primary source of Tribal members' subsistence harvests—the keystone species that has made it possible for the Tribes to live within their traditional areas from time immemorial to the present.[136] Hunting caribou provides more than a food source, it is a treasured way of life that Tribal members desire to continue living.[137] Subsistence resources and practices, such as sharing, are an essential component of family and community

---

[130] Ex. 2 ¶ 8.
[131] Ex. 2 ¶ 11.
[132] Ex. 3 ¶ 8.
[133] Ex. 1 ¶ 8; Ex. 2 ¶ 11.
[134] Ex. 1 ¶ 7; Ex. 2 ¶ 9.
[135] Ex. 1 ¶ 8; Ex. 2 ¶¶ 4, 11.
[136] Ex. 1 ¶¶ 10–11.
[137] Ex. 1 ¶¶ 10–12; Ex. 2 ¶¶ 10, 12; Ex. 3 ¶¶ 6, 9.

*Native Village of Venetie Tribal Govt. v. Bernhardt*, 3:20-cv-00223-SLG          26

relationships.[138]

Continuation of these traditional practices is possible because of the intact habitat provided by the Coastal Plain.[139] Seismic activities will likely change that habitat and impact the Porcupine Caribou Herd's behavior.[140] Tribal members have already observed impacts to caribou from oil and gas development in the North Slope, including mixing between the Porcupine and the Central Arctic herds.[141] Disruptions in the Coastal Plain resulting from seismic activities will likely alter the Porcupine Caribous Herd's habitat or migration and, in turn, irreparably harm the Tribes' way of life.[142]

***Coastal Plain.*** It is well-documented that seismic surveying activities have caused, and are likely to cause irreparable damage to the Coastal Plain landscape and ecosystem.[143] Even much less intensive seismic operations have left scars across the landscape and altered vegetation, soils, permafrost, and hydrology for decades.[144] Indeed, seismic surveying activities "create the most extensive impacts related to Arctic oil and gas production."[145]

The KIC Seismic Proposal is likely to have even more severe impacts than those resulting from Coastal Plain seismic surveys conducted in the 1980s and annual seismic

---

[138] Ex. 1 ¶ 13; Ex. 2 ¶ 10.
[139] Ex. 2 ¶ 10.
[140] Ex. 1 ¶ 8; Ex. 2 ¶ 10.
[141] Ex. 1 ¶ 9; Ex. 3 ¶ 7.
[142] Ex. 1 ¶¶ 8, 14; Ex. 2 ¶ 10; Ex. 3 ¶¶ 8, 10.
[143] *See* Exs. 10, 11.
[144] *See* Exs. 10, 11.
[145] *See* Ex. 10 at 16.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                    27

surveying activities across the central North Slope.[146]  Key factors include:  (1) the much

denser grids used in modern 3D seismic surveying, as opposed to older 2D techniques;

(2) the much windier and hillier landscape of the Coastal Plain than areas to its west,

which results in open areas having little or no snow cover, while adjacent ravines have

large snowdrifts, making cross-country travel more difficult and more damaging; (3) a

greater proportion of moist vegetation types and ice-rich soil layers on the Coastal Plain,

both of which are especially vulnerable to compression and damage from heavy vehicles;

and (4) increasing climate impacts in recent years, which has resulted in a shift of

precipitation from snow to rain that, together with the proposed seismic exploration

activity, would lead to increasing depth of the "active" soil layer that melts and freezes

and a corresponding decrease in more stable permafrost layers.[147]

Notably, some of the most severe and widespread damage from seismic

exploration often does not become apparent for seven years or more.[148]  Of particular

concern is thermokarst, an erosional process unique to ice-rich permafrost that can lead to

subsidence, mass wasting events, troughs, pits, ponding, gullies, increased hydrological

connectivity, and other effects spreading far from the original location of seismic

surveying tracks.[149]  Erosion is more rapid and severe in hilly terrain, such as that of the

---

[146] *See* Exs. 10, 11.  This point is amply demonstrated by experience west of the Arctic
Refuge, conducted by the same company that would be the operator here.  *See id.*
[147] *See* Exs. 10, 11.
[148] *See* Ex. 10 at 13.
[149] *See* Ex. 10 at 12-13; Ex. 11 at 23-28.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                    28

Coastal Plain, due to the easier flow of water.[150]  Thermokarst is already more common

due to climate change, and it can be greatly exacerbated by seismic exploration

activity.[151]

Vegetation impacts from seismic exploration can also be severe and long-lasting.

The plant species most sensitive to direct seismic damage and slowest to recover include

moist sedges, mosses, and lichens, which are prevalent on the Coastal Plain.[152]

Vegetation is also indirectly affected by thermokarst and the other changes to soil and

hydrology discussed above.[153]

Severe and long-lasting impacts of seismic exploration on soils, vegetation, and

hydrology include those associated with camp movement due to the heavy vehicles and

equipment used, the large armada of vehicles, and the dozens of times camps are moved

throughout a winter season.[154]  Camp movement will be among the first activities to

occur when and if seismic exploration is approved.[155]

*Caribou and Other Wildlife.*  Caribou, migratory birds, and other wildlife are

likely to be irreparably harmed by seismic activities as well.  Seismic operations are

planned to take place through the end of May.[156]  Caribou mothers arrive in the spring,

---

[150] *See* Ex. 10 at 13.
[151] *See* Exs. 10, 11.
[152] *See* Ex. 10 at 11; Ex. 11 at 30-33.
[153] *See* Exs. 10, 11.
[154] *See* Ex. 10 at 4-6; Ex. 11 at 34-35.
[155] *See* Ex. 5 at 7-8; Ex. 7 at 1; Ex. 8 at 2, 3-4; Ex. 9 at 11-12.
[156] *See* Ex. 5 at 3; Ex. 9 at 11.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          29

and calving begins in late May.[157]  The overlap of seismic operations with the calving period in the spring, when caribou are especially vulnerable, has the potential to result in substantial adverse impacts on reproductive success.[158]  Moreover, summer cleanup operations would occur during times when both caribou and migratory birds are present.[159]  The noise and vibration of airplane and helicopter overflights can be highly disturbing to wildlife, especially when conducted repeatedly and relatively low to the ground, as proposed by KIC.[160]  Further, the intensive summer helicopter activity is proposed to take place in July and August, right when migratory birds are in their most vulnerable nesting, brood-rearing, and molting stages.[161]

Caribou, migratory birds, and other wildlife depend on the unique habitat and ecosystems throughout the Coastal Plain.  Seismic exploration will have the greatest adverse impacts on the moist types of vegetation—sedges, moss, and lichen—that serve as important forage resources for caribou mothers and calves.[162]  Over time, the initial damage caused by seismic exploration will likely lead to irreversible cascading effects, including the replacement of the high-quality vegetation that caribou depend on with

---

[157] *See* AR 661 at 90376.
[158] *See* AR 661 at 90384; Ex. 20 at 58 ("In late winter and spring (April-May), PCH caribou may also be found approaching and entering the Coastal Plain in preparation for calving season, which starts in mid to late May. Therefore, caribou could be encountered during the proposed seismic surveys on the Coastal Plain.").
[159] *See* Ex. 20 at 58 ("... [C]aribou use the Coastal Plain during the post-calving and insect relief seasons and could be encountered during summer clean-up activities associated with the proposed seismic surveys.").
[160] *See* AR 661 at 90390.
[161] *See* AR 661 at 90347, 90357.
[162] *See* AR 661 at 90378.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                    30

lesser quality plants and non-native species.[163]  This would likely have substantial

impacts on the health, behavior, and migration patterns of the Porcupine Caribou Herd.[164]

Defendants have acknowledged that "PCH may be more sensitive to changes in

vegetation conditions in calving and post-calving areas.  Vegetation changes ... could

incrementally contribute to herd health declines in the long-term."[165]  The ecosystem

changes discussed above can be expected to degrade habitat for migratory birds, fish, and

other wildlife as well.[166]

  ***Tribal Archaeological and Cultural Resources.***  Seismic exploration is likely to

cause irreparable harm to archaeological and cultural resources, and allowing seismic

activities without up-to-date surveys would be unprecedented.

  The limited and outdated surveys that have been done make it clear that

archaeological and cultural resources are present within the area of KIC's proposed

seismic exploration activity, although the exact locations of known sites and the overall

extent and character of such resources remain unknown.[167]  These resources are likely to

be permanently destroyed by seismic activities, including the transportation and

movement of equipment, the laying and retrieval of source lines and nodes, the operation

of the tracked vibrator vehicles, and the construction, operation, maintenance, and

---

[163] *See* AR 661 at 90321, 907322, 90327, 90328, 90383 tbl. 3-21, 90384.
[164] *See* AR 661 at 90384; Exs. 1, 2, 3.
[165] Ex. 20 at 61.
[166] *See* Ex. 10 at 2, 10, 17; Ex. 11 at 7, 18.
[167] *See* Ex. 4; Ex. 13; Ex. 14 at 13.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG    31

cleanup of camps and airstrips.[168]  The physical impacts of these activities to the physical

landscape, even when conducted on snow pack, is well documented, as discussed

above.[169]  The same impacts to the physical environment threaten archaeological and

cultural resources which are found on and within the landscape.[170]

If Defendants approve the KIC Seismic Proposal for this upcoming winter, they

will do so without having required or conducted the necessary archaeological and cultural

resource survey before seismic exploration.[171]  As explained above, the only surveys of

the Coastal Plain are old and woefully inadequate.  Defendants' failure to require or

conduct a survey before seismic exploration is a stark departure from normal procedures.

From 2015 to 2020, every winter seismic project in the North Slope has required an

archaeological survey or relied on surveys done within the past ten years.[172]  Because of

the lack of adequate documentation and Defendants' failure to require a new survey

before KIC's seismic exploration, the extent and locations of archaeological and cultural

resources within the Coastal Plain that may be affected by seismic exploration is

unknown.[173]

Seismic exploration also threatens irreparable harm to the known and documented

archaeological and cultural resources.  Many of these sites' locations were recorded

---

[168] *See* Ex. 4.
[169] *See* Exs. 10, 11, 12.
[170] *See* Ex. 4.
[171] *See* Ex. 4 ¶ 7 (citing Ex. 4-1 at 9-12).
[172] *See* Ex. 4 ¶ 7 (citing Ex. 4-1 at 9-10).
[173] *See* Ex. 4; Ex. 13; Ex. 14 at 13.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                 32

before GPS technology was available, meaning their precise locations are unknown.[174]
KIC's proposal to scout for cultural sites "during operations" and implement a 500-foot
buffer[175] will be ineffectual because the sites' locations cannot be precisely determined
on the Coastal Plain, in the winter, under snow. Indeed, Defendants have admitted that
"current information for interior portions of the Project Area is based on piecemeal,
reconnaissance-level survey work last conducted prior to GPS availability or interviews
conducted without field visits" and that, as a result, the "accuracy of cultural [site
locations] for the Project Area ... remains partially unverified, particularly geographic
coordinates; thus, some sites could fall outside their respective avoidance areas."[176] It
appears Defendants are not planning to require KIC to find and relocate the known sites
prior to seismic exploration, and snowfall and limited visibility ensure that they cannot be
adequately protected from irreparable injury.[177]

"NEPA ensures that [agencies] will not act on incomplete information, only to
regret its decision after it is too late to correct."[178] Here, Defendants' authorization of
seismic exploration within the Coastal Plain with insufficient information regarding the
existence, location, and character of archaeological and cultural resources threatens

---

[174] *See* Ex. 4 ¶ 8 (citing Ex. 4-1 at 12-14).
[175] Ex. 21 at 17. *See id.* at 14; Ex. 20 at 38.
[176] Ex. 20 at 36.
[177] Ex. 4 ¶ 8 (citing Ex. 4-1 at 13-14).
[178] *Indig. Envtl. Network*, 347 F. Supp. 3d at 581 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 30, 371 (1989)).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          33

irreparable injury to these resources[179] and violates NEPA requirements.[180]

**B.    Irreparable Harm from Oil and Gas Leasing**

The upcoming Lease Sale scheduled for January 6, 2021 is also likely to cause irreparable harm.  Unlike typical oil and gas leases, the Coastal Plain leases will guarantee lessees rights-of-way and easements across areas of the Coastal Plain outside their lease tract boundaries,[181] resulting in irreparable harm across vast swaths of the Coastal Plain.[182]  Defendants have also indicated that they believe their ability to prohibit, condition, or restrict lessees' oil and gas development activities after lease issuance is much more limited than usual.[183]  As such, these leases will constitute the "point of commitment" after which the "government no longer has the ability to prohibit potentially significant inroads on the environment."[184]  The leases would also result in a "threat of irreparable harm to public land" if they are issued.[185]

Courts have recognized the irreparable harm flowing from the issuance of these types of leases and granted preliminary injunctions to prevent oil and gas lease sales and

---

[179] Ex. 4.

[180] *See Indig. Envtl. Network*, 347 F. Supp. 3d at 581 ("The Department appears to have jumped the gun when it issued the ROD in 2017 and acted on incomplete information regarding potential cultural resources along the 1,038 acres of unsurveyed route."); *Indig. Envtl. Network v. U.S. Dep't of State*, No. CV-17-29-GF-BMM, 2019 WL 652416, at *10 (D. Mont. Feb. 15, 2019) (affirming injunction of construction activities in areas "not yet surveyed for cultural resources").

[181] *See supra* notes 50-54, 56, 57, and accompanying text.

[182] *See* Exs. 1, 2, 3, 4, 10, 11, 12, 14.

[183] *See supra* notes 55, 56, and accompanying text.

[184] *Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1998).  *See S. Utah Wilderness Alliance v. Allred*, 1:08-cv-02187 (memo. order), at *4.

[185] *S. Utah*, at *4.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          34

maintain the status quo pending the outcome of litigation. For instance, a preliminary injunction was recently granted to enjoin BLM and other federal agencies from implementing amendments to a Sage Grouse Habitat Management Plan because Plaintiffs were likely to succeed on the merits of their NEPA claims and (1) the amendments would otherwise be "effective immediately," (2) BLM would be "approving oil and gas leases; drilling permits; rights-of-way for roads, pipelines, and powerlines; coal and phosphate mining approvals; and livestock grazing permit renewals" under the weakened protections of the amended Plan, and (3) the "expressed intent" of the Trump Administration was to open up more land to resource development immediately.[186] These circumstances are quite analogous to the present situation given Defendants' reliance on the deeply flawed Final EIS and ANILCA § 810 Evaluation for the Leasing Program and their plan to implement that Program on a fast-track basis through the upcoming Lease Sale and seismic exploration.

Additionally, the First Circuit upheld a preliminary injunction precluding the Department of the Interior from proceeding with a scheduled oil lease sale that would have granted oil drilling rights on 488 offshore tracts near the New England coast.[187] The government argued there was no irreparable harm because several further steps and government authorizations would be needed before oil exploration could begin. The First Circuit rejected this argument because NEPA's procedural requirements are aimed at

---

[186] *W. Watersheds*, 417 F. Supp. 3d at 1331-34 (D. Idaho 2019).
[187] *Massachusetts. v. Watt*, 716 F.3d 946, 947 (1st Cir. 1983).

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG        35

ensuring informed decision-making concerning environmental impacts and because the actions taken by industry in reliance on the leases meant that their issuance represented a "link in a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues."[188]  Similarly here, the Coastal Plain leases will grant property rights to engage in oil and gas development and, in the absence of injunctive relief, the government and private parties will move forward with oil and gas development activities in reliance on a Final EIS and other documents likely to be deemed invalid.  These activities are likely to cause irreparable physical harm,[189] and the leases could be difficult to revoke after they have been granted.[190]

In the same vein, this Court recently granted a preliminary injunction precluding the U.S. Forest Service from "opening any bids or awarding any contracts" in connection with an upcoming timber sale.[191]  Much like the present situation, the government was relying on a programmatic EIS for a regional timber development program, and the planned timber sale was one of its first actions implementing that program.  It was also undisputed that ground-disturbing activities could take place shortly after the issuance of the leases.  The same is true here, especially since the Coastal Plain leases grant such unusually expansive rights to the leaseholders.

Throughout these cases, courts have made it clear that the issuance of leases

---

[188] *Id*. at 952.
[189] *See* Exs. 1, 2, 3, 4, 10, 11, 12, 14.
[190] Oil and gas leaseholders have sued to prevent their leases from being withdrawn.  *See, e.g., Impact Energy Res. LLC v. Salazar*, 693 F.3d 1239 (10th Cir. 2012).
[191] *Se. Alaska*, 413 F. Supp. 3d at 986.

*Native Village of Venetie Tribal Govt. v. Bernhardt*, 3:20-cv-00223-SLG          36

granting substantial property rights and limiting subsequent agency oversight represents a key decision point that can lead to irreparable harm, and such leasing decisions must be enjoined to preserve the status quo while litigation is pending. The Coastal Plain leases will be exactly these types of leases. By transferring unusually expansive property rights and limiting future agency oversight, Defendants will make it far easier for the leaseholders to build roads, undertake seismic operations, conduct exploratory drilling, build gravel mines, and construct and operate heavy industrial facilities, including wells, pipelines, pads, and camps, across vast areas of the sensitive Coastal Plain ecosystem (each lease tract is about 40,000 to 50,000 acres[192]). For the reasons discussed above, the Tribes, the Coastal Plain, wildlife, and archaeological and cultural resources will be irreparably harmed by seismic exploration and other large-scale industrial activities taking place on the Coastal Plain under the leases that would be granted in the absence of injunctive relief.[193]

## III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES TIP SHARPLY IN FAVOR OF PRELIMINARY INJUNCTIVE RELIEF.

The irreparable harm to the Tribes, the Coastal Plain, wildlife, and tribal archaeological and cultural resources is described above and in the attached Declarations and Exhibits.[194] Weighing against this irreparable harm, the federal Defendants and Intervenor-Defendants can only point to economic harm, which is not irreparable. Much

---

[192] *See* Ex. 16 at 13 (showing 1.5 million acres divided into 32 large tracts).
[193] *See* Exs. 1, 2, 3, 4, 10, 11, 12, 14.
[194] *See* Exs. 1, 2, 3, 4, 10, 11, 12, 14.

like the First Circuit case discussed above, the federal Defendants cannot argue that oil from the Coastal Plain is "needed immediately" given the Covid-19 pandemic, associated economic slump, and low demand for oil. Further, they cannot be expecting immediate tax revenue, enhanced national security, or other benefits from the exploration and development of a new, largely unexplored region with uncertain oil and gas reserves and highly challenging terrain and weather conditions that will make any future development slow and arduous.[195]

The Intervenor-Defendants may point to a few jobs that will not materialize in the near term, but this is insufficient to outweigh irreparable environmental harm.[196] Moreover, Intervenor-Defendants may have an interest in postponing capital investments until the validity of the Leasing Program has been resolved by this Court. If Plaintiffs succeed on the merits, as is likely for the reasons discussed above, capital investments made during the course of this litigation could be lost.

Strong public interests also weigh in favor of an injunction, including the well-established public interest in avoiding irreparable environmental injury, especially in the context of public lands, as well as the public interest in enforcing federal agency compliance with NEPA, ANILCA, and the Refuge Act, the public interest in ensuring meaningful public participation in government decision-making, and the public interest in protecting the ability of subsistence communities to continue their traditional way of life,

---

[195] *Massachusetts*, 716 F.2d at 953.
[196] *See supra* notes 67, 68, and accompanying text.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          38

as recognized by Congress in ANILCA.

Overall, the public interest and balance of equities tip sharply in favor of granting preliminary injunctive relief.

## IV.    NO BOND SHOULD BE REQUIRED.

Plaintiffs are all governing entities of federally-recognized Tribes,[197] and they seek to prevent irreparable harm to the spirituality, culture, and identity of their members, as well as to the Coastal Plain and its wildlife and ecosystems.  Plaintiffs enjoy a thriving culture and a rich subsistence-based way of life, but their tribal governments do not receive substantial monetary income.  The imposition of a significant bond would have a chilling effect on the ability of Tribes to protect their interests and public interests through judicial review.  The Court should therefore exercise its discretion to waive any bond requirement.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully urge the Court to grant their motion for a temporary restraining order and preliminary injunction precluding seismic exploration activities and lease issuance until a final decision is rendered in this matter. Plaintiffs are asking for leasing to be enjoined by no later than **January 6, 2021** because Defendants have been unable or unwilling to specify what date is the earliest thereafter that final leases could be issued.  Plaintiffs are also asking for seismic exploration activities to be enjoined by **January 26, 2021** based on their understanding that this is the

---

[197] *See* Exs. 1, 2, 3.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG                39

earliest date ground-disturbing activities could take place.[198]  Plaintiffs also urge the

Court to waive the bond requirement.

DATED:  December 15, 2020.

Respectfully submitted,

By:      *s/ Matthew N. Newman*
Matthew N. Newman (AK Bar No. 1305023)
Wesley James Furlong (AK Bar No. 1611108)
Megan R. Condon (AK Bar No. 1810096)
NATIVE AMERICAN RIGHTS FUND

*s/ Teresa B. Clemmer*
Teresa B. Clemmer (AK Bar No. 0111059)
Peter H. Van Tuyn (AK Bar No. 8911086)
Karen E. Schmidt (AK Bar No. 1211113)
BESSENYEY & VAN TUYN, LLC

*Counsel for Plaintiffs Native Village of Venetie
Tribal Government, Arctic Village Council, and
Venetie Village Council*

---

[198] *See* Exs. 8, 9.  An earlier order enjoining seismic operations may be beneficial in preventing private parties from expending time and money in mobilizing for seismic activities this winter, but this is not Plaintiffs' primary concern.

*Native Village of Venetie Tribal Govt. v. Bernhardt,* 3:20-cv-00223-SLG          40