Megan R. Condon (AK Bar No. 1810096)
Mitchell Forbes (AK Bar No. 2402005)
NATIVE AMERICAN RIGHTS FUND
420 L Street, Suite 310
Anchorage, AK 99501
Phone: (907) 276-0680
mcondon@narf.org
forbes@narf.org

*Lead Counsel for Plaintiffs Native Village of Venetie
Tribal Government, Arctic Village Council, and Venetie Village Council*

Peter H. Van Tuyn (AK Bar No. 8911086)
Karen E. Schmidt (AK Bar No. 1211113)
BESSENYEY & VAN TUYN, LLC
911 West 8th Avenue, Suite 101, PMB 59
Anchorage, AK 99501
Phone: (907) 278-2000
peter@bvt-law.com
karen@bvt-law.com

*Co-Counsel for Plaintiffs Native Village of Venetie Tribal Government, Arctic Village
Council, and Venetie Village Council*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DOUG BURGUM, *et al.*, <br><br> Defendants, <br><br> and <br><br> ALASKA OIL & GAS ASSOCIATION, *et al.*, <br><br> Intervenor-Defendants. | Case No. 3:20-cv-00223-SLG |

## PLAINTIFFS' OPENING BRIEF UNDER LOCAL RULE 16.3

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 1

   I.   The Gwich'in People's Relationship with the Coastal Plain ................................. 1

   II.  Establishment and Protection of the Arctic Refuge ................................................. 3

   III.  The Coastal Plain Oil and Gas Leasing Program ................................................. 4

       A.  The 2017 Tax Cuts and Jobs Act ................................................................. 4

       B.  The 2025 Budget Reconciliation Act ............................................................. 5

       C.  Development of the 2020 Leasing Program ..................................................... 6

       D.  Review of the 2020 Leasing Program ............................................................. 8

       E.  Reinstatement of the 2020 Leasing Program .................................................. 10

STANDARD OF REVIEW ........................................................................................... 11

ARGUMENT ............................................................................................................... 12

   I.   Interior Violated the Refuge Act and ANILCA ...................................................... 12

       A.  Interior Failed to Adopt a Leasing Program Consistent with the Purposes of the Arctic Refuge ...................................................................................... 13

          1. *Interior failed to adopt a leasing program consistent with the purposes of the Arctic Refuge* ............................................................. 13

          2. *Interior's reversal of 2024 ROD was unlawful* ............................................. 17

       B.  Interior Failed to Make a Compatibility Determination ................................. 19

   II.  Interior Failed to Comply with Its Obligations to Consider and Protect Subsistence under ANILCA. ................................................................................... 21

       A.  Interior Unlawfully Excluded Communities ................................................. 23

       B.  Interior Applied an Erroneous Interpretation of "Subsistence Uses" to Exclude Culturally Important Subsistence Resources and Practices. ............... 24

       C.  Interior Made an Erroneous Determination that the Leasing Program Would not Significantly Restrict Subsistence Uses for Arctic Village and Venetie. .... 27

   III.  Interior Violated the NHPA ................................................................................... 28

       A.  Interior Failed to Consider Effects on The Sacred Place Where Life .............. 29

       B.  Interior Failed to Adequately Consult with the Tribes ................................... 34

   IV.  Interior Misinterpreted the Tax Act's Surface Development Limitation .............. 37

   V.   Interior Violated NEPA. ........................................................................................ 41

    A.  Interior Failed to Conduct a NEPA Analysis Despite New Circumstances that Substantially Change the Analysis of the Proposed Action ............................ 42

        1. *New circumstances and information warranted a new NEPA analysis* ....... 43

        2. *The existing NEPA analysis did not adequately analyze the effects of the proposed action* ...................................................................................... 46

    B.  Interior Failed to Consider a Reasonable Range of Alternatives .................... 50

CONCLUSION ............................................................................................................. 52

# TABLE OF AUTHORITIES

**Cases**

*Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, No. 3:24-CV-00051-SLG,
2025 WL 903331 (D. Alaska Mar. 25, 2025).................................................................. 9

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
67 F.3d 723 (9th Cir. 1995) ....................................................................... 24, 25

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)...................................................................................... 21

*Bd. of Cnty. Comm'rs v. U.S. Bureau of Land Mgmt.*,
706 F. Supp. 3d 1180 (D. Colo. 2022)........................................................... 48

*City of Tenakee Springs v. Clough*,
915 F.2d 1308 (9th Cir. 1990) ...................................................................... 21

*Del. Audubon Soc'y v. Sec'y of the U.S. Dep't of Interior*,
612 F. Supp. 2d 442 (D. Del. 2009)............................................................... 20

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)...................................................................................... 11

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)................................................................................ 16, 17

*Feliciano v. Dep't of Transp.*,
605 U.S. 38 (2025)........................................................................................ 39

*Half Moon Bay Fish. Mktg. Ass'n v. Carlucci*,
857 F.2d 505 (9th Cir. 1988) ........................................................................ 45

*Hanlon v. Barton*,
740 F. Supp. 1446 (D. Alaska 1988) ........................................................ 23, 26

*Idaho Sporting Cong. Inc. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) ........................................................................ 41

*Indig. Envtl. Network v. U.S. Dep't of State*,
347 F. Supp. 3d 561 (D. Mont. 2018)............................................................ 45

*Kunaknana v. Clark*,
742 F.2d 1145 (9th Cir. 1984) ........................................................... 21, 23, 26

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ..................................................................11, 37, 40

*Lopez v. Garland*,
  116 F.4th 1032 (9th Cir. 2024) ..................................................................37

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ..................................................................41, 45, 48

*McQuiggin v. Perkins*,
  569 U.S. 383 (2013) ..................................................................4

*Modeste v. Birkholz*,
  809 F. Supp. 3d 891 (D. Alaska 2025) ..................................................................40

*Montana Wilderness Ass'n v. Connell*,
  725 F.3d 988 (9th Cir. 2013) ..................................................................32

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut.*
  *Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................................................................11, 16

*N. Plains Res. Council v. Surface Transp. Bd.*,
  668 F.3d 1067 (9th Cir. 2011) ..................................................................48

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014) ..................................................................4

*Nat'l Parks Conservation Ass'n v. Semonite*,
  916 F.3d 1075 (D.C. Cir. 2019) ..................................................................31

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
  459 F. Supp. 2d 1102 (D.N.M. 2006), ..................................................................32

*Orutsararmiut Native Council v. U.S. Army Corps of Eng'rs*,
  751 F. Supp. 3d 971 (D. Alaska 2024) ..................................................................12

*Pit River Tribe v. U.S. Forest Serv.*,
  469 F.3d 768 (9th Cir. 2006) ..................................................................28

*S. Utah Wilderness All. v. Norton*,
  457 F. Supp. 2d 1253 (D. Utah 2006) ..................................................................42

*Sierra Club v. Penfold*, aff'd 857 F.2d 1307 (9th Cir. 1988),
  664 F. Supp. 1299 (D. Alaska 1987) ..................................................................26

*Stanley v. City of Sanford, Fla.*,
   606 U.S. 46 (2025) .............................................................................. 38

*Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*,
   929 F.3d 1143 (9th Cir. 2019) ............................................................. 4

**Statutes**

2 U.S.C. § 644 ....................................................................................... 5

5 U.S.C. § 706 ............................................................................... 11, 16

16 U.S.C. § 668dd .............................................................. 14, 16, 18, 19

16 U.S.C. § 668ee ...................................................................... 14, 19

16 U.S.C. § 3101 ...................................................................... 13

16 U.S.C. § 3111 ............................................................... 20, 21, 23

16 U.S.C. § 3112 ...................................................................... 21

16 U.S.C. § 3113 ............................................................... 24, 25

16 U.S.C. § 3120 ............................................................... 21, 22, 26

16 U.S.C. § 3143 ...................................................................... 4

42 U.S.C. § 4332 ....................................................... 42, 45, 46, 48

42 U.S.C. § 4336 ...................................................................... 42

42 U.S.C. § 6505 ...................................................................... 39

54 U.S.C. § 300308 .............................................................. 28

54 U.S.C. § 302706 .............................................................. 29, 33

54 U.S.C. § 304108 .............................................................. 29

54 U.S.C. § 306108 .............................................................. 28

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487,
94 Stat. 2371 (1980)
   § 303 .............................................................................. 3, 13
   § 304 .............................................................................. 14, 15
   § 305 .............................................................................. 14

One Big Beautiful Bill, Pub. L. No. 119-21, 139 Stat. 72 (2025) ............... 5, 43, 49, 50

Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054 (2017) ....... 4, 5, 14, 18, 36, 37

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                      v
Case 3:20-cv-00223-SLG    Document 158    Filed 06/12/26    Page 6 of 61

**Regulations and Administrative Materials**

36 C.F.R. § 60.4................................................................................................ 34

36 C.F.R. § 800.1....................................................................................... 28, 30

36 C.F.R. § 800.2....................................................................................... 33, 34

36 C.F.R. § 800.4....................................................................................... 34, 35

36 C.F.R. § 800.5....................................................................................... 31, 35

36 C.F.R. § 800.6....................................................................................... 30, 35

36 C.F.R. § 800.16............................................................................................ 29

43 C.F.R. § 51.4................................................................................................ 22

43 C.F.R. § 3130.0-5 ........................................................................................ 39

50 C.F.R. § 25.12.............................................................................................. 19

Advisory Council on Historic Preservation, *Information Paper on Cultural Landscapes: Understanding and Interpreting Indigenous Places and Landscapes* (Oct. 2016)…………………………………………………...............................................29

Advisory Council on Historic Preservation Office of Gen. Counsel, *Recent Court Decision Regarding the Meaning of "Direct" in Sections 106 and 110(f) of the National Historic Preservation Act*, Memo to Staff (June 7, 2019) ............................ 31

Advisory Council on Historic Preservation, *When Do Project Planning Activities Trigger Section 106 Review* (June 28, 2019) .......................................................... 32

Bureau of Land Management, *2026 Coastal Plain Lease Sale Bid Recap* (June 5, 2026)....................................................................................................... 11

Bureau of Land Management, *Handbook H-1790-1 National Environmental Policy Act* (Jan. 2008)................................................................................................ 43, 45

Department of the Interior, *Manual 516 DM 11 Managing the NEPA Process* (Dec. 10, 2020)..............................................................................................42, 45, 48

Pub. Land Order 2214, 25 Fed. Reg. 12,598 (Dec. 9, 1960)..................................... 3, 13, 14

**Other Authorities**

163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) ........................................ 4, 14, 19, 40

Bill Heniff, Jr., Cong. Rsch. Serv., RL30862, The Budget Reconciliation Process: The
Senate's "Byrd Rule" (2022) ...................................................................... 4

Daniel A. Farber, Jonathan S. Gould & Matthew C. Stephenson, *Workarounds in
American Public Law*, 103 TEX. L. REV. 503 (2025) ....................................... 5

Laura B. Comay et al., Cong. Rsch. Serv., RL33872, Arctic National Wildlife Refuge
("ANWR"): An Overview n.10 (2025).......................................................... 4

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2005)................................................ 38

**INTRODUCTION**

This case challenges the legality of the Oil and Gas Leasing Program for the Coastal Plain of the Arctic National Wildlife Refuge ("Arctic Refuge"). The Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council ("the Tribes") seek to protect the Coastal Plain—a place of great cultural and subsistence importance—from an unlawful leasing program that violates the laws intended to protect this place and its values.

After Congress opened the Coastal Plain to oil and gas development in 2017, the Tribes engaged in every process related to the development of the Leasing Program. Regardless, the Department of the Interior ("Interior") refused to properly consider and protect the Tribes' subsistence uses or Izhik Gwats'an Gwandaii Goodlit, a place sacred to the Tribes. These errors are compounded by Interior's failure to comply with numerous federal laws governing the development of the Leasing Program. As a result, Interior has developed a Leasing Program that is not in accordance with law and would irreparably harm the Tribes.

**BACKGROUND**

I.     **The Gwich'in People's Relationship with the Coastal Plain.**

The Gwich'in people have a long-running, cultural and spiritual connection to and relationship with the Coastal Plain of the Arctic Refuge. The Coastal Plain is an irreplaceable natural, cultural, and subsistence resource that is foundational to the

Gwich'in way of life.[1] This importance is reflected in the Gwich'in name for the Coastal Plain, Izhik Gwats'an Gwandaii Goodlit or the Sacred Place Where Life Begins.

The Neets'ąįį Gwich'in are a part of the larger Gwich'in people across Alaska and Canada, all of whom are spiritually and culturally intertwined with caribou.[2] The Neets'ąįį Gwich'in historically lived in scattered camps, moving as the seasons changed.[3] Today, the Neets'ąįį Gwich'in primarily reside in two communities, Vashrąįį K'ǫǫ (Arctic Village) and Vįįhtąįį (Venetie). These communities are located within the former Venetie Indian Reserve, the Tribes' 1.8-million-acre land base which is directly south of the Arctic Refuge.[4]

The Coastal Plain serves as critical calving and post-calving habitat for the Porcupine Caribou Herd, and the nutrients and other resources the Herd needs for survival and population growth are far more available on the Coastal Plain than on other parts of the Arctic Refuge or their migratory route.[5] The Porcupine Caribou Herd in turn sustain the Gwich'in way of life.[6] In fact, the Neets'ąįį Gwich'in chose the locations of Vashrąįį K'ǫǫ and Vįįhtąįį for permanent settlement based on migration paths of the

---

[1] AR48369.

[2] AR48373.

[3] AR48371.

[4] Decl. of Galen Gilbert in Supp. of Pls.' Mot. for a TRO and Prelim. Inj. 1, Dkt. No. 36-4.

[5] AR48374.

[6] AR48373-74.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                      2

caribou and other subsistence animals.[7] Migratory birds from six continents also rely on the Coastal Plain for nesting and breeding.[8] These birds are an important cultural and subsistence resource for the Gwich'in, and their annual arrival in the spring is often a point of celebration as they historically represent the first chance to take fresh game after a long winter.[9]

## II. Establishment and Protection of the Arctic Refuge.

The Coastal Plain first received federal protection in 1960 with the establishment of the Arctic National Wildlife Range for the purposes of "preserving unique wildlife, wilderness and recreational values."[10] Through the 1980 enactment of the Alaska National Interest Lands Conservation Act ("ANILCA") Congress redesignated the Range as a wildlife refuge and expanded its footprint.[11] In ANILCA, Congress added four additional purposes to the Arctic Refuge: "to conserve fish and wildlife populations and habitats in their natural diversity," "to fulfill the international treaty obligations . . . with respect to fish and wildlife and their habitats," "to provide . . . for continued subsistence uses," and "to ensure . . . water quality and necessary water quantity."[12] ANILCA

---

[7] AR48372.

[8] AR48391.

[9] AR48391.

[10] Pub. Land Order 2214, 25 Fed. Reg. 12,598 (Dec. 9, 1960) [hereinafter "Pub. Land Order 2214"].

[11] Pub. L. No. 96-487, § 303(2), 94 Stat. 2371, 2390 (1980).

[12] *Id.* § 303(2)(B).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief 3

prohibited "leasing or other development leading to production of oil and gas" in the Refuge.[13]

### III. The Coastal Plain Oil and Gas Leasing Program.

#### A. The 2017 Tax Cuts and Jobs Act.

Through a rider in the 2017 budget reconciliation bill, referred to as the Tax Cuts and Jobs Act ("Tax Act"), Congress directed the development of an oil and gas leasing program for the Coastal Plain.[14] Congress did not excuse the leasing program from compliance with other laws or remove, abrogate, or otherwise modify any of the original public land order or congressional purposes of the Arctic Refuge.[15] Instead, the Tax Act added as an additional purpose for the Refuge "to provide for an oil and gas program."[16]

---

[13] 16 U.S.C. § 3143.

[14] *See* Pub. L. No. 115-97, § 20001(b)(2)(A), 131 Stat. 2054, 2235-37 (2017) [hereinafter "Tax Act"].

[15] *See* 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) (statement of Sen. Murkowski) (explaining the Tax Act "did not waive NEPA or any other environmental laws" and any program "will include a regular order environmental process"). *See also McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013) (noting that "Congress legislates against the backdrop of existing law"); Laura B. Comay et al., Cong. Rsch. Serv., RL33872, Arctic National Wildlife Refuge ("ANWR"): An Overview n.10 (2025) (noting that congressional negotiations around the Tax Act were shaped by "limitations imposed by the budget reconciliation process on matters that can be considered in reconciliation legislation. In particular, the Senate's 'Byrd rule' limits inclusion of provisions extraneous to the goals of the reconciliation instructions"); s*ee also* Bill Heniff, Jr., Cong. Rsch. Serv., RL30862, The Budget Reconciliation Process: The Senate's "Byrd Rule" (2022). Courts routinely rely on the expertise of the Congressional Research Service. *See, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 522 (2014) (citing a report by the Congressional Research Service); *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*, 929 F.3d 1143, 1148 (9th Cir. 2019) (same).

[16] Tax Act § 20001(b)(2)(B).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                      4

The Tax Act directed Interior to hold at least two oil and gas lease sales on the Coastal Plain.[17] The statute also limited any surface development associated with the Leasing Program to 2,000 acres.[18]

### B. The 2025 Budget Reconciliation Act.

In 2025, Congress enacted the One Big Beautiful Bill Act ("OBBBA").[19] Among its many provisions, OBBBA required Interior to hold four lease sales under the Coastal Plain Oil and Gas Leasing Program ("Leasing Program"), which Congress directed the Secretary to establish under the Tax Act.[20] Like the Tax Act, OBBBA was a reconciliation bill that does not effectuate changes in policy or the application of other laws.[21] Congress left unchanged the Tax Act's 2,000-acre limitation on surface development.[22] OBBBA

---

[17] *Id.* § 20001(c)(1)(A), (c)(1)(B)(ii).

[18] *Id.* § 20001(c)(3).

[19] *See* Pub. L. No. 119-21, 139 Stat. 72 (2025) [hereinafter "OBBBA"].

[20] OBBBA § 50104(b)(1).

[21] *See supra* note 15 and accompanying text. *See also* 2 U.S.C. § 644(b)(1)(A) (providing that "a provision of a reconciliation bill . . . shall be considered extraneous if such provision does not produce a change in outlays or revenues[]"); Daniel A. Farber, Jonathan S. Gould & Matthew C. Stephenson, *Workarounds in American Public Law*, 103 TEX. L. REV. 503, 527 n.110 (2025) (noting that the Byrd Rule "requires that provisions included in reconciliation measures be predominately budgetary as a means of preventing the use of reconciliation for matters that are primarily non-budgetary in nature").

[22] OBBBA § 50104(b)(5).

also requires Interior to offer leases with "the same terms and conditions" included in the 2020 Coastal Plain Oil and Gas Leasing Program Record of Decision ("2020 ROD").[23]

### C. Development of the 2020 Leasing Program.

In April 2018, the Bureau of Land Management ("BLM") announced its plans to prepare an Environmental Impact Statement ("EIS") for the Leasing Program.[24] Throughout the development of the Leasing Program, the Tribes engaged with the federal government on a nation-to-nation basis to advocate for the protection of the Coastal Plain and their citizens' way of life. The Tribes participated in the development of the EIS as cooperating agencies and submitted extensive comments throughout the environmental review process.[25] The Tribes also participated as consulting parties in the National Historic Preservation Act ("NHPA") section 106 process,[26] which requires federal agencies to consider impacts on historic properties, including Traditional Cultural Places, and avoid, minimize, or mitigate adverse impacts. The Tribes' leaders and citizens gave testimony at public meetings, submitted written comments, and participated in nation-to-nation consultations.[27]

---

[23] *Id.* § 50104(b)(2).

[24] AR17685.

[25] *See, e.g.*, AR90163; AR48368-97; AR84502.

[26] AR93736; AR93734; AR93738.

[27] *See, e.g.*, AR18846-994; AR 21966-68.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                 6

In the Final EIS ("FEIS"), BLM identified as its preferred action "Alternative B," which would "offer[] the opportunity to lease the entire program area" and have "the fewest acres with [No Surface Occupation] stipulations."[28] In the 2020 ROD, BLM adopted Alternative B from the FEIS—choosing to make all 1.56 million acres of the Coastal Plain available for leasing.[29]

BLM stated that "an alternative to reduce the impact area to less than 2,000 acres of production and support facilities . . . is inconsistent with the mandate" in the Tax Act.[30] The agency interpreted Section 20001(c)(3) of the Tax Act "as a directive to the BLM that it must not deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 surface acres are covered by production and support facilities."[31] BLM noted that Congress did not define the terms "covered by" and "production and support facilities" and that BLM would thus "determine whether each type of proposed facility constitutes a 'production and support facility,' and if so, whether such proposed facilities would cover federal land on the Coastal Plain."[32] Finally, BLM decided that the reclamation of covered land over time increased "the required

---

[28] AR90196.

[29] AR18385; AR205971.

[30] AR205966.

[31] AR205966.

[32] AR205967.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                 7

authorization of surface acres covered by production and support facilities beyond 2,000 acres."[33]

BLM held the first lease sale in January 2021.[34] The Alaska Industrial Development and Export Authority ("AIDEA") acquired leases for seven tracts.[35]

### D.       Review of the 2020 Leasing Program.

In 2021, President Biden issued an Executive Order noting legal deficiencies in the Leasing Program and directing Interior to "review the program and, as appropriate and consistent with applicable law, conduct a new, comprehensive analysis of the potential environmental impacts of the oil and gas program."[36]

To implement this directive, Secretary Haaland issued Secretarial Order 3401, in which she identified "multiple legal deficiencies" in the Leasing Program.[37] These deficiencies included "insufficient analysis" under the National Environmental Policy Act ("NEPA") such as the "failure to adequately analyze a reasonable range of alternatives" in the EIS, and the 2020 ROD's failure to "properly interpret" the Tax Act.[38] Secretary

---

[33] AR205967.

[34] AR522271; AR522183-84.

[35] AR522317. Two other entities, Knik Arm Services LLC and Regenerate Alaska, Inc., each acquired one tract. AR522317. These leases were later relinquished by the leaseholders. AR522342-46; AR 522336-39.

[36] AR522320.

[37] AR522325.

[38] AR522325.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                          8

Haaland also stated that Interior would "conduct a new, comprehensive analysis of the potential environmental impacts of the Program and address the identified legal deficiencies."[39] BLM then announced its intent to prepare a supplemental EIS ("SEIS") for the Leasing Program pursuant to Secretarial Order 3401.[40] As with the EIS, the Tribes participated in the development of the SEIS as cooperating agencies.[41] Ultimately, Interior cancelled AIDEA's leases on the Coastal Plain based on the "legal deficiencies in the record supporting the leases," including insufficient analysis under NEPA and the improper interpretations of the Tax Act.[42]

BLM identified in the Final SEIS its preferred action "Alternative D2," which made available "400,000 acres for a second lease sale in the northwest portion of the program area that has the highest potential for the discovery of hydrocarbons."[43] BLM's preferred alternative also "addresse[d] additional public requests to expand protections for key resources including polar bears and caribou." Among other things, BLM expanded "the no leasing area in the medium hydrocarbon area which corresponds to

---

[39] AR522325.

[40] AR207244.

[41] AR389259.

[42] AR522349-55. Interior's lease cancellation decision is the subject of separate litigation, now pending before the U.S. Court of Appeals for the Ninth Circuit. *See* Case Nos. 25-3231, 25-3344.

[43] AR207247; AR389297 (quoted text).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                 9

critical Porcupine Caribou Herd calving areas."[44] BLM selected this alternative in the Leasing Program Record of Decision ("2024 ROD").[45] BLM received no bids during the second lease sale.[46]

### E.  Reinstatement of the 2020 Leasing Program.

President Trump returned to office and subsequently issued an Executive Order focused on Alaska, which included directives to the Secretary to withdraw Secretarial Order 3401, rescind the cancellation of leases on the Coastal Plain, rescind the 2024 SEIS and 2024 ROD, and reinstate the 2019 FEIS and 2020 ROD.[47] The Executive Order did not address any of the legal deficiencies Interior previously identified.[48]

BLM thereafter issued a Determination of NEPA Adequacy ("DNA") and stated that the 2024 SEIS "remain[ed] valid" alongside the 2019 FEIS "to support the selection, in a new ROD, of a different alternative among those previously analyzed."[49] Shortly after the issuance of the DNA, Interior issued a new Leasing Program Record of Decision ("2025 ROD"). The 2025 ROD adopted Alternative B from the 2024 ROD, which "uses

---

[44] AR389297.

[45] AR519743.

[46] *Alaska Indus. Dev. & Exp. Auth. v. U.S. Dep't of the Interior*, No. 3:24-CV-00051-SLG, 2025 WL 903331, at *3 (D. Alaska Mar. 25, 2025).

[47] AR522366-67.

[48] AR522367.

[49] AR522066.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                 10

the same lease stipulations and ROPs as Alternative B from the 2019 EIS" and "was the alternative that was adopted by the 2020 ROD."[50]

Through the 2025 ROD, BLM reinstated the 2020 ROD and included the same faulty interpretations of the Tax Act requiring the agency to authorize no less than 2,000 acres of surface development.[51] The 2025 ROD also includes similar discussions about what constitutes a "production and support" facility, and interprets the 2,000-acre surface development limit as a revolving cap.[52]

On June 5, BLM held the third lease sale and received nine bids on five tracts.[53]

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") instructs courts to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."[54] To satisfy this standard, an "agency must examine the relevant data

---

[50] AR519752; AR522114.

[51] AR522118.

[52] AR522118-19.

[53] Bureau of Land Management, *2026 Coastal Plain Lease Sale Bid Recap* (June 5, 2026), https://www.blm.gov/sites/default/files/docs/2026-06/2026%20Coastal%20Plain%20Lease%20Sale%20Bid%20Recap.pdf.

[54] 5 U.S.C. § 706(1)-(2).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                 11

and articulate a satisfactory explanation for its action."[55] Absent such analysis, an agency

action is arbitrary and capricious, and "cannot carry the force of law."[56]

Further, it is the duty of the courts reviewing agency interpretations of law under

the APA to "decide legal questions by applying their own judgment."[57] The determination

of "[w]hether agency action is not in accordance with law is a question of statutory

interpretation, rather than an assessment of reasonableness in the instant case."[58]

## ARGUMENT

In developing and approving the Leasing Program, Interior failed to meet its

procedural and substantive obligations. Instead, Interior has approved a Leasing Program

that fails to account for the purposes of the Arctic Refuge, fails to properly consider and

protect subsistence uses and Traditional Cultural Places, improperly interprets key

provisions of the Tax Act, and lacks proper analysis under NEPA. These flaws and

omissions render the Leasing Program unlawful.

## I.     Interior Violated the Refuge Act and ANILCA.

Interior's adoption of the 2020, 2024, and 2025 RODs is inconsistent with the

purposes of the Arctic Refuge and thus violates the Refuge Act and ANILCA. In

---

[55] *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[56] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

[57] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

[58] *Orutsararmiut Native Council v. U.S. Army Corps of Eng'rs*, 751 F. Supp. 3d 971, 977 (D. Alaska 2024) (internal quotations omitted) (quoting *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010)).

addition, Interior failed to issue a written determination that the Leasing Program and associated new uses were compatible with the Arctic Refuge's purposes. This violated the Refuge Act.

### A. Interior Failed to Adopt a Leasing Program Consistent with the Purposes of the Arctic Refuge.

Interior failed to adopt a leasing program consistent with all the purposes of the Arctic Refuge. First, in the 2020 ROD, 2024 ROD, and 2025 ROD, Interior failed to adopt an oil and gas leasing program consistent with and protective of the Refuge's purposes, in violation of the Refuge Act and ANILCA. The Tax Act and OBBBA did not repeal or otherwise override the original purposes of the Range and Arctic Refuge which Interior must consider when developing a leasing program. Second, contrary to the agency's own findings that the 2024 ROD best met the statutory mandates of the Refuge Act and ANILCA, Interior reversed course without explanation and re-adopted a less-protective alternative from the 2020 ROD. By failing to explain the change in position and contrary findings between its 2024 ROD and 2025 ROD, Interior's decision in the 2025 ROD was arbitrary, capricious, and not in accordance with the mandates of ANILCA and the Refuge Act.

#### 1. *Interior failed to adopt a leasing program consistent with the purposes of the Arctic Refuge.*

Interior violated the Refuge Act and ANILCA when the agency adopted an oil and gas leasing program in the 2020, 2024, and 2025 RODs by failing to adopt a program consistent with all eight purposes of the Arctic Refuge.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief          13

In 1960, the Secretary recognized three purposes for the Range: wildlife, wilderness, and recreation.[59] In ANILCA, Congress added four purposes of the Arctic Refuge, in addition to ANILCA's overarching subsistence and conservation purposes.[60] Congress retained existing protective mandates not in conflict with ANILCA, including Public Land Orders.[61] The Refuge Act also mandates that the purposes of a refuge include those from original designations.[62] Accordingly, the original Range purposes and the ANILCA purposes are all purposes of the Arctic Refuge. The Tax Act added an additional purpose for the Coastal Plain—an oil and gas program—but did not modify existing purposes or elevate oil and gas over the existing seven purposes.[63] Congress was clear that it was not repealing or altering application of any existing legal mandates.[64] ANILCA and the Refuge Act mandate that any leasing program protect all of the purposes, including the Range purposes.[65]

---

[59] Pub. Land Order 2214.

[60] ANILCA § 303(2)(B); 16 U.S.C. § 3101(a), (b).

[61] ANILCA § 305.

[62] 16 U.S.C. § 668ee(10).

[63] Tax Act § 20001(b)(2)(B)(iii).

[64] *See* 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) (statement of Sen. Murkowski) (explaining the Tax Act "did not waive NEPA or any other environmental laws" and any program "will include a regular order environmental process").

[65] ANILCA §§ 304(a), 305; 16 U.S.C. § 668dd(a)(3)(A).

In its ROD and EIS documents, Interior impermissibly ignored the original Range purposes of "preserving unique wildlife, wilderness and recreational values."[66] Instead, in some instances, Interior summarily stated that the Range purposes no longer apply.[67] This is contrary to Congress' intent and Interior does not explain this conclusion.[68]

In the 2019 FEIS, Interior summarily stated that the action alternatives "account for all purposes of the Arctic Refuge."[69] And in the 2020 ROD Interior failed to identify or consider the Range purposes, concluding without explanation that the Leasing Program protects the Refuge's purposes.[70] Similarly, the 2024 ROD, though it mentions the original Range purposes in passing, only utilizes "four conservation purposes" and a "fifth purpose" added in the Tax Act for its balancing.[71] Likewise, the 2025 ROD fails to mention any of the original Range purposes,[72] with the agency ignoring those purposes

---

[66] Pub. Land Order 2214.

[67] AR91979 (stating recreation is not a current purpose); AR92047 (stating the Tax Act superseded Range purposes); AR93224 (identifying the Refuge purposes without Range purposes); AR389286 (asserting in the 2024 SEIS that ANILCA "superseded" the original purposes of the Refuge).

[68] *See supra* notes 61-65 and accompanying text.

[69] AR90188.

[70] AR205963-64.

[71] AR519750; AR519751.

[72] AR522111-75.

and erroneously claiming that "Congress itself balanced the purposes" of the Refuge towards an oil and gas program and away from the four ANILCA purposes.[73]

By improperly excluding the Range purposes, the Secretary could not ensure that the Leasing Program is consistent with all the purposes of the Arctic Refuge, as mandated by ANILCA and the Refuge Act. Federal law requires compliance with all Refuge purposes when developing, analyzing, and selecting a preferred alternative.[74] Interior needed to consider these purposes specifically and address how the program ensured their protection. Far from doing so, the leasing program adopted will have the greatest impacts on the original Range and ANILCA purposes of the alternatives considered.[75] By failing to acknowledge all eight purposes and thereby failing to adopt a leasing program that protects them, the Secretary failed to consider an important aspect of the problem; this is arbitrary and not in accordance with the law.[76]

---

[73] AR522122-23.

[74] ANILCA § 304(a) (requiring compliance with the Refuge Act).

[75] Alternative B from the 2019 FEIS, adopted in the 2020 and 2025 RODs made all 1.56 million acres of the Coastal Plain available for leasing. AR18385; AR205971. Whereas Alternative D2 from the 2024 SEIS, adopted in the 2024 ROD, made the statutory-minimum 400,000 acres availabe for leasing. AR389297 & AR758739-40; s*ee also*, AR389573 (describing in the 2024 SEIS that Alternative B would have the greatest impacts to subsistence); AR389620-24 & AR90531-33 (describing in the 2019 FEIS and 2024 SEIS that Alternative B would have the greatest impacts to recreation); AR389633-35 & AR90543-44 (describing in the 2019 FEIS and 2024 SEIS that Alternative B would have the greatest impacts to wilderness characteristics, qualities, and values).

[76] 5 U.S.C. § 706(2)(A), (D); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## 2. *Interior's reversal of 2024 ROD was unlawful.*

Despite Interior's robust record supporting the selection of 2024 SEIS Alternative D2, the agency changed course less than a year later and selected the 2019 FEIS Alternative B. The Secretary failed to adequately explain the dramatic change in position that the 2025 ROD would protect the Arctic Refuge's subsistence and conservation purposes despite the contrary findings in the 2024 ROD.

When an agency changes policy or course, it must acknowledge the change in course, show that the new rule is legally permissible, express that it is a better policy, and provide good reasons for the change in policy.[77] When a policy change rests on changed factual findings, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate."[78]

The Secretary previously determined that Alternative D2 best met the Refuge Act's and ANILCA's statutory mandates, specifically that it "best ensures the Refuge purposes will be carried out" and "involves the minimal amount of public lands necessary

---

[77] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). The Refuge Act mandates that each refuge "shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A).

[78] *Fox Television Stations, Inc.*, 556 U.S. at 515.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                        17

to comply with" the Tax Act.[79] That determination was based on factual findings about what measures were necessary to ensure the protection of those purposes.[80]

In the SEIS and 2024 ROD, Interior provided strong legal and scientific support for the SEIS's selection of Alternative D2 as the preferred alternative most consistent with all statutory purposes of the Arctic Refuge.[81] Compared to all other alternatives developed in the 2019 FEIS and 2024 SEIS, the 2024 SEIS Alternative D2 made available the fewest acres for leasing, leading to the fewest surface impacts and the least adverse impacts on the Porcupine Caribou Herd, while limiting oil and gas development to those areas that have the highest potential for discovery of hydrocarbons, as the Tax Act directs.[82] Contrary to these extensive findings and without detailed justification, the

---

[79] AR519750; AR519762; *see also* AR519747 (explaining that Alternative D2 "provides the most comprehensive framework for addressing the diverse management needs of the Coastal Plain and its resources. It protects important subsistence resources and uses and recognizes important cultural links between tribes and the Coastal Plain and seeks to protect lands for values and resources important to the tribes").

[80] *See, e.g.*, AR389265 (describing in the SEIS that the stipulations and ROPs in Alternative D2 as "more protective" as it "stresses protection of the four conservation-oriented statutory purposes of the Arctic Refuge"); AR51975 (describing Alternative D2's lease stipulations and ROPs as "designed to maximize protection of key resources"); AR389557 & AR389577 (concluding in the SEIS after review of scientific data that Alternative D2, as compared to all other alternatives, would "have the least impacts" to the Porcupine Caribou Herd); *compare* AR389572 (stating Alternative B "would result in the greatest potential impact on Porcupine Caribou calf survival and overall herd numbers").

[81] AR210693-700.

[82] Tax Act § 20001(c)(1) (requiring that lease sales offer the highest hydrocarbon potential lands).

Secretary determined in the 2025 ROD that re-adopting the 2019 FEIS Alternative B would meet the mandates of ANILCA and the Refuge Act.[83]

By failing to explain the change in position and contradictory findings, the Secretary failed to show that the 2025 ROD includes the measures necessary to protect the purposes of the Arctic Refuge. This failure renders the 2025 ROD arbitrary, capricious, and not in accordance with the law, in violation of ANILCA, the Refuge Act, and the APA.

**B.    Interior Failed to Make a Compatibility Determination.**

Despite acknowledging that the Leasing Program will potentially impact the other Refuge purposes, Interior failed to issue a written determination that the Leasing Program and associated new uses were compatible with the Arctic Refuge's purposes.

Under the Refuge Act, the Arctic Refuge "shall be managed to fulfill . . . the specific purposes for which that refuge was established."[84] The "purposes" of a refuge include those "specified in or derived from the law, proclamation, executive order, agreement, public land order . . . establishing, authorizing, or expanding a refuge[.]"[85] The Arctic Refuge must therefore be managed in a manner that fulfills all the purposes outlined above, including those set forth in Public Land Order 2214 and ANILCA. These

---

[83] AR522122-23; AR522128.

[84] 16 U.S.C. § 668dd(a)(3)(A).

[85] *Id*. § 668ee(10); *see also* 50 C.F.R. § 25.12(a).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                  19

purposes emphasize the conservation of wildlife, habitat, and ecosystems and the continuation of traditional subsistence-based ways of life.

The Refuge Act requires the Secretary to determine that any "new use of a refuge" is "a compatible use" before initiating or permitting that use.[86] A use is "compatible" if it will not "materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge."[87] Compatibility determinations must be in writing[88] and based on "sound professional judgment."[89]

The Leasing Program is a new use of the Arctic Refuge that requires a compatibility determination. Nothing in the Tax Act or OBBBA eliminates or waives this requirement.[90] Interior acknowledges that it retains authority to determine "where and under what terms and conditions" leasing and oil and gas development will occur.[91] And, Interior has pointed to mitigation measures that may reduce adverse impacts on other

---

[86] 16 U.S.C.§ 668dd(d)(3)(A)(i).

[87] *Id.* § 668ee(1); *see also* 50 C.F.R. § 25.12(a).

[88] *See* 50 C.F.R. § 25.12(a).

[89] 16 U.S.C. § 668ee(1); *see also* 50 C.F.R. § 25.12(a).

[90] The Tax Act did not repeal other federal laws, including ANILCA generally or the Refuge Act, pursuant to which a compatibility determination is required. 16 U.S.C. § 668ee(1); *see* 50 C.F.R. § 25.12(a). Indeed, Senator Murkowski emphasized in her floor statement in support of the Tax Act's Refuge provisions that: "All [] relevant laws, regulations, and Executive Orders will apply under our language. . . ." 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017). *See supra* note 15.

[91] AR205958; AR205960; AR205961; AR205969.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                              20

purposes to some extent.[92] At the same time, however, Interior admits there will be "some potential impact on the other four refuge purposes."[93]

In the 2020, 2024, and 2025 RODs, Interior failed to make any definitive determinations that the Leasing Program will be "compatible" with the other purposes of the Arctic Refuge.[94] Interior's approval of the Leasing Program in the absence of a compatibility determination violates the Refuge Act and ANILCA.

## II. Interior Failed to Comply with Its Obligations to Consider and Protect Subsistence under ANILCA.

In enacting ANILCA, Congress found that the "continuation of the opportunity for subsistence uses . . . is essential to Native physical, economic, traditional, and cultural existence."[95] Congress further found that "continuation of the opportunity for a subsistence way of life" required the establishment of an administrative structure to "enabl[e] rural residents who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska."[96] Congress declared it to be federal policy that the "utilization of the public lands in Alaska is to cause the least adverse

---

[92] AR205964.

[93] AR 205963.

[94] *See Del. Audubon Soc'y v. Sec'y of the U.S. Dep't of Interior*, 612 F. Supp. 2d 442, 450 (D. Del. 2009) (finding a Refuge Act violation where the "record is simply devoid of anything that even purports to be a compatibility determination").

[95] 16 U.S.C. § 3111(1).

[96] *Id.* § 3111(5).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief 21

impact possible on rural residents who depend upon subsistence uses of the resources of such lands[.]"[97] Section 810 outlines a procedure under which effects on subsistence uses must be considered and "provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized."[98]

The ANILCA section 810 process takes place in two phases. Under the first step, commonly known as "tier one," the agency must consider: (1) the "effect" of the proposed "use, occupancy, or disposition" on "subsistence uses and needs"; (2) the "availability of other lands for the purposes sought to be achieved"; and (3) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[99] In conducting the tier-one evaluation, the agency must consider cumulative impacts, along with direct and indirect impacts.[100] If, after completing the tier-one evaluation, the agency determines that the proposed activity "may significantly restrict subsistence uses," the agency must proceed to tier two.[101]

In tier two, the agency must provide notice, hold hearings, and make a series of detailed findings and determinations. The agency is prohibited from authorizing the

---

[97] *Id.* § 3112(1).

[98] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 554 (1987).

[99] 16 U.S.C. § 3120(a).

[100] *See City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990).

[101] *Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                22

proposed activity unless and until it determines: (1) the restriction on subsistence uses "is necessary, consistent with sound management principles for the utilization of the public lands," (2) "the proposed activity will involve the minimal amount of public lands necessary[,]" and (3) "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources[.]"[102]

### A. Interior Unlawfully Excluded Communities.

After acknowledging the importance of the Coastal Plain to caribou and the subsistence uses of those caribou by 22 Alaskan communities,[103] Interior erroneously limited its ANILCA section 810 evaluation to only four communities. Specifically, Interior acknowledge that 22 communities have "positive customary and traditional use determinations" for the Porcupine and Central Arctic herds and that these communities "could be affected by impacts on caribou abundance and availability."[104] Nevertheless, Interior limited its tier-one evaluation to four communities—Kaktovik, Nuiqsut, Arctic Village, and Venetie—with the justification that "[t]hey are the closest to the program area and have subsistence uses in or near the program area or rely heavily on resources that use the program area."[105]

---

[102] 16 U.S.C. § 3120(a).

[103] AR90850; AR390775-76.

[104] AR90850; AR390776. Customary and traditional use determinations are made by the Federal Subsistence Board based on "a long-established, consistent pattern of use, incorporating beliefs and customs which have been transmitted from generation to generation." 43 C.F.R. § 51.4.

[105] AR90850; AR390775.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                        23

Interior's additional threshold inquiry, based on proximity and heavy use, violated ANILCA. The tier-one evaluation is itself a threshold inquiry, requiring the agency to determine "whether contemplated actions 'would significantly restrict subsistence uses.'"[106] Applying a close-proximity-and-heavy-use threshold to exclude communities at the outset of the tier-one evaluation is at odds with ANILCA's mandates and procedure as well as Interior's own findings. Despite recognizing 22 Alaskan communities' "high" subsistence use of caribou and potential impacts to "resource availability or abundance" for subsistence users, Interior excluded 18 of these communities from its analysis.[107] As a result, Interior did not consider the full extent of subsistence uses, potential adverse impacts, and the full range of potential alternatives to minimize adverse impacts. This unlawful threshold also excluded subsistence users from an administrative structure Congress specifically established to provide subsistence users with a meaningful role in the decision-making process.[108]

Interior's erroneous additional threshold is inconsistent with ANILCA's procedural requirements and its mandates to protect subsistence ways of life and provide a meaningful role for subsistence users in the management process.

> **B.** **Interior Applied an Erroneous Interpretation of "Subsistence Uses" to Exclude Culturally Important Subsistence Resources and Practices.**

---

[106] *Hanlon v. Barton*, 740 F. Supp. 1446, 1448 (D. Alaska 1988) (quoting 16 U.S.C. § 3120(a)).

[107] AR90467; AR90850; AR389560; AR390776.

[108] 16 U.S.C. § 3111(5); *Kunaknana*, 742 F.2d at 1150.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                 24

Interior utilized a definition of subsistence uses that unlawfully excluded culturally important subsistence resources and practices from its ANILCA section 810 evaluation. ANILCA broadly defines "subsistence uses" as:

> The customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade.[109]

The Ninth Circuit has recognized that subsistence uses extend beyond a "sufficient food supply" and "include customary and traditional practices which ANILCA was designed to protect."[110]

Interior's exclusion of waterfowl is an illustrative example of the agency's flawed interpretation of subsistence uses. Though Interior recognized that waterfowl are "culturally important to residents of these communities," the agency did not consider waterfowl in its ANILCA section 810 evaluation because "they do not comprise the majority of the wild foods consumed by residents of Kaktovik, Nuiqsut, Arctic Village, or Venetie."[111] Interior's rationale for excluding certain culturally important subsistence resources is inconsistent with the statutory definition of subsistence uses, which expressly

---

[109] 16 U.S.C. § 3113.

[110] *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 731 (9th Cir. 1995).

[111] AR90850; AR390775.

includes "customary and traditional uses" beyond "consumption as food."[112] Interior's exclusion of culturally important resources is also inconsistent with Ninth Circuit precedent recognizing that subsistence uses are not limited "to maintaining a sufficient food supply."[113]

Interior's narrow definition of subsistence uses is also reflected in its failure to evaluate potential effects on customary and traditional practices, including sharing. ANILCA defines subsistence uses as "customary and traditional uses by rural Alaska residents" and expressly includes "barter, or sharing for personal or family consumption" and "customary trade."[114] Despite this clear statutory language, Interior's ANILCA section 810 evaluation did not address traditional and customary practices.[115] In other sections of the FEIS and SEIS, Interior discusses the importance of subsistence practices, stating these practices "strengthen community and family social ties, reinforce community and individual cultural identity, and provide a link between contemporary Natives and their ancestors."[116] Interior also recognized potential impacts on traditional subsistence practices[117] yet failed to include them in its ANILCA section 810 evaluation.

---

[112] 16 U.S.C. § 3113.

[113] *Morrison*, 67 F.3d at 731.

[114] 16 U.S.C. § 3113.

[115] In the EIS and SEIS, there is a single reference to sharing in the ANILCA section 810 evaluation. AR90850; AR390775.

[116] AR90460 (quoted language); AR389587.

[117] AR90474; AR90479; AR389564; AR389571.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                26

Interior's unlawful exclusion of culturally important subsistence resources and practices improperly narrowed its ANILCA section 810 evaluation, and in turn undermined its finding of no significant restriction on subsistence uses.

### C. Interior Made an Erroneous Determination that the Leasing Program Would Not Significantly Restrict Subsistence Uses for Arctic Village and Venetie.

In determining the Leasing Program would not significantly restrict subsistence uses for Arctic Village and Venetie, Interior applied an erroneous standard for triggering tier-two obligations. Tier-two obligations apply if the agency determines that the proposed activity "would significantly restrict subsistence uses."[118] This threshold is "quite low."[119] Only a "threat of significant restriction" is required, and such a restriction "need not be likely."[120] To ensure the continuation of subsistence ways of life, "Congress indicated that residents so engaged should play a part in the administrative structure."[121] Section 810 "provides the procedural mechanism which insures this local input into the administrative decision-making process."[122]

---

[118] 16 U.S.C. § 3120(a).

[119] *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987), *aff'd* 857 F.2d 1307 (9th Cir. 1988).

[120] *Hanlon*, 740 F. Supp. at 1449.

[121] *Kunaknana*, 742 F.2d at 1150.

[122] *Id.*

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief 27

Though Interior found that the Leasing Program "would" or "could" affect subsistence resources,[123] the agency did not make a positive finding of significant restriction for Arctic Village and Venetie. Instead, Interior concluded a positive determination was not required because "large-scale displacement and consequent large decreases in the abundance of [Porcupine Caribou Herd] available for subsistence use is unlikely."[124] A standard focusing on "large" adverse impacts that are "likely" is far more stringent than the low "may significantly restrict" threshold for tier two and is also inconsistent with Interior's finding that 22 communities could be affected by impacts on caribou abundance and availability.[125] Interior's finding is further undermined by its exclusion of culturally important subsistence resources and practices as well as its failure to address missing information.[126] Interior's erroneous and unlawful finding precluded the agency from making informed decisions concerning the minimization of adverse impacts on subsistence uses and precluded subsistence users from a meaningful role in the process.

## III. Interior Violated the NHPA.

---

[123] *See, e.g.*, AR389560; AR389566; AR389570; AR90471; AR90476; AR90479.

[124] AR90858; AR390788-89.

[125] AR90850; AR390776.

[126] Interior did not have sufficient information to make the findings required under tier one, particularly for Arctic Village. *See, e.g.*, AR90465 & AR389560 ("Data to calculate resources of importance for Arctic Village are not available, as there have been no comprehensive household harvest surveys in that community[.]"); AR90850 & AR390775 ("Detailed harvest data for Arctic Village is not available but it is likely similar to the harvest documented for Venetie.").

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief 28

### A. Interior Failed to Consider Effects on The Sacred Place Where Life Begins.

In developing the Leasing Program, Interior failed to consider effects on the Sacred Place Where Life Begins and other landscape-level historic properties based on a misinterpretation of its obligations under NHPA section 106. The NHPA includes a "series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance."[127] Section 106 of the statute requires a federal agency "having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking" to "take into account the effect of the undertaking on any historic property."[128] The goal of this process is to "identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties."[129]

The NHPA defines "historic property" as "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register"[130] and includes, "[p]roperty of traditional religious and cultural importance to an Indian tribe[.]"[131] The Advisory Council on Historic Preservation ("ACHP"), the

---

[127] *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006) (quoting *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1093-94 (9th Cir. 2005)).

[128] 54 U.S.C. § 306108.

[129] 36 C.F.R. § 800.1(a).

[130] 54 U.S.C. § 300308.

[131] 54 U.S.C. § 302706(a); 36 C.F.R. § 800.16(l)(1).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                           29

federal agency with exclusive authority to promulgate regulations under the NHPA,[132] has made clear that the section 106 process requires federal agencies to "identify and assess effects of their actions on historic properties, including indigenous landscapes considered eligible for the National Register."[133]

Interior failed to consider the Sacred Place Where Life Begins in its section 106 process. Specifically, Interior did not adequately identify the Sacred Place Where Life Begins as a historic property and evaluate its National Register eligibility, Interior did not assess the Leasing Program's effects on the Sacred Place Where Life Begins, and Interior did not develop and consider alternatives or modifications to the Leasing Program that would avoid, minimize, or mitigate adverse effects.

The Sacred Place Where Life Begins is a historic property of traditional religious and cultural significance to the Tribes, which the Tribes raised to Interior throughout the development of the Leasing Program.[134] In the FEIS and SEIS, Interior recognized "potential impacts on traditional belief systems/religious practices and other ethnographic cultural resources, such as TCPs and cultural landscapes, particularly for the Gwich'in,

---

[132] 54 U.S.C. § 304108(a).

[133] Advisory Council on Historic Preservation, *Information Paper on Cultural Landscapes: Understanding and Interpreting Indigenous Places and Landscapes* (Oct. 11, 2016), https://www.achp.gov/sites/default/files/whitepapers/2018-06/InformationPaperonCulturalLandscapes.pdf.

[134] *See, e.g.*, AR56055-62 (Tribes' Draft EIS comments); AR90452 (FEIS citing Tribes' comments).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                              30

would be adverse, regional, and long term."[135] Nevertheless, Interior did not address the Leasing Program's effects on the Sacred Place Where Life Begins. Instead, Interior took the position that it had no obligation to consider the Leasing Program's effects on historic properties during the NHPA section 106 process, because the Leasing Program does not authorize specific ground-disturbing activities, and therefore cannot cause adverse effects.[136] Interior's position does not comply with the law and precluded the agency from meeting its obligation under NHPA section 106.

The section 106 process is meant to inform the development, selection, and evaluation of alternatives.[137] Failing to undertake section 106 review for the Leasing Program's programmatic effect on the Sacred Place Where Life Begins precluded Interior from considering alternatives or modifications that avoided, minimized, or mitigated adverse effects to the Sacred Place Where Life Begins, and other, potential, landscape-level historic properties.[138]

Interior's position also reflects a flawed interpretation of the types of effects it must consider as part of the section 106 process. Adverse effects occur "when an

---

[135] AR90455; AR389553.

[136] *See, e.g.*, AR90453 & AR389552 ("Issuance of oil and gas leases under the directives of Section 20001(c)(1) of PL 115-97 would have no direct impacts on the environment because by itself a lease does not authorize any on the ground oil and gas activities. . ."); AR520510 & AR209871 (explaining that a determination of eligibility for the National Register was not prepared for the Sacred Place Where Life Begins).

[137] 36 C.F.R. §§ 800.1(c), 800.6(a).

[138] *Id.* § 800.6(a).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief 31

undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify it for inclusion on the National Register that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."[139] Adverse effects also "include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative."[140] Effects do not need to physically alter a historic property to be direct. Rather, direct refers "to causation and not physicality."[141] Accordingly, "if the effect comes from the undertaking at the same time and place with no intervening cause, it is considered 'direct' regardless of its specific type (e.g., whether it is visual, physical, auditory, etc.)."[142] The Leasing Program sets forth the program under which Interior will issue leases and the parameters for future development decisions. Those leases and parameters thus have effects on future activity, which Interior was required to consider under the NHPA.[143]

Interior's position is also inconsistent with the ACHP's guidance and case law regarding planning-level activities. As the ACHP explains, when a planning activity

---

[139] *Id.* § 800.5(a)(1).

[140] *Id.*

[141] *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1088 (D.C. Cir. 2019).

[142] Advisory Council on Historic Preservation Office of Gen. Counsel, *Recent Court Decision Regarding the Meaning of "Direct" in Sections 106 and 110(f) of the National Historic Preservation Act*, Memo to Staff, 2 (June 7, 2019).

[143] 36 C.F.R. § 800.5(a)(1).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                 32

"commits the agency to a decision regarding the use of resources or the location of a project, the agency has restricted the availability of alternatives to avoid, minimize, or mitigate adverse effects," thus triggering section 106 compliance.[144]

In *Montana Wilderness Association v. Connell*, the Ninth Circuit rejected an agency's efforts to delay more robust identification until after a resource management plan was adopted.[145] In that case, the court concluded that the delayed identification plan was not permissible under the NHPA because the management plan was "not solely a *general* land use plan; it also authorizes *specific* uses[.]"[146] Similarly, the Federal District Court in New Mexico rejected an agency's assertion that the section 106 process "need not be completed until after leasing, at the [application for permit to drill] APD stage, when a party has applied for permission to drill and BLM knows exactly where the proposed disturbance of land will occur."[147] The court addressed the timing issue specifically in the context of landscape-level traditional cultural properties ("TCPs"), concluding that "TCPs may not be able to be adequately protected if the Section 106 consultation process is delayed until the APD stage, after land has already been leased for

---

[144] Advisory Council on Historic Preservation, *When Do Project Planning Activities Trigger Section 106 Review* (June 28, 2019), https://www.achp.gov/digital-library-section-106-landing/when-do-project-planning-activities-trigger-section-106-review.

[145] *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1008-10 (9th Cir. 2013).

[146] *Id*. at 1008.

[147] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 459 F. Supp. 2d 1102, 1123 (D.N.M. 2006), *vacated in part on other grounds*, 565 F.3d 683 (10th Cir. 2009).

oil and gas development."[148] The court further explained that for historic properties covering a smaller area "mitigation of impacts can be accomplished simply by moving the proposed drill site to a different location on the leased parcel."[149] However, for landscape-level TCPs "such movement may not be adequate mitigation. It is possible, for example, that the entire leased parcel could be located on a TCP."[150] Ultimately, the court held that where "such total preclusion is necessary to protect a TCP, waiting until the APD stage to complete the Section 106 consultation process does not comply with NHPA."[151]

Adopting the Leasing Program and holding lease sales are concrete actions that restrict the availability of alternatives to avoid, minimize, or mitigate adverse effects on historic properties. Therefore, Interior's failure to consider the potential effects on the Sacred Place Where Life Begins and other landscape-level TCPs during the development of the Leasing Program violates the NHPA.

### B. Interior Failed to Adequately Consult with the Tribes.

In carrying out their section 106 obligations, the NHPA requires federal agencies to "consult with any Indian tribe . . . that attaches religious and cultural significance to

---

[148] *Id.* at 1124-25.

[149] *Id.* at 1125.

[150] *Id.*

[151] *Id.*

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                          34

[historic] property,"[152] "that may be affected by an undertaking."[153] The ACHP's regulations require federal agencies to engage in consultation at specific steps in the section 106 process about specific determinations. Namely, federal agencies must provide Tribes "a reasonable opportunity to identify [their] concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate [their] views on the undertaking's effects on such properties, and participate in the resolution of those adverse effects."[154] Consultation "should be conducted in a sensitive manner respectful of tribal sovereignty" and must "recognize the government-to-government relationship between the Federal Government and Indian tribes."[155]

Interior failed to adequately consult with the Tribes during the section 106 process. Specifically, Interior did not adequately consult with the Tribes in identifying historic properties, including the Sacred Place Where Life Begins. The ACHP's regulations require an agency, "in consultation with . . . any Indian tribe . . . that might attach religious and cultural significance to properties within the area of potential effects" to

---

[152] 54 U.S.C. § 302706(b).

[153] 36 C.F.R. § 800.2(c)(2)(ii).

[154] *Id.* § 800.2(c)(2)(ii)(A).

[155] *Id.* § 800.2(c)(2)(ii)(B)-(C).

"take the steps necessary to identify historic properties within the area of potential effects[.]"[156]

Simply acknowledging that a historic property exists is not enough. Rather, for properties not previously evaluated for National Register eligibility, such as the Sacred Place Where Life Begins, Interior was required to apply the National Register criteria[157] "[i]n consultation with . . . any Indian tribe . . . that attaches religious and cultural significance to identified [historic] properties[.]"[158] In this process, Interior must "acknowledge that Indian tribes . . . possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them."[159]

Interior never consulted with the Tribes to apply the National Register criteria and did not produce a determination of eligibility for the Sacred Place Where Life Begins.[160]

Interior also failed to consult with the Tribes in assessing the Leasing Program's effects on historic properties, including the Sacred Place Where Life Begins, much less resolve adverse effects as the law requires. The regulations require Interior, "[i]n consultation with . . . any Indian tribe . . . that attaches religious and cultural significance to identified historic properties," to "apply the criteria of adverse effect to historic

---

[156] *Id.* § 800.4(b).

[157] *See id.* § 60.4.

[158] *Id.* § 800.4(c)(1).

[159] *Id.*

[160] AR520510 & AR209871.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                         36

properties within the area of potential effects."[161] Additionally, Interior must "consult with . . . Indian tribes . . . to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects to historic properties."[162] Interior failed to consult with the Tribes during these steps of the section 106 process because, as discussed, Interior refused to consider the Leasing Program's adverse effects on the Sacred Place Where Life Begins.[163]

Interior failed to adequately consult with the Tribes in the section 106 process. The section 106 process mandates specific consultation obligations at specific steps of the process: identification of historic properties, evaluation of their National Register eligibility, assessment of adverse effects, and the resolution of adverse effects. Interior failed to consult with the Tribes in accordance with these mandates.

## IV.     Interior Misinterpreted the Tax Act's Surface Development Limitation.

Congress directed the Secretary to "authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases" issued under the Leasing Program.[164] Interior has misinterpreted key portions of this surface development limitation. First, the 2020 and 2025 RODs

---

[161] 36 C.F.R. § 800.5(a).

[162] *Id.* § 800.6(a).

[163] *Supra* § III(A).

[164] Tax Act § 20001(c)(3).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                    37

interpreted the Tax Act as a mandate that Interior "must not deny or unreasonably limit development of production and support facilities on the Coastal Plain until 2,000 acres are covered by production and support facilities."[165] Second, the agency interpreted § 20001(c)(3) to mean that a facility must be both a "production" and a "support" facility to count toward the surface development limitation.[166] Finally, Interior interpreted the surface development limitation as a revolving limitation, as opposed to a one-time cap.[167] These flawed legal interpretations of the Tax Act have resulted in an unlawful Leasing Program.

In cases of statutory interpretation, courts begin "as always, with the plain language of the statute."[168] In *Loper Bright*, the Supreme Court clarified that "[u]nder the APA, it thus 'remains the responsibility of the court to decide whether the law means what the agency says.'"[169]

Interior's determination that it cannot approve a leasing program that allows less than 2,000 acres of surface development sits in conflict with the plain meaning of the Tax Act. Section 20001(c)(3) directs the Secretary to "authorize *up to* 2,000 surface acres" of

---

[165] AR205966 (2020 ROD); AR522118 (2025 ROD).

[166] *See, e.g.*, AR522119.

[167] *See, e.g.*, AR522119.

[168] *Lopez v. Garland*, 116 F.4th 1032, 1043 (9th Cir. 2024) (citation omitted).

[169] *Loper Bright*, 603 U.S. at 392 (quoting *Perez v. Mortgage Bankers Assn.*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

the Coastal Plain to be covered by production and support facilities.[170] The term "up to" as used in § 20001(c)(3) is not mandatory language. Interior is correct that Congress used mandatory language with the phrase "shall authorize,"[171] but the use of "up to" creates a limit on how much surface development the Secretary can authorize, not a floor.[172]

Similarly, Interior has crafted a "conceivable-but-convoluted interpretation over the ordinary" meaning of the term "production and support" facility.[173] While Interior in the 2020 ROD states that it "will have to determine whether each type of proposed facility constitutes a 'production and support facility,'"[174] the 2025 ROD includes an expanded definition, requiring a facility to be both a "production" *and* a "support" facility to count toward the 2,000-acre limitation.[175] The 2025 ROD notes that the Naval Petroleum Reserves Production Act ("NPRPA")—which Congress directed the Secretary to manage the Coastal Plain Leasing Program in a manner similar to—contemplates the "development, production, transportation, and distribution of petroleum resources" as separate actions.[176] But there is nothing in that provision of NPRPA that defines

---

[170] Tax Act § 20001(c)(3) (emphasis added).

[171] AR522118.

[172] *See Merriam-Webster's Collegiate Dictionary* 1376 (11th ed. 2005) (defining "up to" as "a function word to indicate a limit or boundary").

[173] *Stanley v. City of Sanford, Fla.*, 606 U.S. 46, 55-56 (2025).

[174] AR205967.

[175] AR522119.

[176] AR522118 (quoting 42 U.S.C. § 6505).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                          39

"production" or "support" to bolster Interior's argument that Congress meant something other than the ordinary meanings of the terms.

The Supreme Court recognizes that occasionally Congress may "define a word or phrase in a specialized way or employ a term of art with long-encrusted connotations in a given field."[177] Section 20001 does not define "production" or "support," and neither does NPRPA. In fact, the provision of NPRPA that Interior cites to in the 2025 ROD directs the President to "conduct a study, in consultation with representatives of the State of Alaska, to determine the best overall procedures to be used in the *development, production, transportation, and distribution of petroleum* resources in the reserve"[178]— thus underscoring that NPRPA and its implementing regulations do not provide a particular definition of the terms production or support. Neither NPRPA nor its implementing regulations provide a special, out-of-the-ordinary definition for "production" or "support."[179]

Finally, the text of § 20001(c)(3) does not support Interior's assertion that Congress intended the 2,000-acre limit to be a revolving limit whereby lands that formerly contained production or support facilities will no longer count toward the 2,000-acre limit once reclaimed. The 2025 ROD notes that the 2019 EIS "assumed for

---

[177] *Feliciano v. Dep't of Transportation*, 605 U.S. 38, 45 (2025).

[178] 42 U.S.C. § 6505 (emphasis added).

[179] *See, e.g.*, 43 C.F.R. § 3130.0-5 (definitions provision of the lease sale regulations for the National Petroleum Reserve-Alaska).

analytical purposes that reclaimed acreage of Federal land formerly containing production and support facilities would free up additional acreage to be subject to the 2,000-acre mandate in Section 20001(c)(3) once they are reclaimed."[180] The 2025 ROD further states that this assumption "is the most in harmony with the statute and Congressional intent."[181] With the 2,000-acre limitation, Congress sought to minimize the damage the Leasing Program would have on the Coastal Plain.[182] Interior's interpretation—mandating a minimum of 2,000 acres of development and allowing for a revolving cap of surface development—frustrates Congress's goal of protecting the Coastal Plain.

Here, "the reviewing court's role is 'to independently interpret the statute and effectuate the will of Congress. . . .'" [183] Nothing in the text of § 20001(c)(3) indicates that Congress intended the 2,000-acre limit to be one that could be met, and then unmet, with reclamation.

## V.    Interior Violated NEPA.

Interior violated NEPA when it unlawfully relied on the 2025 DNA for NEPA

---

[180] AR522119.

[181] AR522119.

[182] 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) (statement of Sen. Murkowski) ("I would be the first to agree that the environment and local wildlife will always be a concern, always be a priority . . . That is why surface development will cover up to, but no more, than 2,000 Federal acres.").

[183] *Modeste v. Birkholz*, 809 F. Supp. 3d 891, 901 (D. Alaska 2025) (quoting *Loper Bright*, 603 U.S. at 395).

compliance despite significant new circumstances that would substantially change the analysis. In addition, Interior improperly relied on two existing NEPA documents—the 2019 FEIS and 2024 SEIS—that failed to adequately analyze the effects of Leasing Program on the Coastal Plain. Interior's failure to comply with NEPA's directive that the agency undertake supplemental NEPA analysis when presented with new information and circumstances, in turn, led the agency to violate NEPA's requirement to analyze a reasonable range of alternatives to inform its decision when adopting the Leasing Program.

### A. Interior Failed to Conduct a NEPA Analysis Despite New Circumstances that Substantially Change the Analysis of the Proposed Action.

Interior's use of a DNA was improper for two reasons: (1) new circumstances and information warranted a new NEPA analysis and (2) the existing NEPA analysis did not adequately analyze the effects of the proposed action. Because of the significant new circumstances and inadequate existing NEPA analysis, Interior must prepare a supplemental Environmental Assessment ("EA") or EIS.[184] The 2025 DNA is insufficient to satisfy the Interior's legal duties under NEPA and thus violated the APA.

---

[184] *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) (holding that if the "new information is significant," an agency "must prepare a supplemental EA or EIS; [DNAs] cannot serve as a substitute"); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989) (holding agencies must prepare a supplemental NEPA analysis when there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                              42

### 1. *New circumstances and information warranted a new NEPA analysis.*

Two new circumstances arose in 2025 that mandate a new NEPA analysis—the enactment of OBBBA with new mandates for the Leasing Program and Interior's expanded interpretation of the 2,000-acre limitation. Despite these new circumstances, Interior failed to conduct a new NEPA analysis, instead relying on a non-NEPA document in violation of the statute's mandates and the agency's own guidance.

As an initial matter, the Leasing Program is a major federal action significantly affecting the quality of the human environment,[185] and therefore is subject to the requirements of NEPA.[186] NEPA does not contemplate the use of a DNA, and a DNA is not a NEPA analysis.[187] Rather, DNAs are "an administrative convenience created by the BLM"[188] and may only be utilized "to evaluate new circumstances or information prior to issuance of a decision to determine whether [the agency] need[s] to prepare a new or supplemental analysis."[189] Interior may rely on previous NEPA analysis only when there

---

[185] *See, e.g.*, AR17685; AR207244 (notices of intent to prepare an EIS and SEIS to comply with NEPA).

[186] 42 U.S.C. §§ 4332, 4336.

[187] Bureau of Land Management, *Handbook H-1790-1 National Environmental Policy Act*, § 5.1.3 (Jan. 2008) [hereinafter "BLM Handbook"], https://www.govinfo.gov/content/pkg/GOVPUB-I53-PURL-LPS118752/pdf/GOVPUB-I53-PURL-LPS118752.pdf.

[188] *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006).

[189] Department of the Interior, *Manual 516 DM 11 Managing the NEPA Process*, § 11.6 (Dec. 10, 2020) [hereinafter "Interior Manual"] https://www.doi.gov/document-library/departmental-manual/516-dm-11-managing-nepa-process-bureau-land-management.

are "no new circumstances, new information, or unanticipated or unanalyzed environmental impacts that warrant new or supplemental analysis."[190]

The OBBBA, signed into law in July 2025,[191] requires Interior to issue leases with specific terms and conditions,[192] a particular and limiting circumstance that was not analyzed in any NEPA document pertaining to the leasing program. Of the four action alternatives assessed in the 2019 FEIS and the four action alternatives assessed in the 2024 SEIS, *only one alternative* was in line with OBBBA's mandated terms and conditions—the 2019 FEIS Alternative B,[193] highlighting the breadth of this new circumstance in changing the landscape for the agency's analysis. Interior was required to undertake a new NEPA analysis looking at a reasonable range of alternatives that would meet OBBBA's requirements rather than relying on a stale NEPA analysis that predated OBBBA's new mandate.

As to Interior's interpretation of the 2,000-acre limitation, the 2025 ROD articulated an expanded interpretation of the 2,000-acre limitation that is different than

---

[190] Interior Manual, § 11.6. *See also* BLM Handbook, § 5.1.2 (explaining that a new EA or EIS "must be prepared" if the existing NEPA analysis is invalid "in light of new information or circumstances").

[191] OBBBA § 50104(b)(2).

[192] OBBBA requires Interior to "offer the same terms and conditions as contained in the record of decision" that the agency offered for the Refuge lease sale in 2020. *Id.* § 50104(b)(2); s*ee also* AR522064. BLM has interpreted this provision to require it to apply the same stipulations and required operating procedures enumerated in Appendix A to the 2020 ROD. AR522120-21.

[193] OBBBA § 50104(b)(2).

the agency's previous interpretations.[194] This interpretation differs from the agency's previous interpretations in the 2020 ROD and 2024 ROD.[195] Specifically, the interpretation in the 2025 ROD, in addition to reversing the 2024 ROD's determination that the 2,000-acre limitation is not a development minimum and that reclamation cannot be used in calculating acreage, added exemptions of broad categories of "production and support facilities" from the limit and purported to base this on a new interpretation of NPRPA.[196] This interpretation would allow more surface coverage and impacts than under any previous interpretation adopted by Interior and is a new circumstance warranting a new NEPA analysis. Indeed, with this expanded interpretation, Interior admits that "the future application of these principles may differ in some respects from some of the assumptions made in the 2019 Final EIS and/or 2024 Final SEIS as to their interpretation."[197]

Interior's admission that the 2025 ROD's interpretation of the 2,000-acre limitation "does not entirely adopt the assumptions made in the 2024 Final SEIS"[198] is at odds with the 2025 DNA's conclusion that because the 2017 Tax Act "limits surface

---

[194] AR522123-24; *see also*, *supra* § IV.

[195] *Compare* AR205966-69 (2020 ROD); AR519747-50 (2024 ROD); AR522116-21 (2025 ROD).

[196] AR522118-20. Specifically, as to the definition of production and support facilities, Interior for the first time claims this "interpretation is consistent with the NPRPA. . . ." AR522119.

[197] AR522119.

[198] AR522120.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                 45

development impacts up to 2,000 acres," "[n]o new information or circumstances are available that would alter the direct and indirect effects of oil and gas development activities. . . ."[199] The agency's expanded interpretation of the Tax Act's mandates itself is the new circumstance requiring a new NEPA analysis.

### 2. *The existing NEPA analysis did not adequately analyze the effects of the proposed action.*

Contrary to Interior's assertions in the 2025 DNA, the existing NEPA analysis did not adequately analyze the effects of the proposed action.[200] This is especially evident in the 2019 FEIS and 2024 SEIS treatment of impacts on cultural resources. NEPA requires "professional integrity, including scientific integrity, of the discussion and analysis" of NEPA documents.[201] In the absence of adequate baseline data, "there is simply no way to determine what effect the proposed [action] will have on the environment and,

---

[199] AR522068.

[200] Moreover, BLM violated its own guidance concerning DNAs when the agency failed to answer this key question: "[a]re the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?" BLM Handbook at 23. Under this guidance, only if BLM answers "yes" to this and other questions can the agency determine that additional analysis will not be necessary. If the agency answers "no" to this and other questions, a new EA or EIS must be prepared. *Id.* (citing Interior Manual, § 11.6).

[201] 42 U.S.C. § 4332(2)(D).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief 46

consequently, no way to comply with NEPA."[202] An agency's reliance on incomplete or outdated information regarding cultural resources is unlawful.[203]

Interior previously acknowledged that the 2019 FEIS was legally insufficient for its failure to adequately analyze a reasonable range of alternatives[204] and for the FEIS's reliance on faulty analysis in connected reviews under ANILCA section 810 and NHPA section 106.[205] In addition, in violation of NEPA, the 2019 FEIS failed to discuss and analyze the reasonably foreseeable environmental effects of the proposed action.[206] The 2019 FEIS relied on inadequate baseline data, contained erroneous factual assumptions, relied on erroneous interpretations of the Tax Act, failed to analyze impacts of seismic activities, and failed to take into account traditional knowledge.[207] Overall, this led to an inadequate FEIS that understated the reasonably foreseeable environmental effects on subsistence, cultural resources, and caribou.

---

[202] *Half Moon Bay Fish. Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

[203] *Marsh*, 490 U.S. at 371 ("NEPA ensures that [agencies] will not act on incomplete information, only to regret its decision after it is too late to correct."). *See Indig. Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 580-81 (D. Mont. 2018), *vacated as moot* No. CV 17-29-GF-BMM, 2022 WL 22900787 (D. Mont. Sept. 27, 2022) (citing *Marsh* to find the agency must supplement information on unsurveyed acres to provide a full and fair discussion of cultural resources impacts in order to comply with NEPA obligations).

[204] AR522325.

[205] AR522327.

[206] 42 U.S.C. § 4332(2)(C)(i)-(ii).

[207] AR56040-46; AR247544-86.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                47

The 2024 SEIS failed to remedy many of the 2019 FEIS's legal deficiencies. For example, the 2024 SEIS continued to rely on inadequate information from the NHPA section 106 process without initiating a new section 106 process[208] as well as rely on an inadequate ANILCA 810 subsistence evaluation that failed to fill data gaps for Arctic Village.[209] Data gaps due to incomplete ANILCA and NHPA processes carry over to the analysis in the 2024 SEIS. Interior's failure to meaningfully fulfill these legal obligations means that the agency has not properly utilized these connected reviews to help inform the NEPA analysis of impacts, especially to the Porcupine Caribou Herd and associated ecological, cultural, and subsistence importance.

Regarding impacts on cultural resources, the 2024 SEIS continued to rely on the same inadequate and outdated cultural resources data as the 2019 FEIS with no new on-the-ground data or surveys to supplement the analysis.[210] Both the 2019 FEIS and 2024 SEIS rely on inadequate and stale data to ascertain the existence and location of cultural resources within the Coastal Plain. Indeed, the last *comprehensive* survey of cultural resources within the Coastal Plain is from 1982.[211] Moreover, Interior has admitted that

---

[208] *Supra* § III.

[209] AR90465 & AR389560; AR90850 & AR390775 (describing the lack of data to calculate resources of importance for Arctic Village and lack of detailed household surveys).

[210] AR390512-16 (noting in the SEIS no new archaeological studies and data gaps such as "vast inland areas of the program area have received little to no systematic investigation for cultural resources"); AR90447-51 (noting the same in the 2019 FEIS).

[211] *See* AR90448 (2019 FEIS); AR390514 (2024 SEIS); Pls.' Mem. in Supp. of Mot. for TRO & Prelim. Inj. 22, Dkt. No. 36-1.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                           48

"[o]verall, vast inland areas of the program area have received little to no systematic investigation for cultural resources."[212] This data is incomplete, unreliable, and insufficient to inform decision-making for the leasing program.[213] Interior's failure to acquire archaeological data with scientific integrity violates NEPA requirements.[214]

In sum, Interior cannot rely on a DNA to fulfill its NEPA obligations here. Because there is no evidence that Interior actually considered new significant information and because the two EIS documents fail to ensure professional and scientific integrity with updated and robust data, its statement that the 2025 DNA "fully covers the proposed action"[215] is incorrect.[216] A supplemental NEPA analysis would require a new analysis of alternatives and could change the agency's decision.

---

[212] AR90448.

[213] Decl. of Monty Rogers in Supp. of Pls.' Mot. For a TRO and Prelim. Inj. 2-4, Dkt. No. 36-6.

[214] *Marsh*, 490 U.S. at 371 (holding that NEPA requires agencies "not act on incomplete information"); *see also N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011) (holding that agency's reliance on "several-years-old" surveys failed to satisfy hard look standard).

[215] AR522069.

[216] *See, e.g.*, *Bd. of Cnty. Comm'rs of San Miguel v. U.S. Bureau of Land Mgmt.*, 706 F. Supp. 3d 1180, 1203 (D. Colo. 2022) (holding a NEPA analysis inadequate where a DNA claimed an FEIS "fully cover[ed]" the effects of oil and gas leases, "[b]ut the document itself verifies that the BLM defied NEPA's requirements").

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                    49

**B.      Interior Failed to Consider a Reasonable Range of Alternatives.**

NEPA directs federal agencies to study a reasonable range of alternatives to their proposed actions.[217] Because DNAs themselves cannot provide NEPA analysis,[218] Interior failed to undertake an alternatives analysis compliant with NEPA in support of the agency's selection of Alternative B in the 2025 ROD.[219] Instead, without conducting a new NEPA analysis as required, the agency artificially limited its alternatives analysis based on new mandates in OBBBA and ignored the admitted illegality of its 2019 FEIS alternatives analysis. In doing so, Interior failed to consider a reasonable range of alternatives as required by NEPA.

First, despite OBBBA, Interior retained meaningful discretion as to components of the Leasing Program such as timing and location of lease activities. However, Interior failed to develop and consider any alternatives other than Alternative B in the 2019 FEIS that is consistent with OBBBA's mandated terms and conditions. OBBBA mandates Interior hold four lease sales on the Coastal Plain by 2032[220] and "offer the same terms and conditions as contained in the record of decision" that the agency offered for the

---

[217] 42 U.S.C. § 4332(2)(C)(iii) & (2)(F).

[218] Interior Manual, § 11.6.

[219] AR522062 ("If this DNA determines that the analysis conducted in [the 2019 FEIS and 2024 SEIS] remains adequate under NEPA, in a newly issued ROD the BLM may select another alternative within the spectrum of the alternatives analyzed in those documents.").

[220] OBBBA §§ 50104(a)(3), 50104(b)(3)(B).

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                                    50

lease sale in 2020.[221] Interior has interpreted this provision to require it to apply the same stipulations and required operating procedures enumerated in Appendix A to the 2020 ROD.[222]

Despite the OBBBA's new mandate, Interior unlawfully relied on the analyses in the 2019 FEIS and 2024 SEIS, which predated OBBBA.[223] Between the eight action alternatives studied in the 2019 FEIS and 2024 SEIS, only one alternative, Alternative B in the 2019 FEIS, complies with OBBBA's mandated terms and conditions.[224] All the other alternatives considered in the 2019 FEIS and 2024 SEIS contain terms and conditions that differ from those adopted in the 2020 ROD. Instead of developing and analyzing other potential alternatives that might comply with OBBBA's mandates, the agency ignored its responsibility and considered only a single action alternative.

Interior's failure to analyze any alternatives that might comply with OBBBA's mandated terms and conditions, other than Alternative B in the 2019 FEIS, violated NEPA's requirement to study a reasonable range of alternatives to inform its decision when adopting the Leasing Program.

Second, the agency unlawfully relied on stale and inadequate alternatives analyses in the 2019 FEIS and 2024 SEIS. Interior ultimately chose Alternative B from the 2019

---

[221] *Id.* § 50104(b)(2).

[222] AR522115; AR522120-21.

[223] *Supra* notes 191 & 192.

[224] OBBBA § 50104(b)(2).

FEIS, ignoring the agency's prior admission that the 2019 FEIS alternatives analysis was inadequate.[225] In the 2019 FEIS, Interior did not develop or study any alternative that would fulfill, to the extent consistent with Tax Act obligations, the subsistence and conservation purposes for which the Refuge must be managed or minimize adverse effects to the environment. The action alternatives in the 2019 FEIS were very similar to each other and heavily weighted toward maximizing oil and gas development. None of the action alternatives in the 2019 FEIS maximized protection for subsistence, wildlife, habitat, ecosystems, or historic properties. By failing to consider any alternative outside of the 2019 FEIS Alternative B, Interior violated NEPA's mandate that the agency consider a reasonable range of alternatives.

## CONCLUSION

For the foregoing reasons, the Court should grant the Tribes' Motion for Summary Judgment and vacate the challenged actions.

Respectfully submitted this 12th day of June 2026.

/s/ Megan R. Condon
Megan R. Condon (AK Bar No. 1810096)
Mitchell Forbes (AK Bar No. 2402005)
NATIVE AMERICAN RIGHTS FUND

---

[225] AR522325.

*Native Village of Venetie Tribal Government v. Burgum,* 3:20-cv-00223-SLG
Pls.' Opening Brief                                                                      52

**CERTIFICATE OF SERVICE**

I certify that on June 12, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Alaska by using the CM/ECF system.


/s/ Megan R. Condon
Megan R. Condon (AK Bar No. 1810096)
NATIVE AMERICAN RIGHTS FUND