Megan R. Condon (AK Bar No. 1810096)
Mitchell Forbes (AK Bar No. 2402005)
NATIVE AMERICAN RIGHTS FUND
420 L Street, Suite 310
Anchorage, AK 99501
Phone: (907) 276-0680
mcondon@narf.org
forbes@narf.org

*Lead Counsel for Plaintiffs Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council*

Peter H. Van Tuyn (AK Bar No. 8911086)
Karen E. Schmidt (AK Bar No. 1211113)
BESSENYEY & VAN TUYN, LLC
911 West 8th Avenue, Suite 101, PMB 59
Anchorage, AK 99501
Phone: (907) 278-2000
peter@bvt-law.com
karen@bvt-law.com

*Co-Counsel for Plaintiffs Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DOUG BURGUM, *et al.*,<br><br>Defendants,<br><br>and<br><br>ALASKA OIL & GAS ASSOCIATION, *et al.*,<br><br>Intervenor-Defendants. | Case No. 3:20-cv-00223-SLG |

**PLAINTIFFS' REPLY BRIEF UNDER LOCAL RULE 16.3**

## TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. The Tribes' Claims Against the 2020 ROD Are Not Moot, and this Court Has Jurisdiction to Hear Them ........ 1

II. Interior Violated the Refuge Act and ANILCA ........ 2

A. The Original Range Purposes Remain Binding and Were Arbirtarily Excluded ........ 2

B. Congress Did Not Establish an Oil and Gas Program as the "Dominant Purpose" for the Coastal Plain ........ 4

C. Interior Failed to Justify Reversal of the Detailed Factual and Scientific Findings in the 2024 SEIS and ROD ........ 6

D. The Refuge Act Mandates a Written Compatibility Determination for the Leasing Program Uses, Which Has Not Been Waived by Congress ........ 10

III. Interior Failed to Comply with Its Obligations to Consider and Protect Subsistence under ANILCA ........ 11

A. The Record Clearly Demonstrates that Interior Excluded Communities from Its ANILCA Section 810 Evaluation ........ 11

B. Interior's Erroneous Interpretation of "Subsistence Uses" Excluded Culturally Important Subsistence Resources and Practices ........ 13

C. Interior Erroneously Determined that the Leasing Program Would Not Significantly Restrict Subsistence Uses for Arctic Village and Venetie ........ 14

IV. Interior Violated the NHPA ........ 16

A. Interior Failed to Consider Effects on Landscape-Level Historic Properties ... 16

B. Interior Failed to Adequately Consult with the Tribes ........ 18

V. Interior's Unlawful Interpretation of the 2,000-Acre Surface-Development Limitation is Ripe for Review ........ 20

VI. Interior Failed to Comply with Its Obligations under NEPA by Unlawfully

Relying on a DNA and a Single Action Alternative ... 24

A. Significant New Circumstances Render Interior's Use of a DNA Unlawful ... 24

B. The OBBBA Did Not Eliminate the Mandate to Analyze a Reasonable Range of Alternatives ... 26

VII. Vacatur Remains an Appropriate Remedy ... 28

CONCLUSION ... 29

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) .......... 20

*Alaska Indus. Dev. & Export Auth. v. Biden*,
685 F. Supp. 3d 813 (D. Alaska 2023) .......... 27

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 20

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 23

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) .......... 28

*Camp v. Pitts*,
411 U.S. 138 (1973) .......... 8

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) .......... 15

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022) .......... 28

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
341 F.3d 961 (9th Cir. 2003) .......... 20

*CoreCivic, Inc. v. Candide Grp.*,
46 F.4th 1136 (9th Cir. 2022) .......... 15, 16

*Earth Island Inst. v. U.S. Forest Serv.*,
87 F.4th 1054 (9th Cir. 2023) .......... 26

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) .......... 20, 27

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
381 F. Supp. 3d 1127 (D. Alaska 2019) .......... 7

*Hanlon v. Barton*,
740 F. Supp. 1446 (D. Alaska 1988) .................................................................. 15

*Idaho Sporting Cong., Inc. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) .............................................................................. 26

*John v. United States*,
720 F.3d 1214 (9th Cir. 2013) .............................................................................. 5

*King v. Burwell*,
576 U.S. 473 (2015) ............................................................................................. 5

*Knox v. Serv. Emps. Int'l Union, Loc 1000*,
567 U.S. 298 (2012) ............................................................................................. 1

*Kunaknana v. Clark*,
742 F.2d 1145 (9th Cir. 1984) ............................................................................ 15

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ............................................................................... 3, 11, 21

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................................... 21

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ........................................................................................... 25

*McQuiggin v. Perkins*,
569 U.S. 383 (2013) ............................................................................................. 5

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ................................................................................. 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ............................................................................................ 4, 8

*Native Vill. of Hooper Bay v. Burgum*,
No. 3:25-cv-00316-SLG , 2026 WL 2409781 (D. Alaska Aug. 18, 2026) ....... 5, 11, 29

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) ...................................................................................... 20, 21

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ................................................................................ 7

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) .......... 17

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .......... 28, 29

*Pub. Int. Legal Found. v. Nago*,
174 F.4th 664 (9th Cir. 2026) .......... 23

*Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*,
755 F. Supp. 2d 1104 (S.D. Cal. 2010) .......... 19

*Sierra Club v. Penfold*,
664 F. Supp. 1299 (D. Alaska 1987) .......... 15

*Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*,
555 F. Supp. 3d 739 (D. Alaska 2021) .......... 29

*Tulelake Irrigation Dist. v. U.S. Fish & Wildlife Serv.*,
40 F.4th 930 (9th Cir. 2022) .......... 10

*United States v. Am. Trucking Ass'ns*,
310 U.S. 534 (1940) .......... 5

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) .......... 27

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) .......... 27

**Statutes**

5 U.S.C. § 706 .......... 8

5 U.S.C. § 801 .......... 8

16 U.S.C. § 668ee .......... 3

16 U.S.C. § 3113 .......... 13

16 U.S.C. § 3120 .......... 12, 15

42 U.S.C. § 4332 .......... 27

42 U.S.C. § 4336b ........................................................................................ 25

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487,
94 Stat. 2371 (1980)
§ 303 ........................................................................................ 2, 3
§ 305 ........................................................................................ 3, 5

Pub. L. No. 119-52, 139 Stat. 701 (2025) ........................................................ 8

Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054 (2017), ........................*passim*

**Regulations and Administrative Materials**

36 C.F.R. § 800.4 ........................................................................................ 17

36 C.F.R. § 800.14 ........................................................................................ 19

Pub. Land Order 2214, 25 Fed. Reg. 12,598 (Dec. 9, 1960) .................................. 2, 3, 4, 5

Removal of National Environmental Policy Act Implementing Regulations, 91 Fed. Reg. 618 (Jan. 8, 2026) ........................................................................................ 25

**Other Authorities**

163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) .................................................. 11

## INTRODUCTION

Federal Defendants (collectively referred to as "Interior") have developed an unlawful Leasing Program that unnecessarily endangers the Coastal Plain of the Arctic National Wildlife Refuge. The fundamental flaws in the Program, and the attempts by Interior and the Intervenor-Defendants to justify them, highlight grave errors threatening the Native Village of Venetie Tribal Government, Arctic Village Council, and Venetie Village Council's ("the Tribes") interests in and connection to the Coastal Plain.

## ARGUMENT

### I. The Tribes' Claims Against the 2020 ROD Are Not Moot, and this Court Has Jurisdiction to Hear Them.

The Tribes' claims against the 2020 Record of Decisions ("ROD") remain live controversies because it is possible for this Court to grant "effectual relief"[1] on the claims—Intervenor-Defendant Alaska Industrial Development and Export Authority's ("AIDEA") leases on the Coastal Plain were issued pursuant to the 2020 ROD,[2] and could be vacated if the Court finds error with the agency's decision underlying the 2020 ROD.

The Tribes' claims against the 2020 ROD challenge the agency decision-making that led to the January 2021 lease sale in which AIDEA acquired several leases. Last fall,

---

[1] *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (internal quotations omitted).

[2] AR522184.

Interior "terminate[d] the suspension"[3] of AIDEA's leases and placed them "in an active status."[4] While Interior stated that AIDEA's leases are "fully consistent with the 2025 ROD as originally issued,"[5] no party asserts that they were not awarded under the 2020 ROD and the record contains no evidence to the contrary. These leases are clearly the product of the flawed 2020 ROD, and due to their now-active status, remain challengeable by the Tribes. Should the Court find error with the analysis and decision-making underpinning the 2020 ROD, this Court can vacate the ROD and its progeny—including AIDEA's leases.

## II. Interior Violated the Refuge Act and ANILCA.

### A. The Original Range Purposes Remain Binding and Were Arbitrarily Excluded.

Interior and Intervenor-Defendants argue that the 1960 Public Land Order ("PLO") 2214 purposes of preserving "unique wildlife, wilderness, and recreational values" were entirely "superseded" by the enactment of Alaska National Interest Lands Conservation Act ("ANILCA") section 303(2)(B) as amended by the 2017 Tax Cuts and Jobs Act ("Tax Act").[6] This argument is incorrect.

---

[3] AR522438.

[4] AR522442-43.

[5] AR522442.

[6] Defs.' Mem. in Opp'n to Pls' Mots. for Summ. J. and in Supp. of Cross-Mots. for Summ. J. 35, Dkt. No. 168 ("Interior Br."); North Slope Defs.'Resp. in Opp'n to Plfs.' Mots. for Summ. J. 15, Dkt. 171 ("North Slope Br."); Intervenor-Def. AIDEA's Opp'n to Pls.' Mots. for Summ. J. and Cross-Mots. for Summ. J. 19-20, Dkt. No. 173 ("AIDEA Br."); Alaska's Mot. for Summ. J. and Cross-Mot. for Summ. J. 27-28, Dkt. No. 175

ANILCA section 305 explicitly preserves existing public land orders "except to the extent they are inconsistent with" the statute.[7] There is no inconsistency between conserving wildlife, wilderness, and recreation values and the subsistence and conservation purposes of ANILCA. Indeed, the Refuge Act itself defines the "purposes of the refuge" to include those "specified in or derived from the law, proclamation, executive order, agreement, public land order . . . establishing, authorizing, or expanding a refuge."[8] PLO 2214 is the foundational order establishing the Arctic Refuge.[9] Accordingly, those Range purposes remain mandates of the Arctic Refuge as a matter of law.[10] Interior argues that it "has adopted the best statutory reading" of ANILCA as superseding the Range purposes.[11] But the agency's interpretation is not entitled to deference.[12]

---

("State Br.") (citing Pub. L. No. 96-487, § 303(2), 94 Stat. 2371, 2390 (1980) [hereinafter "ANILCA"] and Pub. L. No. 115-97, § 20001(b)(2)(A), 131 Stat. 2054, 2235-37 (2017) [hereinafter "Tax Act"]).

[7] ANILCA § 305.

[8] 16 U.S.C. § 668ee(10); Pls.' Opening Brief under Local Rule 16.3 at 22, Dkt. No. 158 ("Opening Brief").

[9] Pub. Land Order 2214, 25 Fed. Reg. 12,598 (Dec. 9, 1960); Opening Brief at 11.

[10] 16 U.S.C. § 668ee(10); Opening Brief at 22.

[11] Interior Br. at 35.

[12] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024), ("[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."); *see also id.* at 392 n.4 ("[S]tatues can be sensibly understood *only* 'by reviewing text in context.'" (emphasis added, citation omitted)).

By treating the PLO 2214 purposes as legally "superseded" or non-existent,[13] Interior failed to analyze or balance them during the development of the Leasing Program.[14] This omission constitutes a clear failure to "consider an important aspect of the problem," rendering the agency's action arbitrary and capricious.[15]

### B. Congress Did Not Establish an Oil and Gas Program as the "Dominant Purpose" for the Coastal Plain.

In an argument not advanced by Interior, Intervenor-Defendants AIDEA and the State of Alaska argue that Congress, through ANILCA, the Tax Act, and One Big Beautiful Bill Act ("OBBBA"), created a "hierarchy" within the Arctic Refuge's purposes, placing the competitive oil and gas program as the "dominant purpose" for the Coastal Plain.[16] This argument misconstrues both the text and the intent of the legislation.

First, contrary to AIDEA's contentions, Congress by listing the Arctic Refuge's purposes in ANILCA, did not designate any purposes subordinate to another.[17] This is

[13] *See* Interior Br. at 35; North Slope Br. at 15; AIDEA Br. at 20. While Interior asserts that the original purposes were superseded, North Slope Intervenor-Defendants argue in the alternative that the purposes were effectively considered by the agency. In reality, Interior, by ignoring the original purposes of preserving unique wildlife, wilderness, and recreational values, adopted a leasing program that would have the greatest impacts to these values. *See* AR389620-24 & AR90531-33 (final SEIS and EIS describing how Alternative B would have the greatest impacts to recreation); AR389633-35 & AR90543-44 (final SEIS and EIS describing how Alternative B would have the greatest impacts to wilderness characteristics, qualities, and values).

[14] *See* Opening Brief at 27; AR522111-175.

[15] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

[16] *See* AIDEA Br. at 18-21; State Br. at 27-28.

[17] Notably, Interior has never asserted a hierarchy of purposes governing the Arctic Refuge based on the language of ANILCA. *See*, *e.g.* AR522111 (2025 ROD describing

not only evident in the plain language of ANILCA but also in the Congress's intent in passing ANILCA.[18] Second, the Tax Act added an oil and gas program as an *additional* fifth purpose of the Arctic Refuge—it did not modify, abrogate, or subordinate the original four statutory subsistence and conservation purposes.[19] Third, likewise in

---

purposes); AR519750 (2024 ROD describing purposes). Indeed, ANILCA's text is an unambiguous list with no indication of preference. If the statutory language is clear and unambiguous, the court must apply it according to its plain meaning without resorting to other sources of interpretation. *See King v. Burwell*, 576 U.S. 473, 486 (2015).

[18] *See United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940) (explaining courts interpret statutes "to give effect to the intent of Congress"). Indeed, in passing ANILCA, Congress provided that public land orders in effect when ANILCA was enacted "shall remain in force and effect except to the extent that they are inconsistent with this Act." ANILCA § 305. Congress was aware of PLO 2214 when passing ANILCA and yet ANILCA is silent on whether purposes should be hierarchical. *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013) (noting that "Congress legislates against the backdrop of existing law"). Intervenor-Defendant AIDEA's reliance on *John v. United States*, 720 F.3d 1214 (9th Cir. 2013), is misplaced. *See* AIDEA Br. at 19. In that case, the Ninth Circuit addressed the Secretaries' identification of navigable waterways that constitute "public lands" under ANILCA Title VIII, which provides a priority to rural residents for subsistence uses. *John*, 720 F.3d at 1218. The court discussed the purposes of federal reservations in the context of the federal reserved water rights doctrine. The court explained that Congress preserved subsistence uses on these federal reservations even where subsistence was not a specified purpose of the reservation "so that ANILCA does not destroy the preexisting way of life on those federal lands." *Id.* at 1237-38, 1240. Consequently, AIDEA is wrong to assert subsistence was merely an afterthought; rather subsistence is central to ANILCA and Refuge purposes.

[19] Tax Act § 20001(b)(2)(B); Opening Brief, at 12, 22. This Court's recent decision in *Native Village of Hooper Bay v. Burgum* confirms that even when an agency is authorized to take actions under ANILCA, it cannot ignore other co-existing statutory boundaries. No. 3:25-cv-00316-SLG, 2026 WL 2409781 at *11-13, *15-16 (D. Alaska Aug. 18, 2026). Interior and the State argue that ANILCA Section 1302(h)'s "notwithstanding any other provision of law" clause completely exempted land exchanges from the requirements of the Refuge Act. *Id.* at *28. This Court flatly rejected that argument, holding that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Id.* at *29 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

OBBBA Congress did not modify, abrogate, or subordinate the Arctic Refuge's purposes. Congress did not address the Refuge purposes whatsoever in OBBBA, and AIDEA's attempts to read Congress's intent to establish a hierarchy in OBBBA fails.[20]

### C. Interior Failed to Justify Reversal of the Detailed Factual and Scientific Findings in the 2024 SEIS and ROD.

Interior argues that because its policy position changed due to the passage of OBBBA, the agency need not justify its reversal in the face of detailed factual and scientific findings that undermine its reversal. However, the agency is prohibited from discarding prior factual findings without a reasoned explanation and cannot bypass the Administrative Procedure Act's ("APA") hard look requirement by hiding behind a legal

---

Likewise, the Tax Act's addition of an oil and gas program as a fifth purpose did not express a "clear and manifest" congressional intent to repeal the conservation purposes or prioritize an oil and gas program. Indeed, Congress itself is clear that it does not use reconciliation bills, of which the Tax Act is one, to effectuate policy changes. *See* Opening Brief at 12 n.15. Thus, the "shall establish and administer" in the Tax Act must coexist with, rather than override, the co-equal statutory obligations to protect surface resources and subsistence.

[20] AIDEA fails to cite to a case supporting its reading that in OBBBA, Congress "ratifies any alleged error." AIDEA Br. at 21. *But c.f.* Opening Brief, at 13 n.21 (noting reconciliation measures must be predominately budgetary as a means of preventing the use of reconciliation for matters that are primarily non-budgetary).

or procedural "blank slate."[21] Even when reversing a policy, "an agency may not simply discard prior factual findings without a reasoned explanation."[22]

The 2025 ROD selected Alternative B—the very alternative the agency previously found in the 2024 record would cause the "greatest impacts" to subsistence, recreation, and wilderness.[23] By re-adopting Alternative B without providing any "reasoned explanation" for why those impacts are no longer significant, the agency engaged in the exact type of "unexplained conflicting findings" that violates the APA.[24] Interior fails to cite to the record, because it cannot, for its "rationale to explain the disparate findings" as to why, given the impacts associated with Alternative B, those impacts are no longer significant.[25]

Additionally, as a backstop argument, Interior and Intervenor-Defendants argue that because Congress issued a joint resolution of disapproval under the Congressional Review Act ("CRA") nullifying the 2024 ROD, that decision must be "treated as though

---

[21] *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1141 n.110 (D. Alaska 2019) ("An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015)).

[22] *Id*.

[23] *See* Opening Brief at 24.

[24] *Organized Vill. of Kake*, 795 F.3d at 969.

[25] *Id.* (quoting *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010)). Instead, Interior merely cites to the 2025 ROD's determination that the 2025 ROD "is superior to the 2024 ROD as a matter of law" and that the 2024 ROD was "not sufficient to support the required 4 lease sales." Interior Br. at 39-40.

[it] had never taken effect."[26] Consequently, they argue that the 2024 ROD is a legal nullity, and the agency was under no obligation to explain its departure from a rule that legally never existed.[27] This argument confuses *legal nullification* of an agency rule with the *physical and scientific reality* of the administrative record. The agency cannot use a procedural CRA resolution as a legal shield to pretend its own documented scientific findings of environmental degradation in the record do not exist.[28]

The 2024 ROD contains "relevant data" that the agency is prohibited from disregarding. While the CRA joint resolution may have stripped the 2024 ROD of its *legal* force, it did not—and could not—erase the factual data, environmental analyses, and scientific findings compiled in the 2024 Supplemental Environmental Impact Statement ("SEIS").[29] Under the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action."[30] The findings in the 2024 record

---

[26] Interior Br. at 39-40 and n.8; North Slope Br. at 19; AIDEA Br. at 15 (citing 5 U.S.C. § 801(f) and Pub. L. No. 119-52, 139 Stat. 701 (2025)).

[27] *See* Interior Br. at 40 n.8; North Slope Br. at 19; AIDEA Br. at 15-16.

[28] In reviewing an agency's actions, the APA directs that courts must "review the whole record or those parts cited by a party." 5 U.S.C. § 706. The Supreme Court has interpreted this provision to mean that, in general, "the focal point for judicial review should be the administrative record already in existence[.]" *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

[29] *See* AR389255-391356 (2024 SEIS).

[30] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43

regarding the “greatest potential impact[s]” of Alternative B on caribou calving and subsistence remain “relevant data” that the agency is prohibited from ignoring.[31]

Indeed, Interior and Intervenor-Defendants’ position is entangled in a fatal contradiction. In this litigation, they claim the 2024 ROD is a legal non-entity that they have no obligation to explain a departure from.[32] Yet, in the administrative process, the Bureau of Land Management (“BLM”) issued a Determination of NEPA Adequacy (“DNA”) that explicitly states the 2024 SEIS data and analysis “remained valid” to support the new 2025 leasing decision.[33] The agency cannot have it both ways. If the 2024 SEIS is scientifically valid and current enough to support the 2025 ROD, then its findings—specifically, that Alternative B would cause the “greatest potential impact” to caribou and subsistence[34]—remain “relevant data” that the agency was required to examine and address under the APA.

[31] *Compare* AR389557 & AR389577 (concluding in the SEIS that Alternative D2, as compared to all other alternatives, would “have the least impacts” to the Porcupine Caribou Herd), *with* AR389572 (stating Alternative B “would result in the greatest potential impact on Porcupine Caribou calf survival and overall herd numbers”), *and* AR389588 (“Alternatives that allow the greatest amount of land to be developed and which have fewer timing and other restrictions would provide the greatest potential contribution to cumulative effects on subsistence uses and species. [...] thus, Alternative B would have the largest potential contribution to cumulative effects on subsistence uses[.]”).

[32] *See* Interior Br. at 39-40; North Slope Br. at 19; AIDEA Br. at 15-16.

[33] AR522066 (2025 DNA); Opening Brief at 18.

[34] *Supra* note 31.

### D. The Refuge Act Mandates a Written Compatibility Determination for the Leasing Program Uses, Which Has Not Been Waived by Congress.

Interior and Intervenor-Defendants argue that a compatibility determination under the Refuge Act was not required because the Leasing Program is a statutory "purpose" of the Arctic Refuge, not a "use."[35] Relying on *Tulelake Irrigation District v. U.S. Fish & Wildlife Service*[36] they argue that purposes and uses are mutually exclusive, and that a congressional leasing mandate automatically waives the compatibility requirement.[37] This is a mischaracterization of *Tulelake* and the Refuge Act.

In *Tulelake*, the Ninth Circuit held that even when a statute requires the Secretary to "continue the present pattern of leasing" (in that case, for agriculture), the actual agricultural activities remain "uses" subject to the compatibility requirements of the Refuge Act.[38] While the Tax Act established an oil and gas program as a purpose, the actual *activities* of oil and gas leasing, exploration, and development are "uses" of the Arctic Refuge that physically alter the environment. Indeed, the SEIS describes these uses as "major undertakings" that include conducting seismic operations; constructing ice roads and snow trails for transporting equipment and supplies for winter drilling of exploration wells; drilling exploration and delineation wells; constructing gravel pads, roads connecting production pads to main facilities, and landing strips; drilling

[35] Interior Br. at 36-37; North Slope Br. at 17; AIDEA Br. at 24.

[36] 40 F.4th 930 (9th Cir. 2022).

[37] Interior Br. at 36-37; North Slope Br. at 17-18; AIDEA Br. at 24-25.

[38] *Tulelake*, 40 F.4th at 936-37.

production and service wells; installing pipelines; and constructing oil and gas processing facilities.[39]

Furthermore, Congress was clear that the Tax Act did not waive the Refuge Act or any other environmental laws.[40] Under *Loper Bright*, this Court must apply its independent judgment to harmonize the statutes.[41] There is no irreconcilable conflict between the statutory mandate to lease and the compatibility requirement. A compatibility determination is the essential statutory mechanism through which the Secretary exercises his discretion, including which specific public lands to offer for leasing and under what timing limitations oil and gas activities can occur compatibly with other Refuge purposes.

## III. Interior Failed to Comply with Its Obligations to Consider and Protect Subsistence under ANILCA.

### A. The Record Clearly Demonstrates that Interior Excluded Communities from Its ANILCA Section 810 Evaluation.

Interior and Intervenor-Defendants' arguments that the agency's ANILCA section 810 evaluation did not exclude communities[42] are contrary to the record. Though Interior cites to the SEIS's general recognition of "the importance of the project area to caribou"

---

[39] AR390589.

[40] *See* Tax Act § 20001; 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) (statement of Sen. Murkowski); Opening Brief at 12, 22.

[41] *Loper Bright*, 603 U.S. at 392. *See, e.g.*, *Native Vill. of Hooper Bay*, 2026 WL 2409781, at *28-30 (court applying independent judgment for harmonizing the Refuge Act and ANILCA).

[42] Interior Br. at 50-51; North Slope Br. at 23-24; AIDEA Br. at 47-50.

and the potential impacts to 22 communities arising from "impacts related to caribou abundance or availability[,]"[43] the ANILCA section 810 evaluation clearly states that the agency evaluated potential impacts on subsistence uses and needs only for "residents of Kaktovik, Nuiqsut, Arctic Village, and Venetie."[44]

Further, analysis of potential impacts to subsistence for additional communities in the EIS and SEIS does not satisfy the agency's obligations under ANILCA section 810, as Interior and Intervenor-Defendants suggest.[45] ANILCA section 810 requires that the agency evaluate potential effects on subsistence uses and make specified findings.[46] Though North Slope Intervenor-Defendants allege that Interior's conclusions in the SEIS regarding "impacts or changes to migration and abundance" support a section 810 finding of no significant restriction on subsistence uses for communities,[47] Interior itself made no such findings. Rather, Interior's findings regarding significant restriction on subsistence uses are expressly limited to Kaktovik, Nuiqsut, Arctic Village, and Venetie.[48]

Interior and Intervenor-Defendants' arguments that the agency did not exclude

---

[43] Interior Br. at 50-51.

[44] AR390777 & AR390775; *see also* AR390776 (noting that the "Porcupine Caribou Herd-related discussion in this evaluation *focuses exclusively* . . . on subsistence use of them by these three communities [Kaktovik, Arctic Village, and Venetie].") (emphasis added); AR390796-97 (evaluating cumulative impacts "specifically, in the Kaktovik, Nuiqsut, Arctic Village, and Venetie subsistence use areas").

[45] Interior Br. at 50-51; North Slope Br. at 23-24; AIDEA Br. at 47-50.

[46] 16 U.S.C. § 3120(a); Opening Br. at 29-30.

[47] North Slope Br. at 24.

[48] AR390803.

communities are contrary to express statements and findings in the ANILCA section 810 evaluation. Interior's decision to exclude these communities is inconsistent with ANILCA's procedural requirements as well as its mandates to protect subsistence ways of life and provide a meaningful role for subsistence users in the management process.[49]

### B. Interior's Erroneous Interpretation of "Subsistence Uses" Excluded Culturally Important Subsistence Resources and Practices.

Interior's narrow interpretation of subsistence uses precluded meaningful consideration of culturally important subsistence resources and practices. Specifically, the focus of Interior's analysis remained on sufficient food supply at the exclusion of culturally important resources and practices. Though Interior included some analysis of waterfowl in its 2024 ANILCA section 810 evaluation,[50] the agency's flawed interpretation of subsistence uses persisted. For example, the agency continued to apply a threshold to exclude other "culturally important" subsistence resources that "do not comprise the majority of the wild foods consumed by residents of Kaktovik, Nuiqsut, Arctic Village, or Venetie."[51] This rationale is inconsistent with ANILCA's broad definition of subsistence uses, which extends beyond "consumption as food."[52]

---

[49] Opening Br. at 31-32.

[50] Interior Br. at 52 (citing AR390775).

[51] AR390775.

[52] 16 U.S.C. § 3113; Opening Br. at 33-34.

Interior also excluded culturally important practices, including sharing.[53] In contrast to Interior's assertion that the ANILCA section 810 evaluation "meaningfully addresses sharing," the evaluation itself merely acknowledges the existence of sharing networks and potential decreases in sharing.[54] There is no attempt to evaluate these impacts. Instead, Interior excluded communities from its ANILCA section 810 evaluation that the agency acknowledged may experience impacts through sharing networks.[55]

Interior's erroneously narrow interpretation of subsistence uses is contrary to ANILCA, precluding meaningful consideration of culturally important subsistence resources and practices, and in turn undermining the agency's findings of no significant restriction on subsistence uses.[56]

### C. Interior Erroneously Determined that the Leasing Program Would Not Significantly Restrict Subsistence Uses for Arctic Village and Venetie.

Interior did not specifically respond to the Tribes' argument that the agency made an erroneous determination that the Leasing Program would not significantly restrict subsistence uses for Arctic Village and Venetie. North Slope and AIDEA Intervenor-

---

[53] Opening Br. at 34.

[54] Interior Br. at 51 (citing AR390775 (recognizing residents of Venetie receive caribou through sharing); AR390776 (recognizing communities other than Kaktovik, Arctic Village, and Venetie "may experience indirect impacts through impacts on sharing networks"); AR390800 (recognizing Gwich'in communities other than Arctic Village and Venetie "could also experience impacts through a decline in harvests and sharing"); AR390803 (recognizing potential impacts to "communities outside the program area" through sharing networks); AR390806 (listing a reference with "sharing" in the title)).

[55] AR390776.

[56] Opening Br. at 33-34.

Defendants' arguments that Interior reasonably determined that the Leasing Program would not significantly restrict subsistence uses for Arctic Village and Venetie[57] are not supported by the relevant legal standards and the record.

The threshold to trigger a finding that a proposed activity "would significantly restrict subsistence uses" is "quite low."[58] AIDEA's reliance on *Center for Biological Diversity v. Bureau of Land Management* to establish a higher standard is misplaced. In that case, the Ninth Circuit did not address the appropriate standard to trigger a finding of significant restriction on subsistence uses.[59] Instead, as AIDEA noted, the Ninth Circuit discussed the standard as part of its overview of the ANILCA section 810 process.[60] The Ninth Circuit's choice to cite the language of the statute in its overview, rather than the "may significantly restrict" language in *Kunaknana v. Clark*[61] has no bearing on the question of the appropriate standard.[62]

---

[57] North Slope Br. at 25; AIDEA Br. at 52-55.

[58] *Sierra Club v. Penfold*, 664 F. Supp. 1299, 1307 (D. Alaska 1987), *aff'd* 857 F.2d 1307 (9th Cir. 1988); *see also Hanlon v. Barton*, 740 F. Supp. 1446, 1448-49 (D. Alaska 1988) (holding that a finding of significant restriction of subsistence uses is triggered by a "threat of significant restriction" and "such restriction need not be likely").

[59] 141 F.4th 976, 1003 (9th Cir. 2025) (addressing whether BLM adequately considered alternatives to reduce the use of lands needed for subsistence purposes).

[60] AIDEA Br. at 53 (citing *Ctr. for Biological Diversity*, 141 F.4th at 1004).

[61] *Ctr. for Biological Diversity*, 141 F.4th at 1004-1005 (citing *Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984) and 16 U.S.C. § 3120(a)(1)-(2)).

[62] The decision in *Center for Biological Diversity* does not purport to address the appropriate standard. 141 F.4th at 1003-1004. Nor could a three-judge panel overrule the existing precedent in *Kunaknana*, because there is no "'intervening higher authority' [that] is 'clearly irreconcilable' with the reasoning of that decision." *CoreCivic, Inc. v.*

Here, Interior's standard focusing on "large" adverse impacts that are "likely" is far more stringent than the appropriately lower threshold for triggering a finding of significant restriction on subsistence uses.[63] As a result Interior made the erroneous and unsupported conclusion that the Leasing Program would not significantly restrict subsistence uses for Arctic Village and Venetie despite its findings that the Leasing Program "would" or "could" affect the communities' subsistence.[64]

## IV. Interior Violated the NHPA.

### A. Interior Failed to Consider Effects on Landscape-Level Historic Properties.

Interior and Intervenor-Defendant AIDEA argue that the agency met its obligations under the National Historic Preservation Act ("NHPA") section 106 since the Leasing Program does not authorize specific activities capable of impacting historic properties.[65] This ignores Interior's failure to consider the program-wide impacts of the Leasing Program on the Sacred Place Where Life Begins and other potential landscape-level historic properties. Interior's failure to consider landscape-level historic properties precluded its consideration of alternatives or modifications that avoided, minimized, or

---

*Candide Grp., LLC*, 46 F.4th 1136, 1141 (9th Cir. 2022) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)).

[63] Opening Br. at 36.

[64] Opening Br. at 36 (citing AR389560; AR389566; AR389570; AR90471; AR90476; AR90479).

[65] Interior Br. at 54-55; AIDEA Br. at 59.

mitigated adverse effects to the Sacred Place Where Life Begins, and other potential landscape-level historic properties.[66]

The Advisory Council on Historic Preservation's ("ACHP") regulations governing phased identification and programmatic agreements provides "[t]he process should establish the likely presence of historic properties within the area of potential effects for each alternative . . . through background research, consultation and an appropriate level of field investigation[.]"[67] The regulations further provide that as "aspects or locations of an alternative are refined . . . the agency official shall proceed with the identification and evaluation of historic properties."[68]

Here, Interior sought to meet its obligations under NHPA section 106 through the implementation of a programmatic agreement based on its finding that it could not "fully determine effects on Historic Properties within the [area of potential effect] prior to approval[.]"[69] During the section 106 process and development of the programmatic agreement, the Tribes objected to this finding and Interior's rushed timeline.[70] The Tribes explained that this statement was both factually and legally incorrect, in part because the

[66] Opening Br. at 30-34; *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 787 (9th Cir. 2006) ("Similarly, later NHPA review cannot cure the earlier violation, because it did not deal with the question of whether the land should have been leased at all.").

[67] 36 C.F.R. § 800.4(b)(2).

[68] *Id.*

[69] AR28759; Interior Br. at 53-54.

[70] *See e.g.*, AR56041; AR22635-36; AR22368.

leasing program itself was a separate undertaking from any future development activities.[71] Thus, Interior was required to consider the direct, indirect, reasonably foreseeable, and cumulative effects of the entire leasing program, which would not be possible when conducting any section 106 processes for potential future activities.[72]

The Tribes repeatedly raised the harms that could arise from delayed identification, including adverse impacts to the Sacred Place Where Life Begins—a historic property of traditional religious and cultural significance to the Tribes—and failure to consider alternatives that could avoid, minimize, or mitigate such adverse impacts.[73] The Tribes also provided significant information to Interior, including extensive Traditional knowledge and transcripts of interviews the Tribes conducted with Elders and Knowledge Bearers to assist in identification of historic properties.[74] Yet, Interior did not address the Leasing Program's impacts on the Sacred Place Where Life Begins and other potential landscape-level historic properties.

### B. Interior Failed to Adequately Consult with the Tribes.

Interior failed to adequately consult with the Tribes during the NHPA section 106 process, including consultation with the Tribes in the identification of historic properties, evaluation of their National Register eligibility, assessment of adverse effects, and the

[71] AR22368.

[72] AR22368; *see also* Opening Br. at 39-40.

[73] AR20070-72; AR56055-62; AR378134-35; *see also* Opening Br. at 37-42.

[74] *See e.g.*, AR22738-831; AR378201-73.

resolution of adverse effects.[75] The Tribes repeatedly raised this failure with Interior throughout the development of the Leasing Program.[76]

Furthermore, the negotiation of a programmatic agreement "itself requires an extensive consultation process."[77] Interior asserts that it "engaged in significant consultation efforts" in developing the programmatic agreement, citing primarily to invitations to consult, meeting agendas and associated materials for two consulting parties meetings, and one citation to agency staff's notes from interviews held in Venetie.[78] However, the record reflects the limited opportunities to substantively engage on the programmatic agreement. As one glaring example, consulting parties received the draft programmatic agreement from Interior only the day before the single consulting parties meeting that included in-depth discussion on the programmatic agreement.[79] In developing the programmatic agreement Interior provided some opportunities for written

---

[75] Opening Br. at 42-45.

[76] *See e.g.*, AR20074-75; AR22635-37; AR84516-18.

[77] *See Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1110 (S.D. Cal. 2010) (citing 36 C.F.R. § 800.14(f)).

[78] Interior Br. at 55-56 (citing AR22261-314 (emails to consulting parties requesting information about cultural resources and inviting consultation); 31211-14 (emails between agency staff discussing outreach to the City of Kaktovik for consultation); 31875-78 (email to consulting parties with the agenda for the consulting parties meeting held in October 2018 and outline of programmatic agreement); 33513-18 (notes from agency staff on interviews held in Venetie); 33526-55 (email to consulting parties with the agenda for the consulting parties meeting held in March 2019 and draft programmatic agreement)).

[79] AR24210 (providing consulting parties with the draft programmatic agreement the day before the consulting parties meeting held in March 2019).

comments,[80] though the limited opportunities for substantive discussion regarding the agreement undermined meaningful engagement and precluded adequate consultation.

## V. Interior's Unlawful Interpretation of the 2,000-Acre Surface-Development Limitation is Ripe for Review.

The Tribes challenge Interior's unlawful interpretation of the Tax Act's 2,000-acre limitation on surface development contained in the 2020 and 2025 RODs. In determining whether an agency decision is ripe for judicial review, courts examine the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration."[81] Judicial review of an agency's decision does not "inappropriately interfere with further administrative action" when "the agency's decision is at an administrative resting place."[82]

Because the RODs "mark the consummation of the agency's decisionmaking process" and are decisions "from which legal consequences will flow," [83] Interior's erroneous and unlawful interpretation of the surface-development limitation is ripe for

[80] AR22358 (providing consulting parties with a draft outline and requesting comments "regarding the structure and content to ensure that when substantive drafting of the PA begins we are not missing any critical components"); AR24210 (requesting comments on draft programmatic agreement); AR21432 (requesting comments on "DRAFT Final Programmatic Agreement").

[81] *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

[82] *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 870 (9th Cir. 2022) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) and *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 977 (9th Cir. 2003)).

[83] *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted).

this Court's review. The Tribes' claims challenging Interior's interpretation of the surface-development limitation are not asking the Court to do the work of "the offices of the Department or the halls of Congress, where programmatic improvements are normally made."[84] Rather, the Tribes ask this Court to "interpret the act of Congress, in order to ascertain the rights of the parties."[85]

Interior attempts to frame its interpretation of the 2,000-acre surface-development limitation as an abstract policy that has yet to be formalized or acted upon in a concrete way by the agency.[86] Unlike the amorphous agency activity in *Lujan v. National Wildlife Federation* that Interior points to, the RODs are "identifiable agency action[s]" and not merely "the continuing and thus constantly changing operations" of the agency.[87] Here, no "further factual development would significantly advance [the Court's] ability to deal with the legal issues presented"[88] by Interior's plans for surface development in conjunction with the Leasing Program. Interior also has no "further consideration"[89] to do before it implements its faulty interpretation of the surface-development limitation, which would result in more of the Coastal Plain's surface being disturbed than allowed under

---

[84] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

[85] *Loper Bright Enters.*, 603 U.S. at 385 (quoting *Decatur v. Paulding*, 39 U.S. 497, 515 (1840)).

[86] Interior Br. at 41-44.

[87] *Nat'l Wildlife Fed'n*, 497 U.S. at 890 (internal parentheses omitted).

[88] *Ohio Forestry*, 523 U.S. at 737 (internal quotations omitted).

[89] *Id.* at 735.

the statute. Interior's erroneous interpretation of the surface-development limitation has not only been finalized through its inclusion in the RODs and underlying analysis, but the flawed interpretation is also the basis for the agency's plans to implement the entirety of the Leasing Program.

Withholding review at this stage also imperils the Tribes' interests. The core of the Tribes' claims challenging Interior's interpretation of the surface-development limitation is that Interior's faulty interpretation has resulted in a Leasing Program that stands to unnecessarily and unlawfully harm the Coastal Plain and thus also the Tribes' interests. Should Interior's interpretation be allowed to stand and development otherwise proceed, far more of the surface of the Coastal Plain will be impacted than Congress intended.[90] This unlawful overdevelopment of a place sacred to the Tribes would injure the Tribes and their citizens through harm to the land and the wildlife that depend on it.

The arguments raised by Intervenor-Defendants the State of Alaska and AIDEA about the plain meaning of the Tax Act further strengthen the Tribes' claims that Interior improperly interpreted the surface-development limitation.[91] The superfluity canon that AIDEA points to cuts against its argument that Congress intended to establish a requirement that 2,000 acres of surface development be authorized on the Coastal Plain. If Congress intended to require 2,000 acres of surface development, the relevant

---

[90] *See* Opening Br. at 49 n.182 (citing testimony of Sen. Murkowski discussing how the 2,000-acre limit will help prioritize the environment and local wildlife).

[91] *See* State Br. at 32-33; AIDEA Br. at 70-71.

provision of the Tax Act would simply direct the Secretary to authorize 2,000 acres to be covered by production and support facilities. This is not what Congress said, however, and Interior's preferred reading of the statute renders the term "up to" superfluous. The court in *Public Interest Legal Foundation, Inc. v. Nago*, a case AIDEA cites in support of its superfluity argument, notes that the appellant's interpretation of the statute at issue "disregards the limiting phrase" contained therein.[92] The court observed that if Congress desired a particular result, "it could have just said so."[93]

The same is true here. Interior and Intervenor-Defendants have proffered strained and tenuous readings of the surface-development limitation to justify the statutory interpretation errors underlying the Leasing Program. Congress chose to include the term "up to" in section 20001(c)(3) of the Tax Act to limit how much surface development the Secretary was to authorize on the Coastal Plain. Interior and the Intervenor-Defendants would like Congress to have required the Secretary to authorize no less than 2,000 acres of surface development on the Coastal Plain. But if that is what Congress wanted, "it could have said so in words far simpler than those that it wrote."[94]

---

[92] 174 F.4th 664, 679 (9th Cir. 2026).

[93] *Id.* at 681.

[94] *Biden v. Texas*, 597 U.S. 785, 798 (2022).

## VI. Interior Failed to Comply with Its Obligations under NEPA by Unlawfully Relying on a DNA and a Single Action Alternative.

### A. Significant New Circumstances Render Interior's Use of a DNA Unlawful.

While Interior summarily argues that its use of a DNA was allowed despite new circumstances,[95] North Slope and AIDEA Intervenor-Defendants more specifically argue that the 2025 ROD's expanded interpretation of the 2,000-acre surface-development limitation does not constitute a "new circumstance" because it is merely "general guidance" or a "legal interpretation" with no physical footprint,[96] and that the Council on Environmental Quality's ("CEQ") rescission of its regulations in February 2025 leaves the agency with absolute discretion.[97] These arguments mischaracterize NEPA's supplementation requirement and ignore that Interior failed to undertake any NEPA analysis supporting the 2025 ROD.

Supplementation is required when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

---

[95] *See* Interior Br. 47 (arguing in one paragraph that use of a DNA was allowed because no new information or unanalyzed effects warrant supplemental analysis).

[96] North Slope Br. at 35; AIDEA Br. at 67-69.

[97] AIDEA Br. at 62-63.

impacts."[98] First, the CEQ's rescission of its regulations does not alter this statutory mandate.[99]

Second, the 2025 ROD's expanded interpretation of the 2,000-acre surface-development limitation represents a dramatic, substantive shift in policy. The 2024 ROD concluded that the 2,000-acre limit was a development *maximum*[100] and relied on the BLM's finding in the 2024 SEIS that the 2,000-acre limitation would be met "regardless of reclamation of previously disturbed areas."[101] In contrast, the 2025 ROD treats it as a *floor* and *development minimum*,[102] adds exemptions for broad categories of facilities,[103] and allows reclaimed acreage to "free up" more acreage.[104] This expanded interpretation allows for vastly more physical surface disturbance and environmental degradation than what was analyzed under any previous EIS or SEIS.[105] For example, BLM developed the

---

98 *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989); *see also* 42 U.S.C. § 4336b(1) (limiting an agency's reliance on the analysis in a programmatic environmental document where "there are substantial new circumstances or information about the significance of adverse effects that bear on the analysis").

99 This commonsense point—that the executive branch cannot unilaterally modify a statute—was recognized by CEQ in its decision to rescind its NEPA regulations. CEQ, Removal of National Environmental Policy Act Implementing Regulations, 91 Fed. Reg. 618, 625 (Jan. 8, 2026) (providing "rescission of CEQ's regulations does not alter an agency's duty to comply with the statute").

100 AR519747.

101 AR389292.

102 AR522118; *see* Opening Brief at 46-47.

103 AR522118-20; *see* Opening Brief at 53.

104 AR522119; *see* Opening Brief at 49.

105 Opening Brief at 52-53.

development scenarios and "hypothetical projections"—the basis of the agency's analysis of impacts in the EIS and SEIS—based on the likely on-the-ground effects of the 2,000-acre limitation.[106] This new interpretation of the 2,000-acre limitation materially altered the potential impacts of alternatives and warrants new NEPA analysis.[107] The agency's attempt to dismiss the 2,000-acre limitation as "general guidance" to bypass NEPA must be rejected.

### B. The OBBBA Did Not Eliminate the Mandate to Analyze a Reasonable Range of Alternatives.

Interior contends that because the OBBBA mandated the selection of the 2020 ROD's terms and conditions, the agency was legally restricted to a single choice (Alternative B), and that considering only a single action alternative satisfies NEPA.[108] This argument misapplies Ninth Circuit precedent.

The precedent stating an agency satisfies NEPA when it considers only two alternatives—action and no action—is limited to narrow, site-specific projects where only one action is feasible.[109] For a massive, programmatic land-management action

[106] *See e.g.*, AR390596 (describing BLM's interpretation of the 2,000-acre limitation and explaining "[f]or the purposes of impact analysis, BLM employs that [SEIS] interpretation as an assumption in each of the action alternatives analyzed") and AR90778-79 (explaining the same in the EIS).

[107] *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) (holding that a DNA "cannot serve as a substitute" for a supplemental EA or EIS when new information is significant).

[108] Interior Br. at 46-47; *see also* North Slope Br. at 27-28; AIDEA Br. at 53-54.

[109] *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065-66 (9th Cir. 2023) (finding reasonable range of alternatives in a discrete project to thin excess trees from a national

governing 1.56 million acres, considering only a single action alternative is a per se violation of NEPA because it preordains the outcome and fails to foster "informed decisionmaking."[110] Even under the OBBBA, Interior retained meaningful discretion as to components of the program, such as the timing and location of lease activities.[111] By treating the OBBBA as a total waiver of its obligation to study "appropriate alternatives,"[112] the agency unlawfully narrowed its range of alternatives to predetermine a single outcome.[113]

---

forest despite considering only one action alternative, and distinguishing from *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850 (9th Cir. 2022), where an agency's consideration of three action alternatives violated NEPA in a programmatic approval of offshore well simulation treatments where the alternatives lacked meaningful difference).

[110] *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir.1982)).

[111] *Alaska Indus. Dev. & Export Auth. v. Biden*, 685 F. Supp. 3d 813, 835 (D. Alaska 2023) (concluding that "the Tax Act accords to DOI the discretion to implement the Program in a manner consistent with the Tax Act and consistent with ANILCA's purposes, which include environmental conservation along with the newly added purpose of the oil and gas program, and also consistent with other applicable federal laws, including NEPA"). OBBBA reference to the terms and conditions of the 2020 ROD does not negate that Interior had options available to better protect Refuge purposes. *See* AR519747 & AR519750 (2024 ROD explaining more limited Leasing Program in Alternative D2 best protects purposes).

[112] 42 U.S.C. § 4332(2)(C)(iii) (requiring reasonable range of alternatives); *id.* § 4332(2)(H) (requiring development of "appropriate alternatives"); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) (explaining that NEPA requires agencies to "study, develop, and describe appropriate alternatives").

[113] *Westlands*, 376 F.3d at 868.

## VII. Vacatur Remains an Appropriate Remedy.

In an attempt proactively head off the threat of vacatur, AIDEA seeks to justify any errors by Interior under the guise of Congressional direction.[114] Though Congress directed the development and implementation of the Leasing Program, nothing in the Tax Act nor the OBBBA shields Interior's actions from "the strong presumption that Congress intends judicial review of administrative action."[115] Courts have the authority "to award an appropriate remedy where an agency commits error or exceeds its statutory authority."[116]

In such instances where "a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA."[117] The "limited circumstances" in which a court retains "equitable discretion . . . to remand a decision without vacatur while the agency corrects its errors" [118] do not apply here. In determining whether to remand without vacatur, courts "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'"[119]

---

[114] *See* AIDEA Br. at 74 (arguing that "[a]gency actions that carry out specific Congressional direction cannot be 'errors'").

[115] *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986).

[116] *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 660 (9th Cir. 2022).

[117] *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025).

[118] *Id.* (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)).

[119] *Pollinator Stewardship Council*, 806 F.3d at 532 (quoting *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)).

Interior's errors here are not harmless—its errors "go to the fundamental illegality" of the Leasing Program.[120] Because Interior failed to comply with several laws that affect the management of the Arctic Refuge and its decision rests on faulty interpretations of several key statutes, Interior's errors "cannot be cured through further explanation on remand."[121] These "fundamental flaws" make it "unlikely that the same rule would be adopted on remand."[122] Finally, vacatur at this stage would have minimal disruptive consequences, as Interior has finished its development of the ROD, and on-the-ground activities on the Coastal Plain have "not yet commenced."[123]

**CONCLUSION**

For the foregoing reasons, the Court should grant the Tribes' Motion for Summary Judgment and vacate the challenged actions.

Respectfully submitted this 4th day of September 2026.

*/s/* Megan R. Condon
Megan R. Condon (AK Bar No. 1810096)
Mitchell Forbes (AK Bar No. 2402005)
NATIVE AMERICAN RIGHTS FUND

[120] *Native Vill. of Hooper Bay,* 2026 WL 2409781 at *32.

[121] *Id.*

[122] *Pollinator Stewardship Council*, 806 F.3d at 532.

[123] *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 805 (D. Alaska 2021).

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I certify that this brief contains 7,425 words, excluding the parts of the brief exempted by Local Civil Rule 7.4(a)(4), in compliance with the word limits requested in Plaintiffs' Motion for Leave to File Overlength Brief, filed concurrently with this brief.

*/s/* Megan R. Condon
Megan R. Condon (AK Bar No. 1810096)
NATIVE AMERICAN RIGHTS FUND

## CERTIFICATE OF SERVICE

I certify that on September 4, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Alaska by using the CM/ECF system.

*/s/* Megan R. Condon
Megan R. Condon (AK Bar No. 1810096)
NATIVE AMERICAN RIGHTS FUND